1   HEATHER E. WILLIAMS, Bar #122664
    Federal Defender
2   KARA R. OTTERVANGER
    Florida Bar No. 0112110
3   Assistant Federal Defender
    2300 Tulare Street, Suite 330
4   Fresno, California 93721-2226
    Telephone: (559) 487-5561
5   Kara_Ottervanger@fd.org

6   Counsel for Defendant
    CHARLES GEARHEART
7

8                   IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,          Case No. 6:23-mj-006-HBK

12              *Plaintiff,*
                                        **NOTICE OF MOTION AND MOTION TO**
13        vs.                           **DISMISS CHARGE UNDER THE SECOND**
                                        **AMENDMENT; MEMORANDUM OF**
14   CHARLES GEARHEART,                 **POINTS AND AUTHORITIES**

15              *Defendant,*            Date: November 14, 2023
                                        Time: 10:00 a.m.
16                                      Judge: Hon. Helena M. Barch-Kuchta

17

18   **TO: PHILLIP TALBERT, UNITED STATES ATTORNEY; JEFFREY SPIVAK AND**
     **CHAN HEE CHU, ASSISTANT UNITED STATES ATTORNEYS; AND SEAN**
19   **ANDERSON, YOSEMITE LEGAL OFFICER, COUNSEL FOR PLAINTIFF:**

20        **PLEASE TAKE NOTICE** that on November 14, 2023, or as soon thereafter as this matter

21   can be heard, in the Eastern District of California, before the Honorable Magistrate Judge Helena

22   Barch-Kutcha, defendant Charles Gearheart, through counsel Kara Ottervanger, will move this

23   Court for an order dismissing the firearms charge in this case.

24        This motion is made pursuant to the United States Constitution, including the Second

25   Amendment; Federal Rule of Criminal Procedure Rule 12(b); Eastern District of California Local

26   Rule 430.1; and all applicable statutes and case law.

27        //

28        //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This motion is supported by this Notice of Motion; the Memorandum of Points and Authorities; the record of this case; and such argument and further law and evidence as may be presented at the time of the hearing.

Respectfully submitted,

Dated:  September 25, 2023                    HEATHER E. WILLIAMS
                                               Federal Defender


                                               /s/  Kara R. Ottervanger
                                               KARA R. OTTERVANGER
                                               Assistant Federal Defender
                                               Attorney for Defendant
                                               CHARLES GEARHEART

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2    The Supreme Court's recent opinion in *New York State Rifle & Pistol Association,*

3 *Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marked a dramatic shift in Second Amendment law.

4 Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of

5 the government's interest in firearm regulation against the degree of infringement on the

6 challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts,

7 instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the

8 Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the

9 Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption,

10 the government must show that a challenged law "is consistent with the Nation's historical

11 tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is

12 demanding: a firearm regulation is consistent with American tradition only if similar

13 regulations were widespread and commonly accepted in the founding era, when the Second

14 Amendment was adopted.

15    Under the new framework mandated by *Bruen*, this Court should dismiss the firearms

16 charge against Defendant Charles Gearheart, which charges him with improper storage of a

17 loaded firearm in a vehicle within the boundaries of Yosemite National Park under 36 C.F.R.

18 § 2.4(g), incorporating California Penal Code 25610. Because possession of a loaded firearm

19 comes within the Second Amendment's "plain text," Mr. Geartheart's conduct is

20 presumptively protected. And the government will be unable to rebut that presumption. Bans

21 on possessing loaded firearms within a vehicle on public land, even land that was home to

22 government buildings, were alien to the generation that ratified the Second Amendment.

23    Therefore, the sole charge in this case must be dismissed.

24    **I.    Factual Background**

25    On the evening of June 12, 2023, Mr. Gearheart was approached while resting in the

26 back of his van by Ranger Dell Isola on suspicion of camping out of bounds. After providing

27 Ranger Dell Isola with identifying information, Mr. Gearheart stepped out of his vehicle, at

28 which time Ranger Dell Isola allegedly saw a water pipe. Ranger Dell Isola ultimately

1  advised Mr. Gearheart that the rangers were going to search his vehicle because of the water

2  pipe, which could be used for marijuana, despite Mr. Gearheart advising that he used it for

3  tobacco. It was at this time that the Rangers discovered that Mr. Gearheart had a loaded

4  firearm in the front passenger seat of the van. Mr. Gearheart was arrested for a violation of

5  36 CFR § 2.4 (g).[1]

