1  HEATHER E. WILLIAMS, Bar #122664
   Federal Defender
2  KARA R. OTTERVANGER
   Florida Bar No. 0112110
3  Assistant Federal Defender
   2300 Tulare Street, Suite 330
4  Fresno, California 93721-2226
   Telephone: (559) 487-5561
5  Kara_Ottervanger@fd.org

6  Counsel for Defendant
   CHARLES GEARHEART
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          Case No. 6:23-mj-006-HBK

12            *Plaintiff,*
                                       **REPLY TO GOVERNMENT'S OPPOSITION
13      vs.                            TO MOTION TO SUPPRESS**

14  CHARLES GEARHEART,                 Date: TBD
                                       Time: 10:00 a.m.
15            *Defendant,*             Judge: Hon. Helena M. Barch-Kuchta

16

17

18  **I.    The Search of Mr. Gearheart's vehicle was unconstitutional.**

19         **A. The tobacco smell from Mr. Gearheart's pipe defeats any probable
20         cause and renders the search unreasonable.**

21         The Government wants to have its cake and eat it too. While on the one hand extolling

22  Ranger Dell Isola's "training and experience" when it comes to his initial suspicion that Mr.

23  Gearheart's tobacco pipe could be used "to ingest marijuana," it then disregards Ranger Dell

24  Isola's determination that the very pipe he initially saw did in fact smell only of tobacco. In making

25  its argument that the pipe constituted probable cause to search the entirety of the van, the

26  Government overstates the facts and confuses the issue. There was no "odor of marijuana

27  emanating from the pipe," principally because the pipe was used for tobacco. The evidence here

28  shows that the pipe was used for tobacco, which defeated any probable cause that may have

1    existed, notwithstanding later contradictory assertions such as those by Ranger Blade. Moreover,

2    the use of the term "emanate" creates the misleading impression that the alleged odor of marijuana

3    was strong and readily apparent. *See* Opp. at 7, claiming that there was an "odor of marijuana

4    emanating from the pipe" followed by a citation to *U.S. v. Parker*, 919 F. Supp. 2d 1072 (E.D. Cal.

5    2013) (discussing an odor of marijuana emanating from a vehicle so strong it could be smelled

6    from the outside)). Ranger Dell Isola affirmatively asserted that there was *no* smell emanating

7    from the van or anywhere else. Def. Ex. 1 at 38:14. The only reasonable suspicion was from *seeing*

8    the pipe, *see* Def. Ex. 1 at 38:11, which he quickly concluded smelled only of tobacco after all.

9    Def. Ex. 1 at 39:33. Accordingly, the cases the government cite suggesting that a pipe gives

10    independent probable cause to search the van are inapposite, as any such probable cause was

11    extinguished the moment the pipe was confirmed to contain only tobacco. The Government

12    momentarily appears to acknowledge this logic, stating that the pipe was probable cause "until

13    Ranger Dell Isola's smell of the device." Opp. at 11. Later, however, the Government states that

14    Mr. Gearheart's "dishonest[]" "claims as to the use of the pipe for tobacco" was "further reason

15    for an intensive search of the vehicle." Opp. at 14. But Mr. Gearheart was not dishonest, as

16    evidenced by the fact that Ranger Dell Isola confirmed, based on his own training and experience,

17    that the pipe smelled like tobacco. Moreover, any alleged dishonesty was not known prior to the

18    search and could not have constituted probable cause.

19        There is no plausible way to reconcile the apparent distinct perceptions of rangers as to the

20    smell. This Court can assume, at the pleading stage, that rangers know the smell of marijuana and

21    tobacco. It appears from this discrepancy that one or more of the officers were not truthful. Mr.

22    Gearheart intends to prove at a hearing that Officer Dell Isola knows how tobacco smells and was

23    not dishonestly trying to help out Mr. Gearheart by lying about smelling tobacco in the pipe. Of

24    the rangers involved, Ranger Dell Isola has the least motive to be dishonest. This Court cannot

25    resolve this factual dispute or this credibility dispute without a hearing.

