UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES EDWARD GEARHEART, JR,<br><br>Defendant | Case No. 6:23-mj-00006-HBK-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS[1]<br><br>(Doc. No. 9) |

Pending before the Court is Defendant Charles Edward Gearheart Jr.'s ("Defendant" or "Gearheart") Motion to Dismiss Charge Under the Second Amendment. (Doc. No. 9, "Motion"). Gearheart was charged in a three count Criminal Complaint of: (1) camping outside designated sites or areas in violation of 36 C.F.R § 2.10(b)(10); (2) carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation in violation of 36 C.F.R. § 2.4(c); and (3) possessing a controlled substance – psilocybin mushrooms (111.3 grams) in violation of 36 C.F.R. § 2.35(b), stemming from an incident that occurred on June 12, 2023 in the Michaels Ledges area of Yosemite National Park. (*See* Doc. No. 1). Represented by the Federal Public Defender, Gearhart seeks dismissal of Count 2 of the Complaint, the 36 C.F.R. § 2.4(c) charge,[2]

---

[1] This motion was referred by the district court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(a).

[2] Gearheart's Motion initially challenges 36 C.F.R. § 2.4(g), a related statute, which he is charged with violating in case no. 6:23-po-00079-HBK. As the Government's Opposition points out, and Gearheart

on the grounds that the regulation violates the Second Amendment.  (*See generally* Doc. No. 9).  The Government filed an Opposition (Doc. No. 12) and Gearheart filed a Reply (Doc. No. 13).  On January 12, 2024, the Court heard oral argument on the Motion.  The Court denies the Motion.

**BACKGROUND**

The facts in this case are limited to those set forth in the probable cause statement in support of the Complaint.  While on patrol at 2300 hours on the evening of June 12, 2023, Yosemite National Park Ranger Christopher Dell Isola observed a van that had foil shades covering the windows and approached it on suspicion of camping out of bounds.  (Doc. No. 1 at 1).  Ranger Della Isola made contact with Gearheart, who provided identification and advised he was in Yosemite for a court hearing concerning an improperly stored firearm charge arising from a January 4, 2023 incident.  (*Id*. at 2).  As Gearheart stepped out of the vehicle, Ranger Della Isola saw a water pipe in the vehicle, the type of pipe he recognized as commonly used for ingesting marijuana.  (*Id*. at 2).  Gearheart consented to a search of his person for weapons and denied that there were any guns in the vehicle.  (*Id*.).  During a search of the vehicle, 10 paper bags of dried psylocibin mushrooms were discovered and a loaded Mossberg 590A shotgun was found in a cardboard box in the front passenger seat.  (*Id*.).  Gearheart was arrested and charged with the three-count Criminal Complaint.

Gearheart argues that under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ("*Bruen*"), 36 C.F.R. § 2.4(c) no longer survives constitutional scrutiny.  (*See generally* Doc. No. 9).  In *Bruen*, the Supreme Court replaced the means-end balancing test with a new two-step framework in analyzing the constitutionality of a firearm regulation.  The court first must determine whether "the Second Amendment's plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 24.  If so, "the Constitution presumptively protects that conduct." *Id.*  To rebut the presumption, the government must show that the challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.*  A firearm regulation is consistent with

---

acknowledges in his Reply, the applicable statute is 36 C.F.R. § 2.4(c).  (*See* Doc. No. 12 at 2 n.1); (Doc. No. 13 at 1 n.1).

2

American tradition only if similar regulations were widespread and commonly accepted in the founding era when the Second Amendment was adopted. *Id*.

The regulation with which Gearheart is charged, 36 C.F.R. § 2.4(c), states in relevant part that, "Carrying or possessing a loaded weapon in a motor vehicle, vessel or other mode of transportation is prohibited . . ." The provision is modified by § 2.4(a), which states:

> (a) None of the provisions in this section or any regulation in this chapter may be enforced to prohibit an individual from possessing a firearm, including an assembled or functional firearm, in any National Park System unit if:
>
> (1) The individual is not otherwise prohibited by law from possessing the firearm; and
>
> (2) The possession of the firearm is in compliance with the law of the State in which the National Park System unit is located.