6      **II.   Legal Background**

7          **a.   Before *Bruen*, lower courts assessed Second Amendment challenges by**
                **applying means-end scrutiny.**

8

9      The Second Amendment provides, "A well regulated Militia, being necessary to the

10  security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

11  U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second

12  Amendment codified a pre-existing individual right to possess and use firearms for lawful

13  purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the

14  historical background of the Second Amendment," including English history from the 1600s

15  through American independence, colonial law and practice leading up to and immediately

16  following 1791, and evidence of how the Second Amendment was interpreted in the century

17  after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation,

18  and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court

19  concluded the right protected by the Second Amendment is "not limited to the carrying of

20  arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to

21  keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore

22  struck down District of Columbia statutes that prohibited the possession of handguns in the

23  home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

24      Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s

25  "central holding": that "the Second Amendment protects a personal right to keep and bear

26  arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780

27

28  ----------
[1] Mr. Gearheart was also charged with 36 CFR § 2.35(b), possession of psylocibin mushrooms, and 36 CFR § 2.10, camping without a permit.

1    (2010). In holding that the Second Amendment applies against the states as well as the federal

2    government, the Court described the right to keep and bear arms as "fundamental

3    to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."

4    *Id.* at 767. And that right, the Court warned, should not be treated "as a second-class right,

5    subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at

6    780.

7         Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step

8    inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4.

9    The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling

10   within the scope of the Second Amendment's guarantee as historically understood." *United*

11   *States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if

12   the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate

13   form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim

14   implicated "the core right identified in *Heller*-the right of a law-abiding, responsible citizen

15   to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise,

16   intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the

17   governmental interest in firearm restrictions against the challenger's interest in exercising

18   his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir.

19   2016).

20            **b.  *Bruen* replaced means-end balancing with a test rooted solely in the**
              **Second Amendment's "text and history."**

21

22        The Supreme Court's recent opinion in *Bruen* disavowed the lower courts'

23   framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in

24   the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-

25   and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

26        That standard directs courts to begin by asking whether "the Second Amendment's

27   plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution

28   presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was

straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[2] Courts

---

[2] The Court reserved the question whether courts entertaining challenges to state statutes

1  may look to the tradition of firearms regulation "before . . . and even after the founding"

2  period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example,

3  that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the

4  [Second Amendment] right if linguistic or legal conventions changed in the intervening

5  years." *Id.* at 2136. Nor should courts "rely on an ancient practice that had become obsolete

6  in England at the time of the adoption of the Constitution and never was acted upon or

7  accepted in the colonies." *Id.*

8      Conversely, courts must "guard against giving postenactment history more weight

9  than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from

10  immediately after its ratification through the end of the 19th century represent[s] a critical

11  tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791,

12  the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized

13  in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took

14  place 75 years after the ratification of the Second Amendment, they do not provide as much

15  insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-

16  century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts

17  should therefore credit such history to the extent it provides "confirmation" of prior practice

18  with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-

19  ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of

20  the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in

21  original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text

22  controls.").

23      The Court in *Bruen* held that because New York could not point to a robust tradition

24  of regulations similar to the "proper cause" requirement, the state's statute violated the

25  Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate

26  a comprehensive scheme for evaluating historical evidence, but it did stake certain

27

28  _____

should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

1    guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases,"

2    the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

9    *Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a

10   particular regulation "to confront" "a perceived societal problem," but did not do so, then

11   that regulation is unconstitutional today).

12       In "other cases," challenged statutes will "implicat[e] unprecedented societal

13   concerns or dramatic technological changes," which "may require a more nuanced

14   approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the

15   same as those that preoccupied the Founders in 1791," the "historical inquiry that courts

16   must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to

17   use "analogical reasoning" when confronting "present-day firearm regulations" that "were

18   unimaginable at the founding"). Deciding "whether a historical regulation is a proper

19   analogue for a distinctly modern firearm regulation requires a determination of whether the

20   two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an

21   exhaustive survey of the features that render regulations relevantly similar under the Second

22   Amendment," but it did identify "at least two metrics: how and why the regulations burden

23   a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether

24   modern and historical regulations impose a comparable burden on the right of armed self-

25   defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are

26   *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in

27   original).