26        The Government does not dispute that, were this Court were to find as a matter of fact,

27    Ranger Dell Isola was truthful in concluding that the pipe smelled like tobacco, same would dispel

28    the suspicion initially raised by virtue of any notion that a water pipe could be associated with

*United States v. Charles Gearheart*                    2                    *Motion to Suppress*

marijuana use. *See, e.g., United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005) (probable cause for "possession of narcotics [was] dispelled" upon a negative sniff by a drug dog). Any probable cause from the tobacco pipe will be dispelled if this Court concludes that the pipe smelled like tobacco, and that Ranger Blade's self-serving assertions about smelling marijuana from the same pipe are not credible.

Mr. Gearheart advised the rangers that he had a rolled tobacco cigarette in my ashtray" and that he "smoke[s] tobacco out of [the pipe]." Def. Ex. 1 at 34:55. Although there was tobacco located in the front of the van that was thoroughly searched, the rangers did not make a note of that. Critically, the rangers did not even seize the pipe that led to the search. Gov. Ex. 1 at 8. This both eliminates the ability for its contents to be tested to show which ranger's smell was accurate and indicates that the rangers did not consider the pipe to be contraband.

The Government uses the fact that Mr. Gearheart fainted during the search of his person as further support for the illegal search of his van, stating that this "suggest[s] consumption of illicit substances." Opp. at 7, n.6. Notwithstanding the fact that the Government provides no support for that assumption, it further demonstrates the bias that the rangers exhibited toward Mr. Gearheart. That their first conclusion when someone has a medical incident is that they must be a drug user is telling, especially in the face of evidence showing that Mr. Gearheart provided the rangers with credible medical reasons for his fainting. *See, e.g.* Def. Ex. 1 at 6:38 ("I feel like my blood sugar is like a little bit low"); at 9:05 ("I was about to go to sleep in there and I didn't really have anything to eat today"); at 15:32 (advising Ranger Hesse he has a history of at least one seizure); at 16:40 (Ranger Hesse suggesting he woke up and stood up too quick, causing light-headedness); at 27:45 (paramedic confirming the same thing would have happened to him in this situation).

### B. The prolonged detention without additional suspicion renders the ensuing search unreasonable.

With respect to the elongation of the traffic stop, the Government agrees that any "measurable" extension of a traffic stop, including by virtue of the added time it takes an to engage in questioning outside the scope of the initial mission of the stop, renders the prolonged detention unreasonable within the meaning of the Fourth Amendment absent independent reasonable

1    suspicion justifying such "measurable" extension. Opp. at 8-9 (citing *Arizona v. Johnson,* 555 U.S.

2    323, 333 (2009) and *U.S. v Taylor*, 60 F.4th 1237, 1239 (9th Cir. 2023), pet. for certiorari filed,

3    23-10377 (U.S. Oct. 5, 2023)).

4    　　　　But the Government does not mention the seminal U.S. Supreme Court case that

5    established the Fourth Amendment rule against prolonged traffic stops, *Rodriguez v. United States*,

6    575 U.S. 348 (2015). Relevant to this case, *Rodriguez* delineated what inquiries may be done by

7    law enforcement in routine stops without additional reasonable suspicion. As seven justices

8    acknowledged, such routine inquiries are "checking the driver's license, determining whether there

9    are outstanding warrants against the driver, and inspecting the automobile's registration and proof

10   of insurance." (*Rodriguez*, 578 U.S. at 355 (maj. op. of Ginsburg, J., joined by Roberts, C.J. and

11   Scalia, Breyer, Sotomayor, and Kagan, JJ.) (citing *Delaware v. Prouse*, 440 U.S. 648, 658–660

12   (1979) and 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507–517 (5th ed. 2012)); *see also id*. at

13   372 n.2 (Alito, J., dissenting) (same)). *Rodriguez* explained that these "ordinary inquiries" are

14   allowed due to their "close connection to roadway safety," *id.* at 356, and because they may be

15   conducted without measurably prolonging the stop. *Rodriguez* specifically contrasted these

16   inquiries from "drug" investigations or other questions that advance an officer's "endeavor to

17   detect crime in general," which are beyond a traffic stop's mission. *Id.* at 357. If such "unrelated

18   checks" are executed in a way that prolongs the stop, the stop will be unreasonable. *Id*. at 355

19   (citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005)).