36 C.F.R. § 2.4(a). In effect, so long as an individual transporting a firearm in a national park does so in compliance with applicable state and federal law, there is no § 2.4(c) violation. The Government argues, therefore, that so long as the state law(s) with which Gearheart failed to comply are constitutional, § 2.4(c) also passes constitutional muster. (Doc. No. 12 at 2-3).

The Government asserts in the instant case that there are two California state laws relevant for consideration of whether Gearheart was "in compliance with the law of the State in which the National Park System unit is located." The first is California Penal Code § 25850, which largely mirrors § 2.4(c) and prohibits "carrying a loaded firearm . . . in a vehicle in any public place or on any public street in an incorporated city or . . . in a prohibited area of unincorporated territory." The second relevant California law is the State's public carry licensing scheme, California Penal Code § 26150 et seq, which provides an exemption to Cal. Penal Code § 25850 pursuant to Cal. Penal Code § 26010, which states, "Section 25850 does not apply to the carrying of a handgun by any person as authorized pursuant to Chapter 4 (commencing with Section 26150) of Division 5."[3] Notably, the Government has not indicated that Gearheart's June 12, 2023 citation was

---

[3] Depending on the applicant's county of residence, Cal. Penal Code § 26150 provides for the issuance of either a concealed carry license, which is available in any California county, or an open carry license, available only in those counties with a population of less than 200,000 by the most recent federal census. *See* Cal. Penal Code 26150(b)(1), 26155(b)(1). *See also Baird v. Bonta*, --- F.Supp.3d ----2023 WL

3

based on his failure to possess a California public carry license, only that such a license would have provided an exemption to enforcement of § 2.4(c).[4]

Thus, a person transporting a loaded firearm in a vehicle while holding a California public carry license is "in compliance with the law of the State in which" Yosemite National Park is located, namely Cal. Penal Code § 25850, and thus exempt from a violation of § 2.4(c), pursuant to the operation of § 2.4(a)(2).[5] The Government therefore argues that so long as California's public carry licensing framework is constitutional under *Bruen*, § 2.4(c) is also constitutional.[6] Relying on the Supreme Court's discussion of licensing schemes and the historical limitations on concealed carry in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller*"), as well as California Court of Appeal decisions finding the now-invalid "good cause" provision of California's licensing scheme severable, the Government reasons that California's public carry licensing scheme is constitutional. (Doc. No. 12 at 4-8). Alternatively, the Government asserts that 36 C.F.R. § 2.4(c) is lawful as an exercise of the federal government's power under the Property Clause of the Constitution (*id*. at 8-10), and that the regulations are proper because National Parks are "sensitive places" where firearms may be restricted (*id*. at 10-12).

Gearheart does not dispute the relevance of California's public carry licensing scheme or Cal. Penal Code § 25850 but argues that the Government argument "fails to examine whether the

---

9050959 (E.D. Cal. Dec. 29, 2023). Under the plain language of Cal. Penal Code § 26010, an individual possessing either a concealed carry or open carry license would be exempt from Cal. Penal Code § 25850. The eligibility requirements for both licenses are identical. *See* Cal. Penal Code 26150(a)(1)-(4).

[4] The California Penal Code sets forth more than a dozen other exemptions to application of Cal. Penal Code § 25850. *See* Cal. Penal Code §§ 26000-26060.

[5] The Court does not opine on whether an individual visiting Yosemite National Park, in possession of a firearm authorized in another state, would have similarly been exempt under § 2.4(a). Under California law, a United States citizen over the age of 18 "who resides or is temporarily in [California]" may transport a firearm in a motor vehicle provided "(1) The firearm is within a motor vehicle and it is locked in the vehicle's trunk or in a locked container in the vehicle. (2) The firearm is carried by the person directly to or from any motor vehicle for any lawful purpose and, while carrying the firearm, the firearm is contained within a locked container." Cal. Penal Code § 25610. Thus, California law imposes stricter controls on visitors to California transporting a firearm than those in possession of a California Concealed Weapon permit (who may keep loaded weapons unsecured in the vehicle), but it permits non-California residents to transport firearms as long as they properly secured. *See* https://oag.ca.gov/firearms/travel (last visited: March 27, 2024).