28       The Court also stressed the limits of reasoning by analogy:

> To be clear, analogical reasoning under the Second Amendment is neither a
> regulatory straightjacket nor a regulatory blank check. On the one hand, courts
> should not uphold every modern law that remotely resembles a historical
> analogue, because doing so risks endorsing outliers that our ancestors would
> never have accepted. On the other hand, analogical reasoning requires only
> that the government identify a well-established and representative
> historical *analogue*, not a historical *twin*. So even if a modern-day regulation
> is not a dead ringer for historical precursors, it still may be analogous enough
> to pass constitutional muster.

*Id.* (emphasis in original).

Whether based on "distinctly similar" precursors or merely "historical analogues,"

the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-

established and representative" historical analogue); *id.* at 2137 (explaining that "a

governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional

provision" *if* that practice "has been open, widespread, and unchallenged since the early days

of the Republic"). A handful of "outlier[]" statutes or cases from a small number of "outlier

jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed

"doubt," for instance, that statutes from only three of the original thirteen colonies would be

sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety

laws" that New York argued were precursors to its "proper cause" requirement, the Court

discounted two of those ten laws—which were closest to New York's—as unrepresentative.

*See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not

consider them determinative unless the historical record reveals the statutes were actually

enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence

that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government]

to show that [a statute] is consistent with this Nation's historical tradition of firearm

regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing]"

that its firearms regulation is part of the historical tradition that delimits the outer bounds of

the right to keep and bear arms." *Id.* at 2127, 2130; *see also, e.g.*, *id.* at 2141 n.11 ("But

again, because the Second Amendment's bare text covers petitioners' public carry, the

respondents here shoulder the burden of demonstrating that New York's proper-cause

1  requirement is consistent with the Second Amendment's text and historical scope.").

2  Consistent with "the principle of party presentation," courts are "entitled to decide a case

3  based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts

4  "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the

5  government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the

6  government to establish the relevant tradition of regulation.").

7  ### III.    Argument

8  The regulation underlying Mr. Gearheart's firearm charge, 36 C.F.R. § 2.4(g), makes it

9  illegal to "carry[] or possess[] a weapon" in violation of "applicable" law. The applicable state law

10  that Mr. Gearheart is charged with violating is California Penal Code (CPC) § 25610(a)(1), which

11  requires that a firearm within a "motor vehicle" must be "locked in the vehicle's trunk or in

12  a locked container in the vehicle." CPC § 25610, applied to federal lands via 36 C.F.R. §

13  2.4(g), violates Mr. Gearheart's Second Amendment rights to keep and bear arms. Under the

14  Second Amendment's "plain text," a prohibition on possession loaded firearms in a vehicle,

15  unless that firearm is locked and thus inaccessible for the duration of travel, is

16  "presumptively" unconstitutional. *Bruen*, 142 S. Ct. at 2126. The government will be unable to

17  rebut that presumption. There was no "historical tradition," as of 1791, of barring individuals from

18  possessing loaded firearms in their vehicles unless those weapons were locked and unusable.

19

20  **A. The Second Amendment presumptively protects Mr. Gearheart's right to carry a**
21  **loaded firearm in his vehicle on National Park land without having to lock it up.**

22  *Bruen* directs courts to begin the Second Amendment analysis by asking whether "the

23  Second Amendment's plain text covers an individual's conduct." *Id.* The answer to that

24  question in Mr. Gearheart's case is yes. The Second Amendment secures the right of "the

25  people" to "keep and bear arms." There can be no doubt that Mr. Gearheart is among "the

26  people" whom the Second Amendment protects. *See Heller*, 554 U.S. at 580 (noting that

27  "'the people' . . . unambiguously refers to *all* members of the political community, *not an*

28  *unspecified subset*" (emphasis added)); *Bruen*, 142 S. Ct. at 2156 ("The Second Amendment

1    guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain

2    reasonable, well-defined restrictions." (emphasis added)).

3           The right to "bear" arms "naturally encompasses public carry." 142 S. Ct. at 2134.

4    This meaning of "bear" is consistent with the "central component" of that right: "the Second

5    Amendment guarantees an individual right to possess and carry weapons in case of

6    confrontation, and confrontation can surely take place outside the home." *Id.* The Second

7    Amendment therefore extends to places outside the home, such as vehicles and roadways,

8    including those on National Park lands.