20   　　　　The Government relies on *Taylor*, 60 F.4th at 1238-41, but *Taylor* is not dispositive of the

21   issue in this case. There, Taylor was a known probationer driving without registration tags and on

22   active federal supervision for being a felon in possession of a firearm. In *Taylor*, the district court

23   and the Ninth Circuit held that this—together with the fact that Taylor had an empty bag commonly

24   used by people in the area to hold firearms—gave reasonable suspicion to extend the traffic stop

25   and pat Taylor down for weapons without his consent. *Id*. at 1242-43. Because there was this

26   independent reasonable suspicion, the Court's statement concerning routine questions about

27   firearms was no more than dicta. *Compare*, *Rodriguez*, 578 U.S. at 355. The extension of the traffic

28

1    stop in *Taylor* is presently before the United States Supreme Court.[1]

2         *Taylor* also does not help the Government on the measurable-extension question because

3    questions about weapons in that case appear to have been asked without any prolonging. The Ninth

4    Circuit has made clear that extraneous questions that prolong a stop by fewer than 30 seconds still

5    require independent suspicion. *See United States v. Nault*, 41 F.4th 1073, 1078 (9th Cir. 2022)

6    (citing *United States v. Clark*, 902 F.3d 404, 410–11 (3d Cir. 2018) (twenty seconds of questioning

7    about criminal history)); *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir. 2022) (en banc)

8    (twenty-five seconds of questioning about contraband.)). The Ninth Circuit has also separately

9    held that, after *Rodriguez*, such questions may not add "any time" to a stop. *United States v.*

10   *Landeros*, 913 F.3d 862, 867 (9th Cir. 2019). The questions in *Taylor*, however, did not extend the

11   stop in so far as they caused no greater delay than the time it took for them to be uttered, which

12   was "in the same breath" as other questions from the officer. *Taylor*, 60 F.4th at 1239. Because the

13   weapons question in the present case added measurable time to the interaction, even if a matter of

14   seconds or minutes, those questions needed to have been justified with separate reasonable

15   suspicion. The Government does not argue that any of the rangers had reasonable suspicion that

16   there was a weapon in Mr. Gearheart's van—the only basis for the search was the pipe.

17        Additionally, in this case, the officers asked questions related to weapons separate from

18   their initial *Rodriguez*-sanctioned questions (i.e., about having a driver's license), about one minute

19   later. *See*, Def. Ex. 1 at 00:00-3:00. Under *Landeros*, and unlike the "same breath" questions in

20

21   _____

22   [1] The Government also asserts that the rangers could have ordered Mr. Gearheart out of the vehicle without unreasonably prolonging the traffic stop. Opp. at 9. The Government relies on *Taylor*'s holding that ordering an individual to exit the vehicle is within the mission of a traffic stop. Opp.

23   at 9 (citing *Taylor*, 60 F.4th at 1241 and *U.S. v. Moore*, No. 22-30009, 2023 WL 6937414, at *2 (9th Cir. Oct. 20, 2023)). Although Mr. Gearheart does not rely on the delay from his voluntary

24   exit of the vehicle, this gratuitous point reflects the disputed validity of the *Taylor* case more broadly. This aspect of *Taylor* is contrary to the limitation set forth by the Supreme Court in

25   *Rodriguez*—the case the Government ignores—as acknowledged by contrary authority in the Eleventh and Sixth Circuit. *See Baxter v. Roberts*, 54 F.4th 1241, 1262 (11th Cir. 2022); *U.S. v.*

26   *Whitley*, 34 F.4th 522, 532 (6th Cir. 2022) (holding that a directive to exit the vehicle is not within the inherent scope of a traffic stop after *Rodriguez*). The Solicitor General has obtained multiple

27   extensions to respond to this controversial aspect of *Taylor* with a brief in opposition currently due on January 10, 2023. *See* Order granting extension of time, *Taylor v. U.S.,* No. 23-5373 (U.S. Dec.

28   1, 2023).

1    *Taylor*, Ranger Dell Isola's query about weapons contravened the *Rodriguez* rule that such

2    questions cannot add "any time" to the interaction. *Landeros*, 913 F.3d at 867.[2]

3    Putting aside the delay from the gun-related questions, this Court cannot conclude that the

4    two minutes spent listening to radio traffic is automatically reasonable without a hearing into the

5    purpose and reason for this delay. The Government bears the burden of justifying the warrantless

6    Fourth Amendment seizure, and would need to establish that such delay was genuinely tethered to

7    the mission of the camping-based stop, and not incident to a fishing expedition into Mr. Gearheart's

8    possible other crimes without added justification.