[6] As discussed *infra*, the Court does not fully adopt the Government's premise, but agrees that the basic parameters of California's public carry licensing scheme are relevant to the constitutionality of 36 C.F.R. § 2.4(c).

criteria in California's licensing scheme actually satisfies [sic] *Bruen*." Gearheart contends that the Government must articulate a "'text-and-history' analysis . . . demonstrat[ing] a historical basis for each requirement of the licensing scheme." (Doc. No. 13 at 7-8). Further, Gearheart contends that the Property Clause of the Constitution does not authorize the federal government to infringe on individual rights within federal lands and argues that National Parks are not "sensitive places." (*Id*. at 9-16).

## APPLICABLE LAW AND ANALYSIS

### A. Legal Standard

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3) specifies which motions must be made before trial and includes a motion to dismiss for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(v). A motion to dismiss is generally capable of determination if it "involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017). Defendant's Motion claiming that 36 C.F.R. § 2.4(c) is unconstitutional is a jurisdictional challenge and falls within Fed. R. Crim. P. 12(b)(3)(B)(v). *See United States v. Montilla*, 870 F.2d 549, 552 (9th Cir. 1989), *opinion amended*, 907 F.2d 115 (9th Cir. 1990) (jurisdictional claim permitted under Rule 12(b) include allegations that the appliable statute is unconstitutional); *see also United States v. Nassif*, 628 F. Supp. 3d 169, 177 (D.D.C. 2022) (charging document fails to state a claim if the charged provision is unconstitutional or otherwise does not apply to defendant's conduct).

In ruling on a pretrial motion to dismiss, "the district court is bound by the four corners of the [charging document]." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The court "cannot consider evidence that does not appear on the face of the [charging document]." *Kelly*, 874 F.3d at 1046 (citing *Lyle*, 742 F.3d at 436; *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)).

### B. Standing

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." *See, e.g., Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013). As the Supreme

1  Court has observed, "[n]o principle is more fundamental to the judiciary's proper role in our
2  system of government than the constitutional limitation of federal-court jurisdiction to actual
3  cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal
4  quotation marks omitted).  The party invoking federal jurisdiction has the burden of establishing
5  constitutional standing.  *Clapper*, 568 U.S. at 411-12; *see also Bond v. United States*, 564 U.S.
6  211 (2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).  To establish Article III
7  standing, a party must show an injury that is "(1) concrete, particularized, and actual or imminent;
8  (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling." *Clapper*,
9  568 U.S. at 409 (internal quotation marks omitted).  "[This] irreducible constitutional minimum"
10 requires that the party suffer "an invasion of a legally protected interest . . ." *Lujan*, 504 U.S. at
11 560.

12 Because the Government charged Gearheart with a violation of 36 C.F.R. § 2.4(c), and
13 because he is subject to a constitutional injury if convicted under a potentially invalid law, the
14 Court concludes that he has standing to challenge the constitutionality of § 2.4(c).  (*See Bond*, 564
15 U.S. at 226 ("Bond, like any other defendant, has a personal right not to be convicted under a
16 constitutionally invalid law.") (Ginsburg and Breyer, J., concurring).  Significant, however,
17 Gearheart does not allege that he attempted to follow California's public carry law, nor does he
18 even discuss the public carry scheme in his moving brief.  Because Gearheart does not submit any
19 competent evidence to the effect that he applied for a license or that such an application would
20 have been futile[7], he lacks standing to raise a Second Amendment challenge to Cal. Penal Code
21 § 26150 et seq. (*See State v. Wilson*, ___ P.3d ___, 2024 WL 466105, at *2 (Haw. Feb. 7, 2024)
22 ("Wilson illegally possessed a handgun because he never tried to follow Hawaii's firearm
23 registration and license to carry law.  Because he didn't apply for a permit, he lacks standing to
24 raise a Second Amendment challenge."); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 308 (2d

---

[7] At oral argument, Gearheart's counsel represented that Gearheart did not apply for a public carry license because he lacked an established residential address in California, a requirement of the application. However, without an affidavit or other sworn statement by Gearheart attesting to the facts regarding his inability to obtain a public carry license or the futility of him applying for one, Gearheart fails to establish the constitutional minimum for Article III standing. *See Lujan*, 504 U.S. at 560; *see also Antonyuk*, 89 F.4th at 308.