9           And, the Supreme Court has made clear that individual right to possess and use firearms

10    for lawful purposes like self-defense and hunting. *Heller,* 554 U.S. 570, 592, 599, 624 (2008);

11    *Chapman*, 666 F.3d 225-226; *Bruen*, 142 S. Ct. at 2134. Self-defense includes a reasonable

12    access to the arms. A law that requires the firearm to either be unloaded or stored in a locked

13    compartment unconstitutionally restricts the ability to defend oneself by adding burdensome,

14    time-consuming steps between perceiving a threat and being able to respond to it. The Ninth

15    Circuit has recognized that "without bullets, the right to bear arms would be meaningless."

16    *Jackson v. City of San Francisco*, 746 F.3d 953 (9th Cir. 2014) (abrogated on other grounds). Just

17    as a regulation "eliminating a person's ability to obtain or use ammunition could thereby make it

18    impossible to use firearms for their core purpose," *id*., so too does a regulation requiring that a gun

19    loaded with ammunition must be locked away when in transport.

20           In *Heller*, the Supreme Court determined that the District of Columbia's requirement "that

21    firearms in the home be rendered and kept inoperable at all times" made it "impossible for citizens

22    to use them for the core lawful purpose of self-defense and [was] hence unconstitutional." 554

23    U.S. 630. Later, *Bruen* made clear that "the Second Amendment guarantees an individual right to

24    possess and carry weapons in case of confrontation, and confrontation can surely take place outside

25    the home." 142 S. Ct. 2134. If a requirement that firearms *in the home* be inoperable is

26    unconstitutional as an infringement upon the core lawful purpose of self-defense in the event of a

27    confrontation, then surely a similar requirement that firearms *outside the home*—i.e. in a vehicle—

28    be either inoperable or locked away and thus inaccessible must also be an unconstitutional

1  infringement upon the core lawful purpose of self-defense.

2  **A. The Government will be unable to rebut the presumption that CPC § 25610**
3  **is unconstitutional.**

4  Because "the Second Amendment's plain text covers [the defendant's] conduct, the

5  Constitution presumptively protects that conduct." *Id.* at 2126. To rebut the presumption, the

6  government must establish that CPC § 25610 "is consistent with this Nation's historical

7  tradition of firearm regulation." *Id.* And this duty to collect and present historic analogues

8  falls to the parties, not the court. *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *8

9  (9th Cir. Sept. 7, 2023). The government will be unable to do so. "Courts in our sister circuits

10  have consistently recognized that the *Bruen* standard for identifying a closely analogous

11  historical regulation is a demanding one." *Id*.

12  Although it is not entirely clear, the "general societal problem" to which CPC § 25610

13  is addressed, *id.* at 2131, to the extent that it involves a threat posed by having readily

14  accessible loaded arms during travel, then the problem is one "that has persisted since the

15  18th century." *Id.* There is nothing about the addition of a gas- or electric- powered motor to

16  the means of transportation that would set the "societal problem" apart from those that would

17  be present during travel by horse, carriage, ship, or steam train. Black's Law Dictionary

18  defines "vehicle" as "*n.* (17c) **1.** An instrument of transportation or conveyance. **2.** Any

19  conveyance used in transporting passengers or things by land, water, or air." VEHICLE,

20  Black's Law Dictionary (11th ed. 2019). Motor vehicle is defined as "(1890) A wheeled

21  conveyance that does not run on rails and is self-propelled, esp. one powered by an internal-

22  combustion engine, a battery or fuel-cell, or a combination of these." *Id*.

23  The government, therefore, can rebut the presumption of unconstitutionality only by

24  showing a historical tradition of regulations "distinctly similar" to CPC § 25610, which

25  forbids possessing readily accessible, loaded firearms in vehicles. *Id.* Mr. Gearheart is

26  unaware of a tradition of firearm regulations, circa 1791, that "broadly prohibit[ed]" carrying

27  readily accessible, loaded firearms within a vehicle. *Id.* at 2138. As a result, the government

28  will be unable to overcome the presumption of unconstitutionality.

1

**B.  Conclusion**

2          The statute under which Mr. Gearheart is charged, California Penal Code § 25610,

3  applied to National Park land via 36 C.F.R. § 2.4(g), violates the Second Amendment as it

4  was understood in 1791. The Court should therefore dismiss this case.

5
                                            Respectfully submitted,
6

7
   Dated:  September 25, 2023            HEATHER E. WILLIAMS
8                                        Federal Defender

9
                                         */s/  Kara R. Ottervanger*
10                                       KARA R. OTTERVANGER
                                         Assistant Federal Defender
11                                       Attorney for Defendant
                                         CHARLES GEARHEART
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28