9    The Government next asks this Court to accept that though "Ranger Dell Isola immediately

10   redirected the stop towards the out-of-bounds camping issue" it was not an unconstitutional

11   extension of the stop for other rangers[3] to override him by smelling the pipe and interrupting

12   Ranger Dell Isola "before [he] could finalize that issue." Opp at. 11. This very clearly demonstrates

13   that the purpose of the traffic stop—camping out of bounds—was unlawfully extended by the

14   search of the vehicle based only on the other rangers' bias against Mr. Gearheart.

15   In arguing that "federal prosecutors may pursue simple possession charges in certain

16   cases," the Government is careful not to contend that this would ever be such a case. That is

17   because it is not.[4]

18

---

19   [2] The Government derides Mr. Gearheart for relying on "an unpublished opinion" for his
     contention about unlawful extension of traffic stop. *See* Opp. at 8. The Government is referring to
20   *United States v. Williams,* No. 22-10052, 2023 WL 5925893 (9th Cir. Sept. 12, 2023), which is
     persuasive authority in this case and is newer than *Taylor*. Moreover, as Mr. Gearheart's motion
21   points out, *Williams* relies exclusively on published cases, such as the above-noted *Landeros*.

22   [3] One of those rangers is Ranger Stephany Hesse, who, despite assuring Mr. Gearheart that she
     was only questioning him about drugs and alcohol for the purpose of rendering proper medical
23   care, later involved herself in the law-enforcement aspect of the encounter by smelling the pipe
     and assisting with the search and evidence collection. *See* Opp. at 3; Def. Ex. 1 at 17:00 (Ranger
24   Hesse to Mr. Gearheart: "So, I'm going to ask you, in an EMT setting, not a police setting . . .");
     *id.* at 32:30 (Ranger Blade advising Ranger Dell Isola, with respect to Ranger Hesse, "So, I would
25   treat her, because now she's like EMT, right? She's assumed that role. Not as law enforcement.").
     Ranger Zavesky also advised that he was moving into "an EMS capacity" (*See* Opp. at 3; Gov. Ex.
26   3 at 12:23), but later participated in the search of the vehicle.

27   [4] As for the characterization of Mr. Gearheart's argument regarding marijuana as "nonsensical"
     and "a series of imagined subjective views," the Government responds to an argument that Mr.
28   Gearheart never made. Opp. at 12. Mr. Gearheart did not discuss marijuana in a home, nor did he
     claim that rangers must "accept the contention of those being investigated without any

---

1

### C.  The DOJ Policy Against Criminal Enforcement of Marijuana Possession in National Parks Renders the Marijuana-Based Search Unreasonable.

2

3    The de-facto decriminalization of marijuana possession in Yosemite provides an

4    independent basis for rejecting the search based on suspicion of possession of marijuana. The

5    Government cites *United States v. Chelgren*, 2010 WL 3210839, at *4 (E.D. Cal. Aug. 10, 2010)

6    for the proposition that the "smell [of burnt marijuana] alone established probable cause to search

7    the interior of the car." Opp. at 11. Mr. Gearheart does not dispute the common-sense rule that the

8    smell of illegal contraband provides probable cause that such contraband may be present. *See, e.g.*,

9    LaFave, et al., Search And Seizure: A Treatise On The Fourth Amendment, § 3.6(b) at nn. 33-36

10   (collecting authorities).

11   But neither *Chelgren* nor the other authorities on this issue address the unique situation of

12   decriminalization through an act of discretion. This distinction is no trifle. As the leading Fourth

13   Amendment treatise notes, in cases where possession or use of marijuana serves as probable cause,

14   it has generally been the case that such possession or use was a violation of applicable criminal

15   law—without any exceptions or qualifications. LaFave, *supra*, § 3.6(b). On the other hand, where

16   marijuana "possession has been made noncriminal" then the scent of marijuana "that would

17   otherwise suffice as establishing probable cause to . . . search for criminal possession of marijuana

18   may be deemed inadequate." *Id*.; *see generally* Kreit, Marijuana Legalization and Pretextual Stops,

19   50 U.C. Davis L.Rev. 741 (2016). To this end, when marijuana possession is an infraction—i.e. is