Cir. 2023) (finding plaintiff had standing to challenge N.Y. state public carry licensing regime despite never having formally applied, where he stated, in affidavit, reasons he was deterred by various requirements of the application process). Accordingly, while the Court must examine California's public carry licensing scheme, it need not analyze a facial challenge to the California law and determine whether it survives constitutional scrutiny under *Bruen*. The limited question before the Court is whether 36 C.F.R. § 2.4(c), as applied on federal lands in California, violates the Second Amendment.

**C. Discussion**

    1. <u>Defendant Raises a Limited Facial Challenge to 36 C.F.R. § 2.4(c)</u>

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated . . ." *Bucklew v. Precythe*, 587 U.S. ——, 139 S. Ct. 1112, 1127 (2019). To mount a successful facial challenge, the plaintiff "must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. ——, 141 S. Ct. 2373, 2387 (2021) (alteration in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). In other words, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew*, 139 S. Ct. at 1127; accord *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023). For this reason, facial challenges are "the most difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (alteration adopted and quotation omitted).

In their briefing, the Parties disagree on the precise nature of Gearheart's legal challenge to 36 C.F.R. § 2.4(c). The Government describes Plaintiff's claim as a facial challenge, (Doc. No. 12 at 4), while Gearheart describes it as "a challenge to the constitutionality of 36 C.F.R. § 2.4(c) as applied to prosecutions in California-situated federal lands that necessarily depend on the validity of the state-law exemption authorized in 36 C.F.R. § 2.4(a)(2)." (Doc. No. 13 at 6). At oral argument, the Parties ultimately appeared to agree that Gearheart asserted a challenge that was neither strictly as applied nor facial, but somewhere in between. As in a facial challenge,

Gearheart's burden is to demonstrate that no application of 36 C.F.R. § 2.4(c) to the subset of potential cases he identifies (enforcement actions in California involving state-law exemptions) could be constitutional. The Court finds that Gearheart fails to carry that burden.

        2. <u>36 C.F.R. § 2.4(c) As Applied in California is Consistent with the Nation's Historic Tradition of Firearm Regulation</u>

*Bruen* now controls the review of any firearm-related regulation, and therefore to the extent that Gearheart challenges federal and state gun laws, they must survive scrutiny under *Bruen* and related precedent. As noted above, Gearheart's challenge is to "the constitutionality of 36 C.F.R. § 2.4(c) as applied to prosecutions in California-situated federal lands that necessarily depend on the validity of the state-law exemption authorized in 36 C.F.R. § 2.4(a)(2)." Thus, Gearheart's challenge is to the application of 36 C.F.R. § 2.4, the parallel state law provision Cal. Penal Code § 25850, and related exemptions.

Looking to the first analytical step in *Bruen*, the Court agrees that the Second Amendment covers the conduct regulated by both 36 C.F.R. § 2.4 and Cal. Penal Code § 25850; they both regulate the "individual right to armed self-defense" by controlling the ability to transport firearms in a motor vehicle. *See Bruen*, 597 U.S. at 27. The ability to transport firearms in a vehicle necessarily implicates the right to keep and bear arms for self-defense. Thus, the burden shifts to the Government to point to analogues demonstrating that similar regulations were widespread in the Founding era.

Gearheart points out, correctly, that the Government does not cite examples of specific historical regulations mirroring the elements of § 2.4(c) or § 25850. Defendant thus argues the Government has failed to carry its burden under *Bruen*. While the Government does not engage in detailed historical analysis, the Court finds, based on its own review and the Government's briefing, that § 2.4(c) and § 25850 in combination with applicable exemptions, are consistent with the Nation's historic tradition of firearm regulation.

While Gearheart characterizes 36 C.F.R. § 2.4(c) as a "*ban* [] on possessing loaded firearms within a vehicle on public land," a regulation that was "alien to the generation that ratified the Second Amendment," this is not quite accurate. (Doc. No. 9 at 3) (emphasis added).