20   not fully legalized—probable cause of marijuana possession does not provide authorization to

21   search, even where under that jurisdiction's limited decriminalization scheme, "any quantity of

22   marijuana is 'contraband' and is subject to seizure." *Commonwealth v. Sheridan*, 25 N.E.3d 875

23   (Mass. 2015); accord *Commonwealth v. Daniel*, 985 N.E.2d 843 (Mass. 2013) (at a traffic stop,

24   the smell of marijuana is insufficient probable cause to search the vehicle because the officer

25   cannot tell from the smell whether the amount of marijuana possessed is of a criminal quantity, as

26   opposed to only enough to warrant an infraction); *Lewis v. State*, 233 A.3d 86 (Md. 2020) (given

27   this type of legal landscape, "the odor of marijuana, without more does not provide law

28

investigation." *Id*.

*United States v. Charles Gearheart*                          7                          *Motion to Suppress.*

1    enforcement officers with the requisite probable cause."). The decriminalization schemes at issue

2    in these cases—where marijuana is not fully legal—are analogous here to the existing policy

3    against enforcing simple possession of marijuana; in each case marijuana *could* be a crime under

4    certain circumstances but that alone is not enough to give rise to probable cause to search a vehicle.

5    Finally, the implication of the Government's proposition—that the DOJ policy has no

6    bearing on search and seizure—would have far-reaching consequences. To adopt this position

7    would authorize searches for marijuana possession in every state, even on state land, because

8    marijuana remains illegal under federal law even as applied to state lands. The Cole Memorandum[5]

9    entails the exact same type of executive discretion; the federal government announced its intent

10   to, by and large, decline to pursue federal prosecutions of marijuana offenses where possession

11   and use complies with state law. If the 2022 Presidential Proclamation[6] is construed as so toothless

12   to authorize searches on federal lands based on suspicion of simple possession of marijuana, there

13   is no principled basis stopping searches of all marijuana dispensaries in states that allow

14   recreational or medicinal marijuana, regardless of the legality of those dispensaries under state

15   law. Just as federal authorities have no blank check to search California marijuana dispensaries

16   that necessarily violate federal law—due to the Cole Memorandum discretion—the rangers in this

17   case lacked authority to search Mr. Gearheart's van.

18

19   [5] *See* Former Deputy Attorney General James Cole's Memorandum to U.S. Attorneys, issued on
     August 29, 2013, at https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf
20   (noting that this non-prosecution policy is "intended solely as a guide to the exercise of
     investigative and prosecutorial discretion" and in no way alters the "authority to enforce federal
21   law, including federal laws relating to marijuana, regardless of state law.").

22   [6] President Biden has doubled down on these efforts, most recently by issuing a second Presidential
     Proclamation, pardoning people convicted of simple possession or use of marijuana on federal
23   property. *See* A Proclamation on Granting Pardon for the Offense of Simple Possession of
     Marijuana, Attempted Simple Possession of Marijuana, or Use of Marijuana, issued December 22,
24   2023, pardoning, *inter alia*, convictions under 36 C.F.R. 2.35 (b)2); 36 C.F.R. 1002.35(b)(2); 36
     C.F.R. 1280.16(a)(1); 36 C.F.R. 702.6(b), available at https://www.whitehouse.gov/briefing-
25   room/presidential-actions/2023/12/22/a-proclamation-on-granting-pardon-for-the-offense-of-
     simple-possession-of-marijuana-attempted-simple-possession-of-marijuana-or-use-of-
26   marijuana/.; *see also* "Biden expands pardons for marijuana possession and grants clemency to
     11," by Deepa Shivaram, NPR, December 22, 2023 (quoting President Biden as stating that "no
27   one should be in a federal prison solely due to the use or possession of marijuana.") available
     at     https://www.npr.org/2023/12/22/1221230390/biden-pardons-clemency-marijuana-drug-
28   offenses.