To describe the federal law as a "ban" ignores the significant carveout set forth in § 2.4(a) and related state laws. Read together, 36 C.F.R. §§ 2.4(a) and 2.4(c) provide that any individual transporting a loaded firearm in a motor vehicle within a national park *must do so in compliance with applicable state and federal laws*. California's parallel state law, Cal. Penal Code § 25850, similarly prohibits "carrying a loaded firearm . . . in a vehicle in any public place or on any public street in an incorporated city or . . . in a prohibited area of unincorporated territory" with more than a dozen enumerated exceptions, including for individuals holding a California public carry license. *See* Cal. Penal Code §§ 26000-26060. Accurately characterizing the law is not merely an academic matter but guides the Court in determining whether the law fits within the Nation's historic tradition of firearm regulation.

      As the Supreme Court noted in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Indeed, the Supreme Court in *Bruen* observed that, "Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." 597 U.S. at 38.

      While finding the heightened "good cause" requirement in New York's public carry licensing scheme unconstitutional, the Court made clear that, "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes . . . which often require applicants to undergo a background check or pass a firearms safety course [and] are designed to ensure that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 38; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023) ("Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment."). Thus, while the Supreme Court found in *Bruen* no American "tradition of broadly *prohibiting* the public carry of commonly used firearms" "well-defined *restrictions*" on the right to carry firearms in public remain constitutional. 597 U.S. at 38.

1  (emphasis added).

2  Indeed, looking to regulations in effect during the relevant historical periods confirms
3  this.[8]  The right to keep and bear arms is applicable to the States through the Fourteenth
4  Amendment, *see McDonald v City of Chicago*, 561 U.S. 742, 750 (2010), which was adopted in
5  1868.  Noting this fact in *Bruen*, the Supreme Court expressly declined to decide "whether courts
6  should primarily rely on the prevailing understanding of an individual right when the Fourteenth
7  Amendment was ratified in 1868 when defining its scope" and observed that "the public
8  understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant
9  purposes, the same with respect to public carry." *Id.* at 38.

10  Because Gearheart's challenge is to both federal and state law, the prevailing
11  understanding of the right to bear arms in 1868 and 1791 are both relevant to the Court's analysis.
12  *See Bruen,* 597 U.S. at 4 ("Constitutional rights are enshrined with the scope they were
13  understood to have when the people adopted them." (quoting *Heller*, 554 U.S. at 634–35));
14  *McDonald*, 561 U.S. at 778 (plurality opinion) ("[I]t is clear that the Framers and ratifiers of the
15  Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights
16  necessary to our system of ordered liberty.").

17  This is consistent with the decisions of other federal courts finding "the understanding that
18  prevailed when the States adopted the Fourteenth Amendment" is, along with the understanding
19  of that right held by the founders in 1791, a relevant consideration.  *Nat'l Rifle Ass'n v. Bondi*, 61
20  F.4th 1317, 1322 (11th Cir. 2023); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96,
21  112 (3d Cir. 2023) (en banc) (Ambro, J., concurring) (observing that if the relevant period
22  extends beyond the Founding era, "then Founding-era regulations remain instructive unless
23  contradicted by something specific in the Reconstruction-era"); *Drummond v. Robinson Twp.*, 9
24  F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments'
25  ratifiers approved regulations barring training with common weapons in areas where firearms
26  practice was otherwise permitted."); *Ezell v. City of Chicago*, 651 F.3d 684, 702, 705–06 (7th Cir.

---

28  [8] "The Second Amendment was adopted in 1791; the Fourteenth in 1868.  Historical evidence that long predates or postdates either time may not illuminate the scope of the right." *Bruen*, 597 U.S. at 4.

2011) (explaining that a "wider historical lens" is required for a local—or state—regulation, and considering evidence from both the Founding-era and Reconstruction).