**II.      Mr. Gearheart's statements prior to being Mirandized should be suppressed.**

The Government's complaint about Mr. Gearheart not specifically identifying which statements he seeks to suppress is meritless due to the Government's own misconduct in disclosing evidence to the defense. The Government failed to comply with this Court's order to provide discovery to the defense within 14 days, [Doc. 2], but now asserts that it is Mr. Gearheart who has "fully abdicated" his responsibility. Opp. at 14. Because this encounter lasted for over two hours— not including time spent transporting Mr. Gearheart, cataloguing evidence, etc.—and because there were at least eight rangers on scene for the majority of that time, there are over a dozen hours of body-worn camera video pertaining to this law enforcement encounter. Seven hours of video were provided within the 14 days. Two hours of video were provided on August 12, 2023, well after the 14-day deadline. Another three hours was provided on September 21, 2023, mere days before the motion deadline in this case (which had been extended from an initial deadline of September 18, 2023). Yet another two-plus-hours of video were produced on October 3, 2023, after Mr. Gearheart's motion was filed.

Mr. Gearheart specifically identified this concern in his Motion to Suppress, acknowledging that it was likely that he would need to supplement or amend the claims with additional information once the entire picture became clear. (Mot. at 2, n.1). The Government claims that everything has now been provided, but there are holes in some of the Ranger's body-worn camera footage that the Government does not explain. And, the Government attached a report to its Opposition that has still not been produced to the defense, which reveals that further videos may exist that also have not been produced. *See* Gov. Opp. 1 at 8. It is reasonable for Mr. Gearheart to preserve an issue of such magnitude while awaiting additional discovery from the Government. Mr. Gearheart has no objection if this Court wishes to defer ruling on the *Miranda* issue until the Government identifies what, if any, statements of Mr. Gearheart it seeks to introduce.

The available discovery, however, sufficiently shows that Mr. Gearheart was in custody for purposes of *Miranda.* The Government contends that the fact that Ranger Dell Isola approached the vehicle, which serves as Mr. Gearheart's home, and in which he was preparing to sleep that evening, weighs against custody because Mr. Gearheart was not "summoned." Opp. at 16. The

1   suggestion that approaching a place where someone lives and sleeps—at nearly midnight—and

2   asking to question (and search) them is somehow less invasive or indicative of custody than being

3   summoned from afar boggles the mind. *Cf. United States v. Jerez* (7th Cir. 1997) 108 F.3d 684,

4   690 (warrantless night-time intrusions by law enforcement at a person's residence render the

5   resident particularly "vulnerable" and thus "must be examined with the greatest of caution.").

6           The Government also asserts that Mr. Gearheart was not in custody because he was

7   detained "on a public turnout in a public park." Opp. at 16. This fails to account for the fact that

8   the detention took place between approximately 11pm-1am, and for the duration of the two-plus-

9   hour long encounter there is not another non-law-enforcement person seen. The only light came

10  from the headlights and flashing lights of the numerous Ford Escape vehicles that were present

11  and running, blocking Mr. Gearheart in the turnout. Mr. Gearheart was alone, outnumbered 8-to-

12  1 by law-enforcement rangers, all of whom were armed. Had Mr. Gearheart attempted to leave,

13  any number of them could have pursued him.

14          The Government states that "the number of occupants in the vehicle justified the presence

15  of up to eight officers." Opp. at 19. Apparently in support of this contention, the Government states

16  that "unlike a typical traffic stop, this one" involved Mr. Gearheart's dog. This proposed

17  justification for the presence of eight rangers does not make Mr. Gearheart any less in custody.

18  The only way this justification could possibly further the Government's argument is if the rangers

19  had communicated this need for additional rangers to Mr. Gearheart in order to make the

20  environment feel less coercive. But, there is no exception to *Miranda* if the reason you are in

21  custody is "reasonable" based on a circumstance such as a large dog.

22          Importantly, this post-hoc justification appears fabricated by the Government, as the

23  rangers never said anything about this to Mr. Gearheart. The Government uses several adjectives

24  for the dog, including large, unfriendly, and dangerous. Opp. at 2, 3, 10, 17, and 19. On the

25  contrary, the available discovery reveals that the dog caused no problems whatsoever for the

26  rangers. The rangers handled this dog without incident when they decided to arrest Mr. Gearheart,

27  had the dog placed in a patrol car (Def. Ex. at 1:27:14, at 1:30:40-1:33:07), and dropped the dog

28  off at the Mariposa County Shelter (a representative of whom came to the jail to inform Mr.