*Supra*, 36 C.F.R. § 2.4(c) requires that an individual transporting a loaded firearm in a national park do so in compliance with state and federal laws, including any applicable exemptions. In effect, California—and by extension § 2.4(c)—conditions transportation of a loaded, unsecured firearm in a motor vehicle in Yosemite, at least as to California residents, on possession of a California public carry license. As determined by one scholar after conducting a broad review of historical firearm regulations, similar laws "requiring a physical license or permit to carry concealed and dangerous weapons" in public date at least to the 1860s and in fact "appear to have originated in California." *See* Brief of Amicus Curiae Patrick J. Charles in Support of Neither Party, App'x 1, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (No. 20-843) (hereinafter, "Charles Amicus Br."). The Court finds the following history instructive:

> After the state of California repealed its law prohibiting the carrying of concealed weapons except for "travelers . . . actually engaged in making a journey at the time," S , P , 1863, at 748 (1863); S , P , 1869-70, at 67 (1870), local California jurisdictions began enacting similarly worded ordinances with the notable difference of granting local government officials discretion to issue armed carriage licenses "to any peaceable person, whose profession may require him to be out at late hours of the night." Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, C 173 (1896). These licensing or permitting laws quickly spread across California, including in such cities as San Francisco, Santa Barbara, and Fresno to name a few. 4 App. I.A. at 2-12. And in 1891 the California Supreme Court upheld such a law against a state constitutional challenge, albeit not on Second Amendment grounds. *Ex Parte Cheney*, 90 Cal. 617, 621 (1891) ("It is a well-recognized fact that the unrestricted habit of carrying concealed weapons is the source of much crime, and frequently leads to causeless homicides, as well as to breaches of the peace, that would not otherwise occur.").

Charles Amicus Br. at 10. As one of many examples from the Reconstruction era, an 1892 ordinance in the City of Monterey stated that:

> Every person not being a peace officer, who shall, within the corporate limits of the City of Monterey, carry or wear any dirk, pistol, sword in cane, slung-shot or other dangerous or deadly weapon concealed, except by special permission in writing from the President of the Board of Trustees of said City, shall, upon conviction thereof before any Court of competent jurisdiction be deemed guilty of a misdemeanor . . .

11

App. 11 to Charles Amicus Br.  Indeed, similar laws regulating public carry spread to states and municipalities throughout the nation in the decades surrounding the ratification of the Fourteenth Amendment: Kansas; Milwaukee, Wisconsin; Lincoln, Nebraska; St. Paul, Minnesota; New Haven, Connecticut; and Wheeling, West Virginia, to name a few.  Charles Amicus Br. at 11-12.

While not identical, 36 C.F.R. § 2.4(c) and Cal. Penal Code § 25850 are fundamentally like these Reconstruction-era firearm regulations.  The state law probits transporting a loaded, unsecured firearm in a motor vehicle absent an exemption, such as possession of a California public carry license.  The federal regulation essentially mirrors the state law,[9] and thus conditions transportation of a firearm on compliance with state law.  The 19th century precursors likewise criminalize carrying a concealed weapon in a particular city, county, or state without a license to do so.  The purpose of both the 19th century and modern statutes is the same—to ensure that those who carry firearms in public are responsible, law-abiding citizens.

In the case of California's public carry licensing scheme, this includes ensuring the applicant is not disqualified on account of factors such as (1) being a danger to oneself or others; (2) being subject to a restraining order or protective order; (3) having been convicted in the preceding 10 years of certain serious offenses; (4) having "engaged in an unlawful and reckless use, display, or brandishing of a firearm"; and (5) having been incarcerated or released on probation or parole in the preceding five years following conviction for "an offense, an element of which involves controlled substances."  *See* Cal. Penal Code § 26202 (setting forth disqualifying factors for those applying for a public carry license).  Similarly, New York's 1878 concealed-carry ordinance explicitly cited the concern that the disorderly and the intoxicated were going about carrying pistols, "insult[ing] respectable citizens, and draw[ing] a pistol on any and every occasion, while the better and law-abiding class try to obey the laws and protect themselves with nothing but nature's weapons."  *Antonyuk*, 89 F.4th at 322 (citing New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York, committee report) ("As to the necessity for the passage of the ordinance there can be no question.  The reckless use of

---

[9] As noted above, the issue is not before the Court whether an individual visiting a National Park, and lawfully in possession of a firearm under the laws of another state, would be subject to enforcement of § 2.4(c), and the Court does not opine on the constitutionality of such an application.

firearms by the dangerous classes in this city is proverbial, and this measure of repression seems to be necessary.").