1    Gearheart that the dog would be put down within 3 days). Ranger Blade even confirmed that "the

2    dog is not that big of a concern" and that it "seems friendly." Def. Ex. 1 at 21:36, at 1:25:18; *see*

3    *also id.* at 1:36:06 (Ranger Terry: "your dog seems pretty cool with us so far."); *and* Gov. Ex. 3 at

4    17:53 (Ranger Blade: "it didn't bark or anything"), at 1:24:00 (Ranger Blade: "it hasn't done

5    anything mean to us. It's been actually really, really docile . . . it hasn't even growled at us.").

6          The Government's proposed justification is further belied by statements made by the

7    rangers on scene. Ranger Blade asserted that there was no need for this many rangers. Gov. Ex. 3

8    at 17:13 (in response to Ranger Rippetoe suggesting that they "start peeling some people off,"

9    advising that "everyone, essentially" could leave except Rangers Blade, Dell Isola, and "maybe

10   one" more), at 34:00 (Ranger Blade, advising that it "doesn't matter either way" whether the

11   additional rangers stay). At bottom, the large police presence was unjustified and had the effect of

12   creating a coercive environment.

13         As further evidence that he was in custody, Mr. Gearheart's movements were

14   unquestionably restricted, even after the search of his person was completed. *See e.g.* Def. Ex. 1

15   at 34:11 (Ranger Dell Isola: "come over here and just stand right in front of my vehicle"); at 45:20

16   (Ranger Dell Isola: "you're going to go right over there where my flashlight is."), at 47:01 (Ranger

17   Dell Isola: "head right over to this log and just have a seat there."), at 1:30:40-1:33:07 (Ranger

18   Dell Isola instructing him to stand, where to walk, and what to do with the dog).

19         Finally, the numerous statements made by the rangers themselves demonstrate that Mr.

20   Gearheart was in custody and not free to leave, as it was their intention to arrest him far before he

21   was told he was under arrest. *See, e.g.*, Gov. Ex. 3 at 23:24 (Ranger Blade: advising that they can

22   keep the dog overnight "if we decide that the correct course of action is potentially like a UAA

23   charge or an arrest."), at 31:12-32:07 (Ranger Blade: stating that if they can't arrest him for DUI,

24   they "can still change that direction" by finding something "compelling" in the van after they

25   search it that could lead to an arrest), at 1:00:00 (Ranger Blade: "this is probably going to get him

26   arrested"), at 1:01:40 (Ranger Blade: beginning the process of calling Ranger Christopher Cassling

27   because Mr. Gearheart is "probably not going to stay here tonight"), at 1:04:42 (Ranger Blade:

28   "essentially what I'm getting at is we're probably looking at some sort of arrest tonight."), at

1:21:12 (Ranger Blade: advising Ranger Cassling they are going to take him to Mariposa jail and charge him with "all of the above" except possession with the intent to distribute); Def. Ex. 1 at 57:38 (Ranger Blade: "this is probably going to be an arrest."), at 1:00:04 (Ranger Blade: "they're looking at an arrest for something . . . the bottom line is we can arrest him . . . and come back and do a criminal complaint and figure out what it's going to be for. It's not really important, but it's going to be probably for something."), at 1:24:03 (Ranger Blade: "my recommendation would be to arrest him on misdemeanor charges.").

### III.    Conclusion and Request for Evidentiary Hearing.

Based on the foregoing, and the reasons outlined in Mr. Gearheart's Motion to Suppress, this Court should find that the search of Mr. Gearheart's van was unconstitutional in violation of his Fourth Amendment rights, and that any contraband found within the vehicle should be suppressed under the exclusionary rule. This Court should also find that Mr. Gearheart's statements made regarding drugs or guns in the vehicles in response to the rangers' questioning— which were beyond the scope of the traffic stop—should be suppressed as obtained in violation of his Fifth Amendment rights. Mr. Gearheart respectfully renews his request for an evidentiary hearing in this matter, to occur after this Court has ruled on Mr. Gearheart's pending Motion to Dismiss. Mr. Gearheart expects the evidentiary hearing to last between 3-6 hours for testimony and argument.

Respectfully submitted,

Dated:  December 22, 2023                    HEATHER E. WILLIAMS
                                             Federal Defender


                                             /s/  Kara R. Ottervanger
                                             KARA R. OTTERVANGER
                                             Assistant Federal Defender
                                             Attorney for Defendant
                                             CHARLES GEARHEART