Historians appear to agree that licensing schemes were a post-Civil War phenomenon, largely due to the development of urban centers, professional police forces, and administrative agencies. *See, e.g.*, Brief of Amici Curiae Profs. of Hist. & L. in Supp. of Resps. at 22, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("In the latter half of the nineteenth century, many municipalities also began to enact licensing schemes, pursuant to which individuals had to obtain permission to carry dangerous weapons in public."); Charles Amicus Br. at 7–9; Saul Cornell, "History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?", 49 HASTINGS CONST. L.Q. 145, 168–71 (2022). Thus, the historical record does not yield examples of public carry licensing in the Founding Era. However, as the Supreme Court acknowledged in *Bruen*, "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" and thus "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. The mid-to-late 19th century saw "technological advancements in both firearms and travel" that introduced regulatory challenges unknown to the Founders[10] but that are familiar to us today—mass transportation, dense urban centers, national parks seeing millions of annual visitors. While the regulatory solutions introduced during Reconstruction differed in kind from those of the Founding Era, they reflected the common desire to ensure that "those bearing arms in [a] jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38. Thus, the license-based regulation on transporting loaded firearms set forth in § 2.4(c) and § 25850 are both consistent with the Nation's historic tradition of firearm regulations designed to protect order and public safety.

Gearheart seeks to attack the constitutionality of 36 C.F.R. § 2.4(c) and Cal. Penal Code

---

[10] Patrick J. Charles, "The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes," 13 Charleston L. Rev. 125, 148 (2018)

13

§ 25850 indirectly by arguing that California's public carry licensing scheme, which offers an exemption to both laws, is itself unconstitutional. However, the Court need not analyze California's public carry licensing scheme under *Bruen* because, as noted above, Gearheart has not established standing to challenge that law, nor has he identified any provision of the multi-part statutory scheme that he contends is unconstitutional. To shift the burden to the Government to justify the constitutionality of a law, a criminal defendant must first demonstrate an actual or imminent injury he faces from the law and demonstrate that a favorable judicial decision would likely redress the injury; Gearheart has failed to do so. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("To establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"). At best, Gearheart appears to challenge the very fact that he would be required to hold a public carry permit to legally transport a loaded firearm in his vehicle. Nothing in *Bruen* suggests that a firearm licensing scheme, as a general matter, is per se unconstitutional, and indeed the Court explicitly rejected such an interpretation. *See Bruen*, 597 U.S. at 38, n. 9; at 79 ("the Court's decision does not prohibit States from imposing licensing requirements") (Kavanaugh concurrence). Further, California's public carry scheme, as modified by the California Attorney General's Memorandum, has already survived one constitutional challenge under *Bruen*. *See Baird*, 2023 WL 9050959 (noting that the Attorney General's instruction "mooted any dispute about California's former 'good cause' law) (citing *Flanagan v. Bonta*, 2023 WL 1771160 (9th Cir. Feb. 1, 2023) (dismissing a challenge to the "good cause" requirement as moot).

Accordingly, because the Court concludes both 36 C.F.R. § 2.4(c), as modified by § 2.4(a), and Cal. Penal Code § 25850, as modified by § 26010, are consistent with this Nation's historic tradition of firearm regulation, Defendant fails in his limited facial challenge asserting that every application of these laws on California federal lands is unconstitutional.

### 3. The Property Clause and Sensitive Places Doctrine Do Not Alter the Analysis

The Government asserts that an additional reason to deny Plaintiff's Motion is because the Property Clause of the Constitution provides Congress the power to "make all needful Rules and

Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., art. IV, § 3, cl. 2. This includes regulations over federal property enacted to "control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them . . ." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917).

In one Fourth Circuit case, the court upheld a predecessor of 36 C.F.R. § 2.4(c) against constitutional challenge, relying on part on the Property clause. *See U.S. v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011), abrogated by *Bruen*, 597 U.S. 1. However, the court's Property clause analysis was intertwined with a pre-*Bruen* analysis finding that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks." *Id.* Thus, the Court disagrees with the Government's position that the *Masciandaro* court's Property Clause reasoning can be divorced from the Fourth Circuit's now disavowed means-ends analysis.

Moreover, federal statutes enacted pursuant to the police power vested in Congress by the Property Clause remain subject to constitutional scrutiny. *See, e.g., Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 253 (1991) ("Nor is there merit to petitioners' contention that the Board should nevertheless be immune from scrutiny from constitutional defects because it was created in the course of Congress' exercise of its power to dispose of federal property under Article IV, § 3, cl. 2."). Thus, 36 C.F.R. § 2.4(c), even if justified pursuant to Congress' police powers under the Property Clause, must survive the scrutiny prescribed in *Bruen*.

The Court likewise does not find the so-called "sensitive places" doctrine alters the analysis here. In *Bruen*, the Court affirmed the recognition in *Heller* that "States may forbid public carriage in 'sensitive places'" such as "legislative assemblies, polling places, and courthouses." 597 U.S. at 30. It also noted that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* However, it specifically declined to adopt the position that sensitive places are anywhere "people typically

congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 30-31.

The lower court in *Masciandaro*, upholding the predecessor to 36 C.F.R. § 2.4(c), held that:

> National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities. Moreover, the locations within National Parks where motor vehicles travel—roads and parking lots—are even more sensitive, as roads and parking lots are extensively regulated thoroughfares frequented by large numbers of strangers, including children. Thus, unlike a home or other private property, where the "need for defense of self, family, and property is most acute," the locations in National Parks where vehicles travel, like schools and government buildings, are sensitive places where the Second Amendment leaves the judgment of whether (and if so, how) to regulate firearms to the legislature, not the judiciary.

*United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), aff'd, 638 F.3d 458 (4th Cir. 2011). However, the Fourth Circuit's opinion affirming this ruling was abrogated by *Bruen*, thus this characterization of national park roads as "sensitive places" is no longer good law.

Similarly, in the 2009 case *Nordyke v. King*, the Ninth Circuit upheld a county ordinance prohibiting carrying firearms on "open space venues, such as County-owned parks, recreational areas, historic sites, parking lots of public buildings . . . and the County fairgrounds," in large part because the court believed that large gatherings of people made them sensitive places in the same category as schools and government buildings. *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), but the opinion was vacated after the Supreme Court's opinion in *McDonald*. Thus, this broader definition of sensitive places as recreational spaces where large groups gather is no longer tenable.

Indeed, given the narrow-accepted definition of "sensitives places" the Court is skeptical of designating an entire National Park—in this case one measuring nearly 760,000 acres or 1,200 square miles[11]—a sensitive place. Some pre-*Bruen* cases have allowed regulations on firearms to extend to the area immediately around a sensitive place—such as school zones, *United States v. Redwood*, 2016 WL 4398082 (N.D. Ill. Aug. 18, 2016), post office parking lots, *Bonidy v. U.S.*

---

[11] *See* https://www.nps.gov/yose/learn/management/statistics.htm (last visited: February 29, 2024).

*Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015), and a parking lot 1,000 feet away from the entrance to the U.S. Capitol and a block from the Rayburn House Office Building, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), abrogated by *Bruen*, 597 U.S. 1.  While Yosemite National Park arguably may contain sensitive places, i.e., the Yosemite Court, government buildings and schools, "the Court is aware of no case suggesting that properly designating one location a 'sensitive place' allows the government to give the same designation to a different, non-adjacent location."  *See Solomon v. Cook County Bd. Of Comm'rs*, 559 F.Supp.3d 675, 693-94 (N.D. Ill. 2021) (rejecting designation of entire state forest, comprising 70,000 acres and at least 320 distinct areas, as a sensitive place).  And because the Government has not established that the location where Gearheart was arrested in possession of a loaded weapon was a "sensitive place" within the accepted definition of that term, the Court declines to find that the challenged regulation should be upheld on that basis alone.

Accordingly, it is **ORDERED**:

Defendant's Motion to Dismiss (Doc. No. 9) is DENIED.

Dated:   March 27, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE