Pages 1-107

1                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
2                            (YOSEMITE)

3

4   UNITED STATES OF AMERICA,      )  Case No.  23-mj-00006-HBK
                                   )
5              Plaintiff,          )  Yosemite, California
                                   )  Wednesday, July 10, 2024
6       v.                         )  Courtroom:  Yosemite
                                   )
7   CHARLES EDWARD GEARHEART, JR., )
                                   )
8              Defendant.          )
                                   )
9   _____)

10

11                TRANSCRIPT OF EVIDENTIARY HEARING
              BEFORE THE HONORABLE HELENA M. BARCH-KUCHTA
12                 UNITED STATES MAGISTRATE JUDGE

13  APPEARANCES:

14  For Plaintiff:              CHAN HEE CHU, ESQ.
                                JEFFREY SPIVAK, ESQ.
15                              United States Attorney's Office
                                2500 Tulare Street, Suite 4401
16                              Fresno, California 93721
                                (559) 753-0072
17
    For Defendant:              KARA OTTERVANGER, ESQ.
18                              Office of the Federal Defender
                                2300 Tulare Street, Suite 330
19                              Fresno, California 93721
                                (559) 487-5561
20
    Transcription Service:      Peggy Schuerger
21                              Ad Hoc Reporting
                                2220 Otay Lakes Road, Suite 502-85
22                              Chula Vista, California 91915
                                (619) 236-9325
23

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

2

INDEX

| WITNESSES FOR THE GOVERNMENT: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| Ranger Christopher Dell Isola | 6 | 14 | 26 | -- | -- |
| Ranger Jacob Blade | 31 | 36 | 53 | 55 | -- |
| Ranger Ian Rippetoe | 67 | 71 | -- | -- | -- |

| EXHIBITS: | | Identified | Received |
|---|---|---|---|
| Defense | | | |
| B | Video clip from Ranger Dell Isola's body camera | 20 | 31 |
| C | Video clip from Ranger Dell Isola's body camera | 23 | 31 |
| F | Video clip from Ranger Dell Isola's body camera | 25 | 31 |
| K | Video clip from Ranger Blades' body camera | 46 | 62 |
| R | Video clip from Ranger Blades' body camera | 40 | 62 |
| S | Video clip from Ranger Blades' body camera | 50 | 62 |
| W | Video clip from Ranger Blades' body camera | 48 | 62 |
| AN | Video clip from Ranger Hesse's body camera | 77 | -- |
| AQ | Video clip from Ranger Hesse's body camera | 49 | 62 |
| AV | Video clip from Ranger Rippetoe's body camera | 75 | -- |

1                              INDEX  (Cont'd.)

2    EXHIBITS:                            Identified        Received

3    Defense

4    BL    Video clip from Ranger Hesse's        57              62
           body camera
5
     CLOSING ARGUMENTS:                                        Page
6
     On behalf of the Government
7       By Mr. Chu                                               85

8    On behalf of the Defense
        By Ms. Ottervanger                                       91
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    YOSEMITE, CALIFORNIA  WEDNESDAY, JULY 10, 2024  10:05 A.M.

2                              --oOo--

3         THE CRD:  Calling Case 23-mj-00006, United States v.

4    Charles Gearheart.

5         THE COURT:  Thank you.  Can I please have appearances

6    for the record.  For the Government?

7         MR. CHU:  Good morning, Your Honor.  Chan Hee Chu and

8    Jeffrey Spivak for the United States.

9         THE COURT:  Okay.  Thank you, Mr. Chu, Mr. Spivak.

10        MS. OTTERVANGER:  Good morning, Your Honor.  Kara

11   Ottervanger on behalf of Mr. Gearheart who is present out of

12   custody.

13        THE COURT:  All right.  Thank you, Ms. Ottervanger and

14   Mr. Gearheart.  All right.  So we're here for the evidentiary

15   hearing on the motion to suppress that the Defendant had filed

16   concerning the search of the van that resulted in locating the

17   gun.

18        All right.  So I don't know if you all want to do

19   opening statements or we want to just jump right into the evidence

20   and then let's all be on agreement about whose burden it is and

21   the standard that we need to meet.

22        MR. CHU:  We would just go into the evidence, Your

23   Honor.  To the extent you would wish, our argument on the motion

24   itself, I guess we can reserve to later.

25        THE COURT:  Yeah.  I think you can reserve it until

1  afterwards, to the extent we need to have any argument on it.

2  That's fine.    It's obviously the Defendant's burden and the

3  preponderance of evidence is the standard we're going to be

4  looking at today, just so that we're all on the same page.  And so

5  do you want to --

6          MR. CHU:  We would be calling them -- I'm sorry -- just

7  under the standard that since it's during the search that the --

8          THE COURT:  Right.

9          MR. CHU:  -- burden is technically --

10          THE COURT:  But you still have the -- yeah -- of proving

11  the overall proof that it was -- right, her proof to prove it was

12  not.  Understood.

13          Okay.

14          MR. CHU:  With that, the United States calls our first

15  witness, Ranger Christopher Dell Isola.

16          THE COURT:  Okay.  And are all the other -- anyone else

17  who's being called is not in the courtroom; is that correct?

18          MR. CHU:  Yes, Your Honor.

19          THE COURT:  Okay.  So let's just make sure that the

20  record reflects that the other witnesses are not in the courtroom.

21      (Pause.)

22          THE CRD:  Please raise your right hand.

23    RANGER CHRISTOPHER DELL ISOLA, GOVERNMENT'S WITNESS, SWORN

24          THE CRD:  Thank you.

25          THE COURT:  Let's -- hold on one second.  Let's move

1    this because I don't think Ms. Ottervanger can see.  Let's just

2    move it over to the side or over this way because we won't need

3    that today.

4              MS. OTTERVANGER:  We are going to play some video.

5              THE COURT:  Pardon me?

6              MS. OTTERVANGER:  We are going to play some video during

7    my portion of this.

8              THE COURT:  Okay.  So we can move it --

9              MS. OTTERVANGER:  But --

10             THE COURT:  I can see it over here, too.  Yeah.

11        (Pause.)

12             THE COURT:  It's supposed to be stretched so we can move

13   it when needed.  But I want to make sure that Mr. Gearheart can

14   see as well.  Okay.  All right.  Is that good?  And then if we

15   need to, we can turn it when it's time for that.

16             All right.  All right.  Thank you.  I appreciate that.

17                         DIRECT EXAMINATION

18   BY MR. CHU:

19   Q    Just for the record, Ranger Dell Isola, can you spell your

20   first and last name.

21   A    My first name's Christopher, C-h-r-i-s-t-o-p-h-e-r.  Last

22   name Dell Isola, D-e-l-l I-s-o-l-a.

23   Q    Moving on to the questions, what is your current occupation?

24   A    U.S. Park ranger.

25   Q    And were you a U.S. Park ranger on the date of June 12th,

Dell Isola - Direct                                        7

1   2023?

2   A    Yes.

3   Q    And where do you serve as a park ranger?

4   A    In Yosemite -- in Yosemite National Park.

5   Q    And did you work on June 12, 2023?

6   A    Yes.

7   Q    And you mentioned you're a park ranger currently.  How long

8   have you been a park ranger?

9   A    I have been a park ranger since January of 2023.

10  Q    So about you would say on the date of June 12th, 2023, you'd

11  been a ranger for about six months?

12  A    Correct, five months in the academy and only about a month in

13  the field so far.

14  Q    So just a month in the field?

15  A    Correct.

16  Q    Okay.  And were you in a training program of any kind at that

17  time?

18  A    Yes.

19  Q    Can you briefly describe?

20  A    It is a 11- or 13-week training program where you're shadowed

21  by a field trainer.  I was on my second phase of that program.

22  Q    And just to clarify, that program started in May of 2023?

23  A    Yes.

24  Q    As far as being a park ranger, are you charged with any drug

25  enforcement responsibilities?

1  A    Yes.

2  Q    Have you received any training in that regard?

3  A    Yes.

4  Q    And does that training include identifying controlled

5  substances?

6  A    Yes.

7  Q    And does that training include identifying marijuana

8  specifically?

9  A    Yes.

10  Q    And have you been trained as to items and objects that are

11  used to use controlled substances?

12  A    Yes.

13  Q    And does that include items used to use marijuana

14  specifically?

15  A    Yes.

16  Q    Could you briefly describe the training you've received as to

17  identifying items?

18  A    We were shown several different items at the academy, through

19  PowerPoint presentation and through a case that had several

20  different apparatuses in them.

21  Q    And you received that training prior to June 12th, 2023?

22  A    Yes.

23  Q    As far as your practical experience is concerned, prior to

24  June 12th, 2023, how many traffic stops or vehicle searches were

25  you a part of relating to marijuana?

Dell Isola - Direct                                                  9

1  A    Only a handful, maybe two or three.

2  Q    Okay.  Now, turning to a little bit more of your life

3  experiences, have you spent a significant time of your life in

4  California?

5  A    Yes.

6  Q    Given that -- are you aware that marijuana is legal in

7  California?

8  A    Yes.

9  Q    And given that -- so how long have you spent -- how many

10 years have you spent in California?

11 A    Full time since 2014, and then summers the two years before

12 that.

13 Q    And in your personal life, have you seen other people using

14 marijuana?

15 A    Yes.

16 Q    And have you also seen people while using -- the items that

17 people have used to use marijuana?

18 A    Yes.

19 Q    Do you smoke tobacco?

20 A    Not anymore.

21 Q    And you say "not anymore."  When did you smoke tobacco?

22 A    I smoked tobacco -- I started smoking when I was 14 years

23 old.  I stopped smoking when I was 32.

24 Q    And could you give the year of when you stopped smoking?

25 A    2022.

Dell Isola - Direct                                   10

1  Q    So about a year prior to becoming a ranger?

2  A    Yes.

3  Q    Given that history, are you particularly sensitive to the

4  smell of tobacco?

5  A    Yes.

6  Q    Now, turning to the events at issue, on -- do you recall

7  where you were on June 12th, 2023 at around 11 p.m.?

8  A    In the -- at the Michaels Ledges turnout area of Yosemite

9  Valley.

10  Q    Were you with any other rangers?

11  A    I was with several other rangers.   Initially with Ranger

12  Blade.

13  Q    So initially, you were only with Ranger Blade?

14  A    Yes.

15  Q    Did anything of significance happen around 11 p.m. that

16  night?

17  A    Yes.   We contacted the occupant of a white van for camping

18  out of bounds in that turnout.

19  Q    Did you identify an individual in that van?

20  A    Yes.

21  Q    And who was that individual?

22  A    Charles Gearheart.

23  Q    And how did you identify Mr. Gearheart?

24  A    I identified him by his name and date of birth.

25  Q    So you asked for his name and date of birth?

1    A    Yes.

2    Q    And while, you know, discussing with him the camping issue

3    and his identifying information, did you notice any objects of

4    significance?

5    A    Yes.

6    Q    What did you identify?

7    A    A water pipe smoking piece of paraphernalia.

8    Q    What was the significance of that item?

9    A    It's an item that's commonly used to smoke marijuana.

10   Q    And could that item also be used for smoking tobacco?

11   A    Yes.

12   Q    In your training and experience, is it more common for that

13   item to be used for tobacco or marijuana?

14   A    Marijuana.

15   Q    And would you say significantly so?

16   A    I would say significantly so, yes.

17   Q    Were you the -- were you the only person to notice the water

18   pipe?

19   A    I can't speak to what other rangers noticed, but --

20   Q    Did Ranger Blade say anything to you about noticing the water

21   pipe?

22   A    He asked me if noticed it.  Yes.

23   Q    So he -- when did he ask you that?

24   A    A few seconds before Mr. Gearheart exited the van.

25   Q    So basically a few seconds after you noticed?

1    A    Yes.

2    Q    Okay.  Do you recall what he said about how he phrased the

3    pipe -- or how he described the pipe?

4    A    I believe he said --

5    Q    Ranger Blade -- sorry about that.

6    A    I believe he said something along the lines of, "Did you

7    notice the paraphernalia?"

8    Q    So -- okay.  After you noticed the water pipe, were you able

9    to examine it right away?

10   A    No, not right away.

11   Q    How come?

12   A    We had pulled Mr. Gearheart to the front of the van to

13   conduct a search of his person.  And during that search, Mr.

14   Gearheart had a medical incident.

15   Q    At some point after the medical incident, were you able to

16   smell the pipe?

17   A    Yes.

18   Q    And prior to smelling the pipe, did Mr. Gearheart say

19   anything about the pipe?

20   A    He said that he used it for tobacco.

21   Q    Did he say anything else?

22   A    He said that we can smell it if we want to.

23   Q    So he volunteered that the rangers could smell the pipe?

24   A    Yes.

25   Q    So were you the first person to smell the pipe?

Dell Isola - Direct                                          13

1    A    Yes.

2    Q    What did you smell?

3    A    I smelled tobacco.

4    Q    And after smelling tobacco, what did you do next?

5    A    I put the pipe back down and went over to Mr. Gearheart to

6    start addressing how we were going to wrap the contact up.

7    Q    Did you go back to addressing the camping issue?

8    A    Yes, and where we would want him to stay that night.

9    Q    And the camping issue was initially the reason for the

10   contact; right?

11   A    Yes.

12   Q    So you went back to addressing the initial reason for the

13   contact?

14   A    Yes.

15   Q    And while addressing that issue, did anyone interrupt you?

16   A    Yes.

17   Q    Who interrupted you?

18   A    Either Ranger Blade or Rippetoe.  I don't recall exactly who.

19   Q    And what was the reason for the interruption?

20   A    That they had smelled the pipe and they smelled marijuana.

21   Q    And this was while you were still addressing the camping

22   issue; right?

23   A    Yes.

24   Q    Are you -- are you confident that you smelled only tobacco?

25   A    Not confident that I smelled only tobacco, only that I'm

1  confident that I did smell tobacco.

2  Q    And why do you think you smelled tobacco while others smelled

3  marijuana?

4  A    It's possible that the pipe is being used for both.

5  Q    And you did mention earlier you're particularly sensitive to

6  tobacco; right?

7  A    Yes.

8  Q    Does that include smell?

9  A    Yes.

10 Q    Okay.

11        MR. CHU:  No further questions.

12        THE COURT:  Thank you.  Ms. Ottervanger.

13        MS. OTTERVANGER:  Thank you.

14                    CROSS EXAMINATION

15 BY MS. OTTERVANGER:

16 Q    Good afternoon, Ranger Dell Isola.

17 A    Good afternoon.

18 Q    I guess it's still morning.

19 A    Good morning.

20 Q    Getting ahead of ourselves.  I want to ask you a little bit

21 more about your training.  Can you tell me more about what the

22 five months of academy entailed?

23 A    There was a lot of -- a lot of different subjects that we

24 went through -- driving and defensive training and a lot of law.

25 Q    Did it involve learning what various substances -- I don't

Dell Isola - Cross                                    15

1  remember how Mr. Chu referred to them -- but marijuana, cocaine --

2  what they looked like?

3  A    Yes.

4  Q    What they smelled like?

5  A    Yes.

6  Q    So it wasn't just the things that they were used in.  It was

7  also what it smelled like?

8  A    Yes.

9  Q    Have you ever smoked marijuana?

10 A    Yes.

11 Q    So would -- how often would you say that you've smoked

12 marijuana?

13 A    Not -- not often, not for a long time.

14 Q    Okay.  Did you know what marijuana smelled like before you

15 went to the academy?

16 A    Yes.

17 Q    Would you have been able to recognize it on your own without

18 formal training?

19 A    Yes.

20 Q    But you did have formal training.

21 A    Yes.

22 Q    How long have you -- you said that you've been in California

23 since 2014 full time.  Was that in the park?

24 A    Yes.

25 Q    In what capacity?

1  A    I worked in the Tuolumne Campground as a campground ranger.

2  Q    Okay.  So you've been in Yosemite National Park for about a

3  decade or more?

4  A    Yes.

5  Q    Okay.  And I guess about a decade or more, even including

6  summers, by the time that this stop happened last June?

7  A    Yes.

8  Q    What did you do to prepare for this hearing today?

9  A    I watched the -- my body cam footage again and reviewed my

10 report.

11 Q    Did you speak to anyone?

12 A    I spoke with some of the other rangers.

13 Q    Which ones?

14 A    Ranger Blade and Ranger Rippetoe, not directly about the case

15 but about -- we were in the same room.

16 Q    What do you mean not about the case directly?

17 A    As in I didn't sit and plan with them about the case, but --

18 Q    Did you talk about your body cam footage with them?

19 A    No, I did not.

20 Q    Did you talk about the stop at all with them?

21 A    Yeah.  We talked about the stop.

22 Q    Can you give me a little bit more details of what that

23 entailed?

24 A    Just basic mentioning things that happened at the stop,

25 but --

1   Q    Okay.  Did anything that they said change your recollection

2   of what happened?

3   A    No.

4   Q    When was this conversation?

5   A    Forty-five minutes ago.

6   Q    Okay.  When did you watch the video?

7   A    I came in at 9:00 a.m. and I started watching the video then.

8   Q    Today?

9   A    Yeah.

10  Q    Okay.  So you only made it through about probably the first

11  45 minutes I guess then?

12  A    For today's watching.  I've watched it several times.

13  Q    Okay.  And so I just want to be clear.  You have at least

14  two, I believe, body cam videos.  There was the first long two-

15  hour video and then at least one more.  Have you watched both or

16  all of your videos or just that long two-hour one?

17  A    Only the first one.

18  Q    Okay.  So an hour and 59 minutes and 56 seconds.  Okay.  Have

19  you watched it in its entirety?

20  A    I have.  I didn't today.

21  Q    Okay.  When was the last time you watched it in its entirety?

22  A    I don't recall.

23  Q    Did you speak to Ranger Hesse about this at all?

24  A    No.

25  Q    Did you speak to Mr. Chu?

Dell Isola - Cross                                    18

1   A    Yes.

2   Q    Okay.  Did you speak to Mr. Spivak?

3   A    No.

4   Q    Mr. Anderson?

5   A    I don't believe so.

6   Q    Okay.  So you've already testified you recall the evening of

7   June 2nd and you've sort of intimated, but you were wearing a body

8   camera at that time?

9   A    I was wearing a body camera.  I believe it was June 12th.

10  Q    I'm sorry.  Did I say 2nd?  It was June 12th.  You're right.

11  Thank you.  So you initially made contact with Mr. Gearheart for

12  out-of-bounds camping; is that right?

13  A    Yes.

14  Q    And then he got out of the vehicle?  Is that right?

15  A    Yes.

16  Q    Okay.  And then is that -- and when he got out of the

17  vehicle, is that when you saw the water pipe?

18  A    A few moments before he exited the vehicle.

19  Q    Okay.  And then you said that he had a medical incident.  He

20  -- what happened?  What was that medical incident?

21  A    He at one point lost consciousness -- at one point almost

22  maybe lost consciousness.

23  Q    Okay.  So he kind of just basically fainted --

24  A    Fainted.

25  Q    -- and fell to the ground?  Okay.  When that happened, were

1  there other than just besides you and Ranger Blade on the scene by

2  then?

3  A    Yes.

4  Q    And did two of them go into an EMT role?

5  A    Yes.

6  Q    Do you remember specifically who?

7  A    It was Ranger Hesse and her trainee, Ranger Zavesky, although

8  he didn't -- it was more Ranger Hesse.

9  Q    Okay.  Do you recall Ranger Blade telling you at that point

10 that that meant that Ranger Hesse should no longer be involved in

11 a law enforcement capacity?

12 A    Yes.  He said that she was taking an EMS capacity.

13 Q    Okay.  Why is that an important distinction to make?

14 A    My understanding is that it's based on patient privacy for

15 their medical records.

16 Q    Okay.  Did Ranger Hesse leave after the EMS portion was

17 wrapped up?

18 A    No, I don't believe so.

19 Q    Do you recall Ranger Blade repeatedly telling you that this

20 was your law enforcement call?

21 A    Yes.

22 Q    What did you understand him to mean by that?

23 A    That I was the contacting and primary officer on the scene.

24 Q    What does "primary" mean?

25 A    That most of the direction for the course of the contact

1  would be given by me.

2  Q    Okay.  So you were in charge of the scene?

3  A    Yes.

4  Q    Okay.  Do you recall -- actually, I'm going to play a video

5  for you.

6          MS. OTTERVANGER:  Your Honor, we're going to mark what

7  we have identified for Defense purposes as B.  This is from --

8  this is a clip from Ranger Dell Isola's body camera video that has

9  already been submitted to you as evidence.  I guess I should give

10 you a little background.  I've discussed this with Mr. Chu.

11          THE COURT:  Uh-huh.

12          MS. OTTERVANGER:  He's got no objections to me playing

13 clips.  They haven't been altered in any way other than shortening

14 them into clips.

15          THE COURT:  Understood.  And as I recall, we -- at the

16 previous hearing we had on another matter, we had stipulated as to

17 the authenticity back in the day --

18          MS. OTTERVANGER:  That's my recollection as well.

19          THE COURT:  -- sometime ago.  It's in the docket.  Okay.

20          MS. OTTERVANGER:  Okay.

21          THE COURT:  Does that need to be turned a little bit for

22 him then?

23 BY MS. OTTERVANGER:

24 Q    Can you -- I'm sorry.  Can you see that?

25 A    I can see it.

1          THE COURT:  Oh, you can see it?  You sure?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.

4    BY MS. OTTERVANGER:

5    Q    If you can't at some point, just let me know it and I can

6    turn it for you -- or you can turn it.

7         (Video clip being played.)

8          THE COURT:  Can you see it better?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  I just want to make sure you're not

11   looking at it --

12        (Video clip continues being played.)

13   BY MS. OTTERVANGER:

14   Q    Okay.  So that's a video from your body camera that evening.

15   Who were you speaking to in that clip?

16   A    Ranger Blade.

17   Q    Okay.  And so you went over and confirmed that Mr. Gearheart

18   has just told you it's a tobacco pipe; right?

19   A    Yes.

20   Q    And you told Ranger Blade that you could not tell from

21   looking at it whether it had marijuana or tobacco in it?

22   A    Yes.

23   Q    And you told him there were no other smells emanating from it

24   that you could use to confirm that?

25   A    Yes.

Dell Isola - Cross                                    22

1   Q    And Ranger Blade reminded you that this pipe was your only

2   probable cause; is that right?

3   A    Yes.

4   Q    And that if you say it's tobacco, you will lose probable

5   cause?

6   A    Yes.

7   Q    And that if it were not tobacco, you'll have to search his

8   vehicle?

9   A    Yes.

10  Q    And Ranger Blade gave you advice on the best way to get the

11  tobacco pipe out of the van and smell to confirm?

12  A    Yes.

13  Q    Did you then ask Mr. Gearheart to comply with that?

14  A    Yes.

15  Q    Did Mr. Gearheart comply with that?

16  A    Yes.

17  Q    Did you have any reservations at that point about your

18  ability to comply with what Ranger Blade had suggested about

19  getting it out of the vehicle and smelling it?

20  A    Could you rephrase that?  I don't --

21  Q    Yes.  When he said, "Hey, go get the -- have him get the pipe

22  out and smell it," did you have any reservations about your

23  ability to conduct that smell test?

24  A    No.  I didn't.

25  Q    And Mr. Gearheart had -- I think this was elicited on direct

1  -- had offered to have you smell it; is that right?

2  A    Yes.

3  Q    And I noticed that it was phrased on direct by Mr. Chu that

4  the rangers -- plural -- were given authorization.  Was that your

5  recollection -- that it was a global consent?

6  A    That -- that sounds correct.  I believe he's not actually

7  looking at me when he says that we can smell it or I can -- or

8  "You can smell it" he says.

9  Q    So if he said, "You can smell it," you would have taken that

10  to mean multiple people can smell it?

11  A    Yeah.  I believe so.

12  Q    Based on what?

13  A    Well, he's not looking at me when he says "You can smell it."

14  Q    Was he looking at you during the rest of the conversation?

15  A    For most of it, yes.

16  Q    Okay.  So him taking his eyes off of you is what led you to

17  believe that other people could smell it as well?

18  A    As -- yeah.

19  Q    Okay.

20        MS. OTTERVANGER:    Could you please play what's been

21  marked for Defense as C, please.

22     (Video clip being played.)

23  BY MS. OTTERVANGER:

24  Q    Okay.  So who was it in this video that came over to the pipe

25  with you when you smelled it?

Dell Isola - Cross                                                    24

1   A     I believe it was Ranger Blade.

2   Q     Okay.  And did you see that Ranger Blade, as soon as you said

3   "It's tobacco" and put it back down, left that area?

4   A     Yes.

5   Q     Okay.  And then you proceeded to tell Mr. Gearheart that it

6   smelled like tobacco?

7   A     Yes.

8   Q     And then you told him -- what did you tell him next?

9   A     After that, I told him that we were going to have him stay

10  where he was.  Because of the medical issue he had, I didn't think

11  it was safe for him to drive.

12  Q     Okay.  Did you go back and ever confirm your initial

13  conclusion that it was tobacco?  Did you smell it again?

14  A     I did not.  No.

15  Q     Did you confiscate the pipe?

16  A     I don't recall.

17  Q     Do you recall if you confiscated the contents of the pipe?

18  A     I don't recall.

19  Q     Do you remember the portion of the evening where there was

20  discussion about possibly holding Mr. Gearheart or even arresting

21  him for UIA?

22  A     Yes.

23  Q     Do you want to tell us what "UIA" means?

24  A     It's under the influence of alcohol and it's a charge for

25  being under the influence to a point where you're a danger to

1  yourself or others.

2  Q    And what was decided with respect to that?

3  A    That that was not the charge that we were going to arrest him

4  on.

5  Q    Was that before or after you smelled the pipe?

6  A    Before we smelled the pipe.

7  Q    Do you recall a discussion with Ranger Blade when you both

8  had concluded, UIA is not the right charge.  Here's how we're

9  going to proceed?

10 A    Yeah.  I remember having a conversation.

11 Q    Okay.

12      MS. OTTERVANGER:  Could you please play F for me.

13      (Video clip being played.)

14 BY MS. OTTERVANGER:

15 Q    So this is one of the examples of Ranger Blade telling you

16 that it's your law enforcement call.  Is that -- did you hear

17 that?

18 A    Yes.

19 Q    Okay.  And at the end, he said, "If you don't find anything,

20 probably grounding him here."  What does that mean?

21 A    Having him stay in that spot.

22 Q    And that is with respect to -- okay.  Let me back up.  When

23 you find someone who is camping out of bounds, what's your typical

24 procedure?

25 A    My typical procedure is to contact them and have them move

Dell Isola - Cross/Redirect                26

1  where they're camping to outside of the park.

2  Q    Okay.  And so when you say "We're going to ground him here,"

3  are you basically saying we're going to give him an exception, let

4  him camp in this place that we think is illegal because we don't

5  want him to move because we don't want him to hurt himself or

6  others?

7  A    Yes.

8  Q    Okay.

9          MS. OTTERVANGER:  No further questions.  Thank you.

10          THE COURT:  Any redirect?

11          MR. CHU:  Just -- just briefly, Your Honor.

12          THE COURT:  Uh-huh.

13                    REDIRECT EXAMINATION

14  BY MR. CHU:

15  Q    You know, you were asked quite a bit about being a primary

16  ranger.  The other officers on the scene, they don't stop becoming

17  rangers, do they, once you're the primary?

18  A    No.

19  Q    You know, the first clip you watched, when you walked away

20  from Mr. Gearheart, could you hear from the video or from your

21  recollection the discussion that was going on with Mr. Gearheart

22  and other rangers?

23  A    No, not very well.

24  Q    Okay.  Do you recall if Mr. Gearheart was trying to convince

25  other rangers that it was tobacco, other than yourself, that the

1  pipe was used for tobacco other than yourself?

2  A    I don't recall.  I did hear the word "tobacco" said again,

3  but --

4  Q    Okay.  That's fine.

5            MR. CHU:  No further questions.

6            THE COURT:  Ranger Dell Isola, I just have a question.

7  Was Ranger Blade your training officer that evening?

8            THE WITNESS:  Yes.  He was my trainer.

9            THE COURT:  And how long does that process work?  How

10  long are you with another officer till where you're by yourself

11  when you come in?

12            THE WITNESS:  So the program is 11 to 13 weeks total.

13            THE COURT:  In the park?

14            THE WITNESS:  In the park -- three weeks with one

15  ranger, three weeks with another, three weeks with another, and

16  then two weeks with the first phase ranger.

17            THE COURT:  So you were in your second three weeks here?

18            THE WITNESS:  Yes.

19            THE COURT:  And who had you been with in your first

20  three weeks?  A different ranger then?

21            THE WITNESS:  Yes.  It was a different ranger.

22            THE COURT:  Okay.  Not Ranger Blade?

23            THE WITNESS:  Not Ranger Blade.

24            THE COURT:  So you were with Ranger Blade for three

25  weeks and this would have been approximately the first or the

Dell Isola - Redirect                                    28

1    second week of that three weeks?

2           THE WITNESS:  It was week one or two.

3           THE COURT:  And what is the purpose of having a training

4    ranger with you?

5           THE WITNESS:  To let me get hands-on on-the-ground

6    experience while still having a more experienced ranger walk me

7    through things and help me -- help me make decisions.  And in

8    Phase 2, it's sort of a 50/50 kind of trainer and trainee.

9           THE COURT:  Is the first three weeks more the training

10   agent taking the primary role --

11          THE WITNESS:  Yes.

12          THE COURT:  -- and you observing?

13          THE WITNESS:  Yes.

14          THE COURT:  And the second three weeks, it's sort of

15   split?

16          THE WITNESS:  Yes.

17          THE COURT:  And then the third three weeks is your --

18          THE WITNESS:  Tapers off even more.

19          THE COURT:  Tapers off even more.  And at this point,

20   how many stops had you made?

21          THE WITNESS:  I -- I don't know the number of stops by

22   that point.

23          THE COURT:  Okay.

24          THE WITNESS:  Maybe between 30 and 50.  I'm not sure.

25          THE COURT:  Okay.  All right.  Thank you.

1            THE WITNESS:  You're welcome.

2            THE COURT:  All right.  Anything further?

3            MS. OTTERVANGER:  No, Your Honor.  I would ask if Ranger

4    Dell Isola could stay.  He may need to be recalled -- hopefully

5    not.  I'm sorry.  But --

6            THE COURT:  Okay.

7            THE WITNESS:  Okay.

8            MS. OTTERVANGER:  -- I may just have a question for you

9    about the evidence.

10           THE COURT:  All right.  All right.  All right.  You're

11   not excused from the hearing but you're excused from your

12   testimony right now.  Okay?

13           THE WITNESS:  Thank you.

14           THE COURT:  But stay around.

15           MS. OTTERVANGER:  Thank you.

16                                    (The witness was excused.)

17           MS. OTTERVANGER:  Your Honor, would you -- those clips

18   are already in evidence in the longer form.

19           THE COURT:  Uh-huh.

20           MS. OTTERVANGER:  Would you like me to move those into

21   evidence so that you have the ease of reference of the clips?

22           THE COURT:  Yes.

23           MS. OTTERVANGER:  Okay.  Then I will do that.

24           THE COURT:  And that was B and -- I forget which -- I

25   was trying to mark them.  And you said -- I got B, C -- I got C.

1          MS. OTTERVANGER:  Yes.  There was B, C, and F as in

2  "Frank."

3          THE COURT:  Okay.  And let's just describe them.  B was

4  the --

5          MS. OTTERVANGER:  B is a clip from Gearheart 3 which is

6  Ranger Dell Isola's body camera.

7          THE COURT:  Okay.

8          MS. OTTERVANGER:  It begins -- I can either give you the

9  UTC time or I can give you the minute and second of the longer

10  video.  Which is easier for you?

11          THE COURT:  Just if we identify B.  That's fine.

12          MS. OTTERVANGER:  Okay.

13          THE COURT:  And I get B separate.  That's fine.  But I

14  just want to mark them -- B is Dell Isola's body camera.

15          MS. OTTERVANGER:  That's right.  As is C.

16          THE COURT:  Okay.

17          MS. OTTERVANGER:  And as is F.

18          THE COURT:  Dell Isola -- C is the one where he's

19  talking with Blade, though, in more conversation with Blade?

20          MS. OTTERVANGER:  C is where --

21          THE COURT:  He takes the pipe --

22          MS. OTTERVANGER:  -- Ranger Dell Isola takes -- had the

23  pipe taken out, smells it, --

24          THE COURT:  Okay.

25          MS. OTTERVANGER:  -- and then tells Mr. Gearheart that

Blade - Direct                                          31

1    it's tobacco.

2              THE COURT:  Okay.

3              MS.  OTTERVANGER:    And  B  is  where  he's  having  a

4    discussion with Ranger Blade.

5              THE COURT:  Okay.

6              MS. OTTERVANGER:  And F is also a discussion with Ranger

7    Blade.

8              THE COURT:  Got it.  Okay.

9              MS. OTTERVANGER:  Thank you.

10             THE COURT:  And any objections to them being admitted?

11             MR. CHU:  No, Your Honor.

12             THE COURT:  All right.  They're all admitted.

13             MS. OTTERVANGER:  Thank you.

14             THE COURT:  Okay.  Next witness?

15             MR. CHU:  The United States calls Ranger Jacob Blade.

16        (Pause.)

17             THE COURT:  Please come forward to the witness stand.

18             THE CRD:  Please raise your right hand.

19         RANGER JACOB BLADE, GOVERNMENT'S WITNESS, SWORN

20             THE CRD:  Thank you.  Please have a seat.

21                        DIRECT EXAMINATION

22    BY MR. CHU:

23    Q    Ranger Blade, just for the record, could you spell your first

24    and last name.

25    A    Yeah, Jacob, J-a-c-o-b, Blade, B-l-a-d-e.

Blade - Direct                                          32

1  Q    And as to the questions, what is your current occupation?

2  A    United States Park ranger.

3  Q    And were you a U.S. Park ranger on June 12th, 2023?

4  A    Yes.

5  Q    And where are you a park ranger?

6  A    Yosemite National Park in Valley District.

7  Q    And were you a park ranger at the same location on June 12th,

8  2023?

9  A    I was.

10  Q    And how long have you been a U.S. Park ranger?

11  A    Nine years.

12  Q    As a park ranger, are you charged with drug enforcement

13  responsibilities?

14  A    I am.

15  Q    Have you received training on drug enforcement?

16  A    I have.

17  Q    Does that training include identifying controlled substances?

18  A    It does.

19  Q    And does that training specifically include marijuana?

20  A    Yes.

21  Q    Likewise, have you been trained in identifying items that are

22  used to consume or use controlled substances?

23  A    Yes.

24  Q    And does that specifically include items used to use

25  marijuana?

1   A    Yes.

2   Q    And was this training you received prior to June 12th, 2023?

3   A    Yes.

4   Q    And do you have any certifications as to those trainings?

5   A    Yes.

6   Q    Could you briefly describe those?

7   A    Yes.   I attended a law enforcement academy in 2015.   I

8   attended a second law enforcement academy in 2018 at the Federal

9   Law Enforcement Training Center.   I attended the Field Training

10  Program for the National Park Service on the Natchez Trace Parkway

11  under the tutelage of a drug recognition expert and several other

12  subject matter experts.

13  Q    Now, as far as your practical experience, prior to June 12th,

14  2023, how many marijuana search-related traffic stops had you been

15  a part of?

16  A    I would estimate well over 100.

17  Q    Now, turning to the events on June 12th, 2023, do you recall

18  where you were on June 12th, 2023 at around 11 p.m.?

19  A    Yes.   I was on patrol as a field training officer in the

20  Valley.

21  Q    You say you were a field training officer.   Who were you the

22  field training officer for?

23  A    I was training Officer Christopher Dell Isola.

24  Q    And so you two were alone originally?

25  A    Correct.

1  Q    And is it fair to say at that time you had more experience as

2  a park ranger than Ranger Dell Isola?

3  A    Yes.

4  Q    And, you know, this may be obvious, but were you there to

5  oversee Ranger Dell Isola's work?

6  A    Yes.

7  Q    Were you present for the interactions between Ranger Dell

8  Isola and Mr. Gearheart?

9  A    I was.

10  Q    Do you recall whether Mr. Gearheart possessed a pipe of some

11  kind on the night of June 12th, 2023?

12  A    He did.

13  Q    Do you recall if anyone smelled the pipe?

14  A    Yes.

15  Q    Who smelled the pipe first?

16  A    Ranger Dell Isola.

17  Q    Did Ranger Dell Isola say what he smelled?

18  A    He stated that he smelled tobacco.

19  Q    After stating he smelled tobacco, what did Ranger Dell Isola

20  do next?

21  A    He moved on to the next part of the contact, which I believe

22  was out-of-bounds camping enforcement.

23          THE COURT:  I'm sorry.  Can you state it again?

24          THE WITNESS:  He moved on to the next part of the

25  contact, which I believe was out-of-bounds camping enforcement.

1            THE COURT:  Okay.

2    BY MR. CHU:

3    Q    While Ranger Dell Isola was tending to that issue, what did

4    you do?

5    A    I smelled the pipe myself.

6    Q    And what did you smell?

7    A    Marijuana.

8    Q    Was it your idea, Ranger Blade, to double-check the smell?

9    A    I don't recall.  I believe the supervisor on scene, Ranger

10   Rippetoe, suggested it.  We were both standing right next to each

11   other.

12   Q    And is it commonplace to double-check the work of a trainee?

13   A    Yes.

14   Q    Did anyone else other than you smell the pipe?

15   A    Yes.  Ranger Rippetoe and Ranger Hesse both smelled it.

16   Q    They also confirmed the smell of marijuana?

17   A    They did.

18   Q    Did you inform Ranger Dell Isola about the smell of

19   marijuana?

20   A    I did.

21   Q    And when you did so, was he still tending to the camping

22   issue?

23   A    It was a matter of one minute maybe but, yeah, he was having

24   a conversation with Mr. Gearheart about something.

25   Q    And you mentioned it was about a minute.  So it was about a

1  minute after Ranger Dell Isola smelled the pipe that you smelled

2  the pipe?

3  A    Probably, about -- yeah.

4  Q    Okay.

5            MR. CHU:  No further questions.

6            THE COURT:  All right.  Thank you.  Ms. Ottervanger?

7                      CROSS EXAMINATION

8  BY MS. OTTERVANGER:

9  Q    Good morning, Ranger Blade.

10  A    Good morning, ma'am.

11  Q    What did you do to prepare for this hearing?

12  A    I reviewed my body-worn camera.

13  Q    And so just to be clear, there's a couple of body-worn camera

14  clips that were yours.  Which one do you mean? -- all of them

15  or --

16  A    I reviewed the two-hour one, from the start of the contact to

17  I believe when we got to the ranger office.

18  Q    Okay.  I figured that.  Did you speak to anybody?

19  A    About what?

20  Q    This case.

21  A    Yes.

22  Q    Who?

23  A    Ranger Rippetoe.

24  Q    What did you guys discuss?

25  A    I can't recall.  We were just -- we were watching the videos

1    in the same room.

2    Q    Was that today?

3    A    Yes.

4    Q    Did you watch the entirety of the video?

5    A    I did watch the entirety of it.  There were parts of it, like

6    the vehicle search and the medical portion, that I kind of didn't

7    have the time to watch the full two hours this morning, but --

8    Q    Okay.  Did you watch anybody else's video?

9    A    No, not -- other than the fact that it was playing in the

10   room, no.

11   Q    Okay.  Did you speak to Mr. Chu at all about this today?

12   A    Not today.

13   Q    When did you speak with Mr. Chu?

14   A    Last week.

15   Q    Okay.  Did you speak with Mr. Spivak?

16   A    Not that I recall.

17   Q    Mr. Anderson?

18   A    Not that I recall unless they were present on the call when

19   I was talking to Mr. Chu.

20   Q    Okay.  So you've testified already, of course, that you

21   recall the evening of June 12th, and I think we can surmise, but

22   were you wearing your body-worn camera at the time?

23   A    I was.

24   Q    And you had an interaction with Mr. Charles Gearheart?

25   A    I did.

1  Q    And that was initially for out-of-bounds camping?

2  A    Yes.

3  Q    Can you describe to me what a typical out-of-bounds camping

4  interaction would look like.

5  A    We generally are on patrol.  We see vehicles that show signs

6  of out-of-bounds camping, whether that's the location that they're

7  parked, whether that's the type of window coverings, condensation

8  inside the windows.

9      Rangers are trained in our professional training and

10 experience to see signs of out-of-bounds camping.

11 Q    Uh-huh.

12 A    Subjects are contacted.  They're generally taken and

13 identified, removed from vehicles, and enforcement -- some sort of

14 enforcement action is taken.

15 Q    And what does enforcement action usually look like in a

16 routine out-of-bounds camping interaction?

17 A    It's either a citation or a warning.

18 Q    Are they asked to leave the park?

19 A    Yes, generally.

20 Q    Okay.  And during that interaction, did Mr. Gearheart have a

21 medical incident?

22 A    Yes.

23 Q    Do you recall what that incident was?

24 A    I was only on the outside, but I saw him have some sort of

25 loss of strength or he became weak.

1    Q    Okay.  Would you say that basically he fainted?

2    A    I don't know if he lost consciousness, so I don't -- won't

3    speak to the word "fainting."

4    Q    Okay.  Well, do you recall ever calling him "hitting the

5    ground like a wet noodle"?

6    A    I don't know if he hit the ground, but I believe I might have

7    used words like "a wet noodle."  Yes.

8    Q    Okay.  So that's basically what happened.  Right?

9    A    He, yeah, lost strength.

10   Q    Were there other rangers at the scene by -- by this point

11   besides you and Ranger Dell Isola?

12   A    When the medical happened?

13   Q    Yes.

14   A    I don't recall.

15   Q    Do you recall if -- whether they were there at the time that

16   he fainted -- we'll just call it "fainting" for ease of reference

17   -- or shortly thereafter, do you recall if some of those rangers

18   entered an EMT role?

19   A    Yes.

20   Q    Do you remember who those rangers were?

21   A    I believe it was Ranger Hesse.

22   Q    Okay.  And do you recall telling Ranger Dell Isola that that

23   means that Ranger Hesse is now no longer in a law enforcement

24   role?

25   A    I don't recall.

1          MS. OTTERVANGER:  Could you please play R for me.

2     BY MS. OTTERVANGER:

3     Q    I'll catch you up.  We've got some clips from various body-

4     worn cameras.  It's not the full one 'cause that's two hours long.

5     I believe R is from your -- yes -- it is from your two-hour long

6     video.  And can you see the screen?

7     A    You can kind of see it.

8          THE COURT:  No.  Yeah.  We definitely need to move that

9     one.

10        (Video clip being played.)

11    BY MS. OTTERVANGER:

12    Q    Okay.  So did you hear yourself say that she should no longer

13    be treated as law enforcement?

14    A    I heard the thereabouts of that.  Yes.

15    Q    Okay.  It is a little difficult to hear.  Who were you

16    speaking to, do you know, in that clip?

17    A    It sounds like Dell Isola.

18    Q    Okay.

19         MS. OTTERVANGER:  And, Your Honor, that was R as in

20    "Romeo."  And it's from what is Gearheart 4, which is Ranger

21    Blades' long body-worn camera.

22         THE COURT:  Okay.

23    BY MS. OTTERVANGER:

24    Q    Why was that an important distinction to make?

25    A    We wear a lot of different hats, so it's important not only

1    for the patient care aspect but for us to kind of just keep it

2    cleaner.

3    Q    What do you mean by "cleaner"?

4    A    Just to make it clearer for the officer or the EMT who's

5    acting at that time of what their role is.

6    Q    Okay.

7    A    So it's less of maybe a legal distinction for us but a ease

8    of focus for the workload.

9    Q    Okay.  And did you also hear yourself tell Dell Isola that it

10   was his law enforcement call?

11   A    Yes.  I did hear that.

12   Q    What did you mean by that?

13   A    He's a trainee, so it's easy to get muddied up with him

14   listening to what I say or him having autonomy.  In trainees, they

15   are still fully-commissioned federal law enforcement officers, but

16   I like to remind them that he is that, so he does have authority.

17   Q    Okay.  Do you recall if Ranger Hesse left after the medical

18   incident concluded?

19   A    I don't believe she did.

20   Q    Do you recall keeping her updated about what you were doing

21   on the law enforcement side while she was there?

22   A    No, but that sounds like I probably did that.

23   Q    Okay.  Do you recall her getting involved in the search

24   itself?

25   A    I don't recall.

1  Q    Okay.   If I represent to you that that's what your body

2  camera shows, do you have any reason to doubt that?

3  A    No.

4  Q    And upon Mr. Gearheart -- okay, and I'm just going to call it

5  "fainting" -- do you recall believing that this could have been an

6  arrest for what you called a UIA?

7  A    I'm sorry.  Would you repeat your question?

8  Q    Yes.   When Mr. Gearheart fainted and there was the EMT

9  situation happening for 20 or 30 minutes, do you recall discussing

10 with Ranger Dell Isola that this could be an arrest for what you

11 called a UIA?

12 A    I don't remember that conversation, but that -- that was on

13 the table.  Yes.

14 Q    Okay.

15         MS. OTTERVANGER:   I'm going to ask to play F as in

16 "Frank," which is a clip from Ranger Dell Isola's body-worn

17 camera.

18         THE WITNESS:  Okay.

19     (Video clip being played.)

20 BY MS. OTTERVANGER:

21 Q    Okay.  Could you explain to me what "UIA" means.

22 A    Under the influence of alcohol --

23 Q    Okay.

24 A    -- or other drugs.

25 Q    What is -- sure.  What is the -- what would be the charge for

1  that?  And I don't just want to know the CFR number.  I mean, what

2  I'm -- what do you look for when you are thinking of charging

3  someone with UIA?

4  A    Someone is presenting in a way where they're either a danger

5  to themselves or other people or they're unable to take care of

6  themselves.

7  Q    Okay.  So you said it was on the table, and do you -- did you

8  say in this video that you had decided or you -- you had decided

9  it was not proper?

10  A    That's what it sounded like to me.

11  Q    Okay.  And do you remember who you were talking to in this

12  video?

13  A    Probably Dell Isola.

14  Q    Okay.  Did it sound like he was agreeing that it was not on

15  the table anymore?

16  A    I don't know if he was agreeing or not.

17  Q    Okay.  Do you not recall asking how he felt about it?

18  A    No.  It's common practice for me just to articulate things to

19  the trainee --

20  Q    Uh-huh.

21  A    -- and allow them to, you know, pontificate on those things.

22  Q    Okay.  So you said I believe that you could get an arrest,

23  even though you couldn't notice him for UIA; is that right?

24  A    I -- there's all kinds of -- I mean, there's a way to arrest

25  someone for any misdemeanor you're charging.

1  Q    What were you thinking at that time?

2  A    Of enforcement action?

3  Q    Yes.

4  A    I don't recall.  I was -- I was articulating to Ranger Dell

5  Isola what the next steps would be -- a vehicle search, and then

6  to see where that led for him.

7  Q    At the end of this clip, you say "We could ground him here."

8  What does that mean?

9  A    If someone is out-of-bounds camping and they are not fit to

10 drive, it's not uncommon for us to allow them to finish the night

11 without driving because we don't want to pose an additional risk

12 to theirs or the public's safety.

13 Q    Okay.  So at the conclusion of a U- -- I'm sorry -- an out-

14 of-bounds camping interaction, you would ground them as an

15 alternative to having them leave?

16 A    Potentially.

17 Q    Okay.  Do -- do you recall telling Ranger Rippetoe that you

18 also might have him sleep here tonight?

19 A    I don't recall.

20 Q    If I represent to you that that is what your body camera

21 shows, do you have any reason to doubt that?

22 A    No.

23 Q    And that was also -- that would also be with respect to at

24 the end of the out-of-bounds camping interaction, he would stay

25 here, sleep here?

1    A    Just as an option, as one of the potential outcomes.  Yes.

2    Q    Okay.  Have you had any prior interactions with Mr. Gearheart

3    in the park?

4    A    Yes.

5    Q    When?

6    A    I don't recall -- several months before that interaction.

7    Q    Does January 4th of that year sound about right?

8    A    Yes.

9    Q    Okay.  Who else was there at that time?

10   A    I'm not sure.  Ranger Cassling, Ranger Hesse, and there were

11   several other I think ranger trainees there.  I'm not entirely

12   sure.  I think I had a ranger trainee at the time -- Officer

13   White.

14   Q    Okay.

15   A    If I recall correctly.

16   Q    You said Hesse and Cassling.  What are their first names?

17   A    Stephany Hesse and Christopher Cassling.

18   Q    Okay.  And what are their roles within the park?

19   A    They're --

20   Q    At the time.

21   A    Officer Hesse is a U.S. Park ranger.  I can't recall at the

22   time if she was a field training officer, but she was at some

23   point during that year.  And Ranger Christopher Cassling was a law

24   enforcement supervisor.

25   Q    And on June 12th, you remembered that prior interaction

1  pretty well; right?

2  A    Yes.  I believe so.

3  Q    How many times do you think on June 12th you recited some or

4  all of the facts of that first interaction to other rangers?

5  A    I can't recall.

6  Q    If I told you it was over half a dozen, would you have any

7  reason to doubt that?

8  A    Sounds kind of high, but there were a lot of people on scene

9  that I was briefing on the situations.

10 Q    Okay.  Do you remember what you first said to Ranger Hesse

11 when she arrived on scene on June 12th?

12 A    No.

13         MS. OTTERVANGER:  I'm going to ask you to please play K

14 as in "Kilo," which is a clip from your body-worn camera on June

15 12th.

16         THE WITNESS:  Okay.

17    (Video clip being played.)

18         MS. OTTERVANGER:  So it's kind of hard to hear, but if

19 you could play maybe the first five seconds again, please.

20    (Video clip being replayed.)

21 BY MS. OTTERVANGER:

22 Q    So that -- does it appear to you that this is when Ranger

23 Hesse was just first appearing on scene?

24 A    More or less.

25 Q    And you -- can I hear what your first words to her are?

1   A    Something  "It's  Gearheart"  or  "It's  Mr.  Gearheart"  or

2   something like that.

3   Q    "It's your boy" maybe?

4   A    I can't understand the words.

5   Q    But it seemed like she knew what you meant by that?

6   A    "It's your boy"?

7   Q    Yes.

8   A    I don't know.

9   Q    Okay.  Did she -- did you hear yourself saying "pack

10  revolver"?

11  A    Yes.

12  Q    Okay.  And is that something that happened with the first

13  interaction with Mr. Gearheart?

14  A    Yes.  I believe he lied about having a loaded firearm on his

15  person and tried to remove it from the vehicle we were going to

16  search."

17  Q    And do you -- did you hear yourself tell her that you

18  recognized him the minute he got out?

19  A    No, but I probably said that.

20  Q    It's at the end.  Do you want me to play it again or --

21  A    I mean, I --

22  Q    Do you want me to play it again?

23  A    I -- what's your question?

24  Q    Do you -- did you hear yourself to say that you recognized

25  him as soon as he got out of the car?

Blade - Cross                                                    48

1  A    No, but I did recognize him as soon as he got out of the van,

2  so I can -- I'm sure I said that.

3  Q    Do you recall later when she was involved in the search

4  asking her -- you know, you said, "Coming in for a court date for

5  a weapons violation and, got another gun was used, how do you feel

6  about that?"

7  A    Is that a question?

8  Q    Yes.  Do you recall saying that?

9  A    No.

10 Q    Okay.

11       MS. OTTERVANGER:  Could you please play W.

12      (Pause.)

13      (Video clip being played.)

14 BY MS. OTTERVANGER:

15 Q    Did you hear -- now, do you recall that?

16 A    I don't really recall that but, yeah, I saw it on video, so

17 yes.

18 Q    Did you hear her just on video say, "There's a lot of things

19 I want to say right now.  It looks like you've won again"?

20 A    I -- it's really hard to understand what she said.

21 Q    Okay.

22       MS. OTTERVANGER:  We can play it again.

23      (Video clip being replayed.)

24 BY MS. OTTERVANGER:

25 Q    Do you know what Hesse meant by "looks like you won again"?

1  A    Hesse -- Ranger Hesse liked to take pride in finding illegal

2  firearms in the field.

3  Q    Okay.  And how does that mean you won?

4  A    She would come in and say like who would find one first.

5  Q    After telling her your plan for his arrest, do you recall

6  saying, "Does any of this surprise you all the stuff we found last

7  time?"

8  A    No.  I don't recall it.

9  Q    If I represent to you that that's what you said, do you have

10  any reason to doubt it?

11  A    I don't.

12  Q    And while she was going through the contents of the van with

13  you, do you remember asking her to pose with some of his

14  belongings?

15  A    I don't recall.

16  Q    Okay.

17           MS. OTTERVANGER:  Could you please play AQ?

18       (Video clip being played.)

19  BY MS. OTTERVANGER:

20  Q    So that is from Ranger Hesse's body cam footage, so it's of

21  you taking the photo.  Do you have any reason to doubt that that's

22  you asking her to take a picture with the ball of mace?

23  A    No.

24  Q    Do you recall showing that picture later to other rangers?

25  A    I don't recall.

1  Q    If I represent to you they showed it to both Ranger Rippetoe

2  and Ranger Cassling, do you have any reason to doubt that?

3  A    No.

4  Q    So after Ranger Dell Isola smelled the pipe and said it was

5  tobacco, do you remember what you did next?

6  A    I had the other rangers smell it, I believe.

7         MS. OTTERVANGER:  Could you please play -- well, --

8  BY MS. OTTERVANGER:

9  Q    Did you walk away first?

10 A    First for -- after what?

11 Q    After -- after Ranger Dell Isola smelled it and before you

12 smelled it, did you walk away from the pipe?

13 A    I wasn't standing next to Dell Isola.  I believe I was

14 standing over -- so I don't think I walked anywhere.

15        MS. OTTERVANGER:  Okay.  Could you play S as in "Sam,"

16 please.

17       (Video clip being played.)

18        MS. OTTERVANGER:  Could you pause it there and --

19 BY MS. OTTERVANGER:

20 Q    What I'll ask you to do is I'm going to play it from the

21 start and I'm going to -- I know that it's your body-worn camera,

22 so I think the natural thing would be to listen to what you're

23 saying, and I want you to focus on what Ranger Dell Isola is

24 saying in the background, if you can hear it.

25       (Video clip being replayed.)

1        MS. OTTERVANGER:  Thank you.

2   BY MS. OTTERVANGER:

3   Q    Can you hear what Ranger Dell Isola is saying to Mr.

4   Gearheart in the background?

5   A    Oh, in the background after that?  Sorry.  I thought you

6   meant when I was standing next to him.

7   Q    I meant as you were walking away and going back.

8   A    No.  I didn't.

9   Q    Do you need me to play it again?

10  A    If you really want me to hear it then, yes, I would have to

11  listen to it again.

12       MS. OTTERVANGER:  Play it one more time, please.  I

13  should have been more clear.

14       THE WITNESS:  All right.

15    (Video clip being replayed.)

16  BY MS. OTTERVANGER:

17  Q    Can you hear?

18  A    I mean, I heard him say, "What we're going to do is ..." and

19  I had a conversation with someone else, so --

20  Q    Okay.

21  A    -- I can't really hear.

22  Q    Okay.  Right.  Understood.  So I just want to make sure --

23  you and Ranger Dell Isola went over to the pipe and Ranger Dell

24  Isola smells the pipe; is that right?

25  A    Correct.

1   Q    And then he says it's tobacco?

2   A    Correct.

3   Q    And then you say, "Okay.  Leave it there."  And walked back

4   over to -- well, you tell me instead of me guessing.  Who are

5   those two rangers that walked back over to it?

6   A    Officer Rippetoe and Officer Hesse, I think.

7   Q    Okay.  And then why you're walking back over to those two

8   rangers, what is Ranger Dell Isola doing?

9   A    He's walking away.

10  Q    To -- towards whom?

11  A    Mr. Gearheart.

12  Q    Okay.  And you could hear him say, "What we are going to

13  do ..."?

14  A    I mean, in the video.  But I'm having a conversation.  If

15  you're asking me if I could hear him at the time, I think that's

16  kind of -- I was talking to someone else.

17  Q    That's fine.  Okay.  Did you confiscate the pipe?

18  A    I don't believe so.  We don't usually confiscate

19  paraphernalia.

20  Q    Did you confiscate the contents of the pipe?

21  A    I don't recall.  I don't think so.

22  Q    Okay.  Thank you.

23        MS. OTTERVANGER:  No further questions for now.

24  Appreciate your time.

25        THE WITNESS:  Thank you.

1         MR. CHU:  Just briefly, Your Honor.

2                    REDIRECT EXAMINATION

3   BY MR. CHU:

4   Q    Ranger Blade, do you recall the clip you saw when you were

5   talking about the next steps with Ranger Dell Isola while Mr.

6   Gearheart was being tended to?

7   A    The one that was shown earlier?

8   Q    Uh-huh.

9   A    More or less.

10  Q    Yeah.  And so do you recall if you were discussing the search

11  of the vehicle as the next step?

12  A    That's what it sounded like.  Yeah.

13  Q    And that was prior to actually ever smelling or any talk of

14  smelling the pipe; right?

15  A    Uh-huh.  Yes.  Sorry about that.

16  Q    And the smelling only occurred later; right?

17  A    Correct.

18  Q    And that was at the suggestion of Mr. Gearheart; right?

19  A    The smell?

20  Q    Uh-huh.

21  A    I don't recall.

22  Q    Okay.  Now, Ranger Dell (sic), you saw clips of yourself with

23  a gun -- with a discussion about the gun; right?

24  A    Shotgun?

25  Q    Uh-huh.

Blade - Redirect                                           54

1   A    Yes.

2   Q    That was after the smell; right?

3   A    Yes.

4   Q    That was after the search had already been conducted; right?

5   Or that was ongoing; right?  So that was well after the smell had

6   taken place?

7   A    Yes.

8   Q    And we talked earlier about double-checking a trainee's work.

9   Was that the purpose of the second -- your smell?

10  A    Yes.

11  Q    And, you know, Ms. Gearheart -- I mean, the Defense counsel

12  was talking to you a lot about your prior interaction with Mr.

13  Gearheart; right?

14  A    Yes.

15  Q    Would you consider prior interactions of drug use another

16  reason to potentially consider a person to be -- perhaps be under

17  the influence or be using drugs?

18  A    Potentially.

19  Q    The fainting -- would you consider that a potential cause of

20  drug use?

21  A    Symptom, you mean?

22  Q    Yes.  Sorry about that.

23  A    Potentially, yes.

24  Q    And do you recall noticing the pipe yourself?

25  A    I did.

1  Q    Do you recall also reaching out to -- talking to Ranger Dell

2  Isola to suggest if he had seen it; right?

3  A    I believe that happened.  Yes.

4  Q    Is that because the pipe is generally used for marijuana use?

5  A    Yes.

6  Q    Would you say it's more common for marijuana use than

7  tobacco?

8  A    In my training and experience over a decade, I've never seen

9  a pipe of that sort being used to use tobacco.

10 Q    Okay.  And that would be another reason to perhaps double-

11 check Ranger Dell Isola's work?

12 A    Absolutely.

13            MR. CHU:  No further questions.

14                        RECROSS EXAMINATION

15 BY MS. OTTERVANGER:

16 Q    Let's just assume that the smell of the pipe was at the

17 suggestion of Mr. Gearheart.  Did you hear Mr. Gearheart suggest

18 that you smell the pipe?

19 A    I don't recall.

20 Q    Would you have smelled the pipe even if he didn't suggest

21 that you smell it?

22 A    Would you repeat your question?

23 Q    If Mr. Gearheart never suggested that anyone smell the pipe,

24 would you have smelled the pipe anyway?

25 A    Under my training and experience, I already had probable

Blade - Recross                          56

1  cause based on that pipe that there was paraphernalia and

2  marijuana in that vehicle.

3  Q    So you wouldn't have smelled it at all; you would have just

4  searched based on the -- the sight of it?

5  A    Yes.  I would have inspected the pipe when I, you know -- but

6  I don't think that was necessary to obtain the probable cause.

7  Q    Okay.

8  A    The issue was -- I'm sorry.

9  Q    I'm sorry?

10 A    The issue was the dog in the car I think is what --

11 Q    Yes.  It was suggested to you that you have knowledge of

12 prior interactions, including drug use.  Is it your position that

13 Mr. Gearheart was using drugs during your prior interaction?

14 A    I don't recall.

15 Q    If I suggested to you that none of the drugs that were found

16 on the January 4th interaction were either on Mr. Gearheart's

17 person or in his belongings, does that sound right?

18 A    I don't recall.

19 Q    Do you have any reason to doubt it?

20 A    Maybe, but, no.  If that's what the report stated, then no.

21 Q    All right.

22        MS. OTTERVANGER:  Could you please play BL.

23 BY MS. OTTERVANGER:

24 Q    Well, actually, let me ask you a couple more questions first

25 before we play anything.  It sounds at least during the June 12th,

1   2023 incident, you recalled the January 4th incident pretty well.

2   Tell me what you recall as you sit here today, sort of an overview

3   of what happened at that time.

4   A    I would have to review notes.  That was over a year and a

5   half ago.

6   Q    All right.  Do you recall that -- well, you just said that

7   you -- you believe that he was lying about a pistol.  So do you

8   recall where that pistol was supposedly located?

9   A    I think it was in a bag or a fanny pack of some sort.

10  Q    And was that fanny pack on his person?

11  A    I don't know if it was on his person, but he tried to remove

12  it from the vehicle when the vehicle was going to be searched.

13  Q    So it was in the vehicle, within the passenger compartment of

14  the vehicle?

15  A    I believe it was in his hand.

16  Q    Okay.  Was any gun ever found in that fanny pack?

17  A    I don't know.

18  Q    Okay.

19          MS. OTTERVANGER:  We can play that clip.

20          UNIDENTIFIED SPEAKER:  BL?

21          THE COURT:  And what is this? -- BL?

22          MS. OTTERVANGER:  This is a clip from January 4th.  I

23  believe it is Ranger Hesse's body camera and it will say BL.  It's

24  not neatly named Gearheart 4 or anything.  It's got a very long

25  coded name, but it will be --

1       (Video clip being played.)

2   BY MS. OTTERVANGER:

3   Q    So do you see that drug, marijuana?

4   A    I saw the drug, yes.

5   Q    Was it located within any bags?

6   A    It didn't appear so.

7   Q    Do you recall whose vehicle that was?

8   A    No.

9   Q    Do you recall -- if I told you it was Mr. Gearheart's

10  brother, do you -- does that refresh your recollection at all?

11  A    That sounds like it's plausible.

12  Q    Okay.  If I tell you that that is true, do you have any

13  reason to doubt that?

14  A    No, ma'am.  I do not.

15  Q    Do you have -- do you recall any other marijuana being found

16  on Mr. Gearheart?

17  A    No.

18  Q    Do you recall Mr. Gearheart being subjected to field sobriety

19  tests on that time?

20  A    I don't recall.

21  Q    Okay.  If I represent to you that's what happened, do you

22  have any reason to doubt that?

23  A    I do not.

24  Q    If I represent to you that he passed all those field sobriety

25  tests, do you have any reason to doubt that?

Blade - Recross                                          59

1   A    Pass?  Would you clarify pass and fail?  It's not really how

2   the standardized field sobriety tests are conducted.

3   Q    Why don't you tell me how they're conducted, what they are

4   like.

5   A    There's a, you know, a combination of clues and probable

6   causes in that or not of intoxication or under the influence.

7   It's not a pass-or-fail score.

8   Q    Okay.  So you need a certain amount of clues to find that

9   there's probable cause that they are under the influence of

10  something?  Is that how you phrase it?

11  A    More -- more or less.  Yes.

12  Q    Okay.  If I represented to you that there were not enough

13  clues to indicate that he was under the influence of something, do

14  you have reason to doubt that?

15  A    I do not.

16  Q    Do you recall -- now we're back on June 12th of 2023 -- that

17  after Mr. Gearheart's incident, there was a whole workup by

18  actually Ranger Hesse and some -- just strictly EMT people?

19  A    Do I recall that there was a workup?

20  Q    Yes.

21  A    I don't know what the charge that they created, so I --

22  Q    But they did work him up.  Did they run him through tests to

23  determine if he was okay?

24  A    They examined him in some capacity.  I'm not sure what they

25  did.

1  Q    Okay.  And you don't recall -- and I'm pushing you back --
2  but you had decided he wasn't under the influence enough that it
3  was an issue?
4  A    I believe that's what happened.  Yes.  Under the influence to
5  the point where he's not being arrested for UIA.
6  Q    Uh-huh.  Did you believe he was under the influence?
7  A    No, 'cause he was not arrested for UIA.
8            MS. OTTERVANGER:  No further questions.  Thank you.
9            THE COURT:  Anything further?
10            MR. CHU:  Nothing further.
11            THE COURT:  Is he excused?
12            MS. OTTERVANGER:  Same, Your Honor.  I have no further
13  questions right now.  I'd like you to stick around in case we need
14  to call you again.
15            THE COURT:  Okay.
16            THE WITNESS:  Of course.
17            MS. OTTERVANGER:  Thank you.
18                                    (The witness was excused.)
19            THE COURT:  All right.
20            MR. CHU:  Your Honor, we have one more witness.  Prior
21  to that, could we get a break?
22            THE COURT:  Sure.  Do we need a brief recess? --
23  what? -- five minutes or -- five minutes good?
24            MR. CHU:  Thank you, Your Honor.
25            THE COURT:  Uh-huh.

1        (Recess from 11:28 a.m., until 11:29 a.m.)

2             THE COURT:  Let's go back on the record.  Do we have the

3    recording on?

4             THE CRD:  Yes.  We are.

5             THE COURT:  Okay.  So let me just go through just so

6    that -- I just want to confirm what I have down first.  R, F, K,

7    W, AQ, S, and BL.

8             MS. OTTERVANGER:  Yes.

9             THE COURT:  Okay.  And you'd like to move them all in;

10   is that correct?

11            MS. OTTERVANGER:  I would.

12            THE COURT:  And any objections?

13            MR. CHU:  The only objection we would have, Your Honor,

14   is foundational -- is that to the extent that clips from the

15   January 4 case were admitted, we would request that the body cam

16   footage from that case be admitted in this case as well.

17            MS. OTTERVANGER:  And that only -- the only one that

18   that applies to is BL.  And that is in evidence in the other

19   companion case.

20            THE COURT:  The January 4th case.  So you're objecting

21   in admitting it here, or you're saying you just want it --

22            MR. CHU:  No.  We want it admitted in this case as well

23   in its entirety.

24            THE COURT:  Okay.  Okay.  In its entirety.

25            MR. CHU:  Yes, Your Honor.

62

1          THE COURT:  Okay.  As opposed to just the segment that
2   she showed?

3          MR. CHU:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MS. OTTERVANGER:  And so, Your Honor, if -- I can -- I
6   can just -- I guess I'll ask Ms. Apodaca.  How would you prefer me
7   to get these to you?  Do you want me to Dropbox them to you at the
8   end?

9          THE COURT:  Dropbox, yes.

10          MS. OTTERVANGER:  I can Dropbox the entire video as
11   well?

12          THE COURT:  I have the entire video from the January 4th
13   already 'cause I watched it.

14          MS. OTTERVANGER:  That's right.  Okay.  Is that all
15   right with you, Mr. Chu?

16          MR. CHU:  That's fine.

17          MS. OTTERVANGER:  Okay.

18          THE COURT:  Okay.

19          MS. OTTERVANGER:  And then before we come -- return
20   back, I do just want to renew my objection that I had raised and
21   it was denied to the late notice and sort of the cumulative nature
22   of his appearance.

23          I did not get back -- I made it quite clear to of course
24   the Court and the opposing counsel that I was going to be gone for
25   two weeks.  I was gone for two weeks.  I did not have Internet

1   access for most of that two weeks.

2          THE COURT:  I knew you were out of the country.

3          MS. OTTERVANGER:  That's right.  I didn't return till

4   January 1st -- I'm sorry -- July 1st.  Of course that was a short

5   week because of the holiday.  I had CVB before Your Honor all day

6   yesterday.  I really had about two and a half business days to

7   prepare.  I just wanted to renew my objection.

8          THE COURT:  Absolutely.  Understood.

9          MS. OTTERVANGER:  Thank you.

10          THE COURT:  Noted.  Okay.

11          MR. CHU:  And just to be clear, Your Honor, as far as

12   the video, there are references to multiple body cams, even if

13   only one was shown.  The Defense counsel has represented various

14   statements for various scenarios as -- in asking Ranger Blade,

15   "Would it surprise you" or -- "Would it -- to have this happen,"

16   and I believe some of that goes to the multiple body cams

17   actually.  To the extent that they do, we would request that

18   all -- not just the one -- the one that she showed be admitted.

19          MS. OTTERVANGER:  Let me work through to confirm or deny

20   that.

21          MR. CHU:  Because there's some aspects of that

22   discussion that was already addressed and ruled on in that other

23   case that went to Stephany Hesse's body cam actually, not just

24   Ranger Blade's.  And that is prejudicial to discuss aspects of it

25   -- of one body camera without showing it and then not introducing

1    the entire body camera when, frankly, --

2             MS. OTTERVANGER:  I've lost the thread.  I'm sorry.  Can

3    you start again?

4             MR. CHU:  Well, --

5             MS. OTTERVANGER:  Which -- what number are you -- which

6    one --

7             THE COURT:  Don't talk to each other.  What -- are you

8    now objecting to one of these?

9             MR. CHU:  No, Your Honor.

10            THE COURT:  Okay.

11            MR. CHU:  We're just asking to the extent that there was

12   discussion --

13            THE COURT:  Is there any -- I guess my question then is:

14   Are you saying that another body cam's going to show something

15   differently than what any of these body cams showed?  I mean, they

16   are being recorded simultaneously.

17            MR. CHU:  They are --

18            THE COURT:  Some may make it clearer what's being said.

19   Obviously, Ranger Dell Isola's body camera when he's speaking to

20   Mr. Gearheart clearly states what was going on at that point in

21   time.  The other body camera from Ranger Blade that may have

22   captured that in the distance, obviously it may have caught bits

23   and pieces of it, and --

24            MR. CHU:  But the principal reason I'm asking for

25   multiple body cams in the January case is that --

1          THE COURT:  Oh, January case.

2          MR. CHU:  Right.  So the Defense counsel is talking

3    about both the bag coming in or out of the car.

4          THE COURT:  Right.

5          MR. CHU:  That's specific to Ranger Hesse's actual body

6    cam.  And as to whether there was marijuana use, that's also

7    mainly Ranger Hesse's body camera.  Defense counsel --

8          THE COURT:  Well, I think the Counsel was -- I mean, I'm

9    making the arguments for you, but I think the -- I mean, I'm well

10   aware of the January 4th case.  Mr. Gearheart in that case was

11   charged with possession.  My understanding is there was -- he was

12   -- in that case, they did do a test on him to determine whether

13   they would appoint him to drive the vehicle because they weren't

14   going to appoint the -- his brother to drive the vehicle because

15   they had determined that he was not operating a vehicle in a

16   proper manner and was concerned that he may have been under the

17   influence of marijuana.

18          So I think that's --

19          MR. CHU:  Right.

20          THE COURT:  And there was -- so there was that body

21   camera.  And he had a dog in that case as well, as I recall, and

22   then --

23          MR. CHU:  There was discussion about --

24          THE COURT:  -- then the wife went to the bathroom.  I

25   mean, I saw the body cameras.

1           MR. CHU:  Right.

2           THE COURT:  I mean, --

3           MR. CHU:   There was discussion about whether the

4   marijuana -- drug use or not.  And on Ranger Hesse's body cam, the

5   brother specifically says that they did.

6           THE COURT:  But -- no, the brother says, "I did," I

7   believe is what he said.

8           MR. CHU:  He says, "We had."  That's my recollection,

9   Your Honor, that it was a "we," not an "I."

10          THE COURT:  Okay.  Okay.  Okay.

11          MS. OTTERVANGER:  Either way, it's all on Ranger Hesse's

12  video, which you have.

13          THE COURT:  Right.

14          MR. CHU:  And to the extent --

15          THE COURT:  So -- okay.  So you want the whole -- you

16  want the whole January 4th then --

17          MR. CHU:  Right, and --

18          THE COURT:  -- instead of just the BL.

19          MR. CHU:  -- all I'm saying is to the extent it affects

20  multiple body cams, that all of the body cams come in.

21          THE COURT:  Okay.

22          MR. CHU:  So that --

23          MS.  OTTERVANGER:   Unfortunately,  some  of  the  body

24  cameras were deleted, so there aren't like the ones of the field

25  sobriety tests.  Those are --

1           THE COURT:  Okay.

2           MS. OTTERVANGER:  -- deleted.

3           MR. CHU:  Okay.  And just for the record, Your Honor, as

4  far as objection to the -- Ranger Rippetoe, same points and we

5  would add, of course, that the Defense counsel has his evidence

6  and I believe Ranger Rippetoe's body cam itself was submitted as

7  part of the -- the motion to suppress or one of the replies -- I

8  forget which one.  Just noting that for the record.

9           THE COURT:  Okay.  All right.  Are we ready?

10          MR. CHU:  Yes, Your Honor.

11          THE COURT:  Okay.  So Ranger Rippetoe can come in now if

12  someone wants to re-invite him back in.

13      (Pause.)

14          THE CRD:  Please raise your right hand.

15      RANGER IAN JAMES RIPPETOE, GOVERNMENT'S WITNESS, SWORN

16          THE CRD:  Thank you.

17          THE COURT:  State your whole name and spelling of the

18  last name for the record.

19          THE WITNESS:  My name is Ian James Rippetoe.  Last name

20  R-i-two p's-e-t-o-e.

21          THE COURT:  Okay.

22                        DIRECT EXAMINATION

23  BY MR. CHU:

24  Q    Ranger Rippetoe, what is your current occupation?

25  A    I'm a Supervisory Park Ranger.

1   Q   And did you hold the same title on June 12th, 2023?

2   A   I did.

3   Q   And where are you a park ranger?

4   A   Yosemite National Park.

5   Q   And were you working there on June 12th, 2023?

6   A   Yes, sir.

7   Q   And were you in that same supervisory position at that time?

8   A   I was.

9   Q   And how long have you been a park ranger?

10  A   I've worked seasonal primarily since the summer of 2011.

11  Q   And as a park ranger, are you charged with drug enforcement

12  responsibilities?

13  A   I am.

14  Q   And have you received training on drug enforcement?

15  A   I have.

16  Q   Does that training include identifying controlled substances?

17  A   It does.

18  Q   And does that training include marijuana specifically?

19  A   It does.

20  Q   Likewise, have you been trained on identifying items used to

21  consume or use controlled substances?

22  A   I have been.

23  Q   And as to marijuana specifically?

24  A   Yes, sir.

25  Q   And was this training -- did you -- all this training, did

1  you receive it before June 12th, 2023?

2  A    I did.

3  Q    And do you have any certifications?

4  A    I do.

5  Q    Could you briefly describe them?

6  A    I have a State Police Officer certification through POST.  I

7  have a Seasonal Law Enforcement Academy from Santa Rosa.  And I

8  have my FLETC graduation.

9  Q    And prior to June 12th, 2023, how many marijuana search-

10 related traffic stops were you a part of?

11 A    I'd say dozens to over a hundred.

12 Q    You mentioned you're a Supervisory Park Ranger.

13 A    Yes, sir.

14 Q    And you said that you were in that position on June 12th,

15 2023?

16 A    Correct.

17 Q    Do you recall if Ranger Dell Isola was part of the training

18 program?

19 A    I do.

20 Q    Was he part of the training program?

21 A    He was.

22 Q    And was Ranger Blade ever assigned to be his mentor or

23 supervisor?

24 A    He was.

25 Q    And was he -- was Ranger Blade a supervisor on June 12th,

1    2023?

2    A    He was a field training officer.

3    Q    Field training officer.  And as a field training officer,

4    does he sort of overlook a trainee's work?

5    A    He does.  The trainees are not permitted to work without the

6    presence of their trainer.

7    Q    Turning to the events at issue, on June 12th, 2023, do you

8    recall being called that night for an incident involving a Mr.

9    Gearheart?

10   A    I do.

11   Q    And were you present on the scene at the beginning?

12   A    No.  I arrived later.

13   Q    And when you arrived later, what was going on?

14   A    It was -- a medical event was going on.

15   Q    Do you recall at some point after the medical incident if Mr.

16   Gearheart possessed a pipe of any kind on that night?

17   A    Yes.  I do recall that.

18   Q    Do you recall if anyone smelled the pipe?

19   A    Yes.

20   Q    Who smelled the pipe first?

21   A    Ranger Dell Isola.

22   Q    Did Ranger Dell Isola say what he smelled?

23   A    I believe he said he smelled tobacco.

24   Q    After Ranger Dell Isola stated that he smelled tobacco, what

25   did Ranger Dell Isola do next?

1  A    I believe he continued on with the contact.

2  Q    Okay.  While Ranger Dell Isola was discussing or contacting

3  Mr. Gearheart, what were you doing?

4  A    I believe I had a brief discussion with Ranger Blade on the

5  likelihood that it was actually tobacco in -- in the pipe.

6  Q    Did you suggest Ranger Blade confirm the smell?

7  A    I did.

8  Q    And is that common to double-check or confirm the work of a

9  trainee?

10 A    Very common.

11 Q    And did you end up smelling --

12 A    I did.

13 Q    -- the pipe?  And what did you smell?

14 A    Marijuana.

15 Q    Did anyone else smell the pipe?

16 A    Officer Hesse and Officer Blade also both smelled the pipe.

17 Q    And just lastly, did anyone inform Ranger Dell Isola that --

18 about the smell?

19 A    I believe Officer Blade did.

20 Q    Okay.

21        MR. CHU:  No further questions.

22        THE COURT:  Thank you.  Ms. Ottervanger.

23                  CROSS EXAMINATION

24 BY MS. OTTERVANGER:

25 Q    Good morning.

1   A    Good morning.

2   Q    Can you tell me a little bit about what you've done to

3   prepare for this hearing?

4   A    I've reviewed body cam footage and reports.

5   Q    Which ones? -- because there were many.  Specifically, which

6   body cams did you review?

7   A    I viewed small sections of others, including Ranger Blade's

8   and Dell Isola's, --

9   Q    Okay.

10  A    -- and I reviewed mine.

11  Q    Yours.  That was about an hour and a half?

12  A    Correct.

13  Q    Okay.  And then the small sections of Rangers Blade and Dell

14  Isola, were those the ones that were about two hours?

15  A    I believe so.

16  Q    Okay.  Did you speak with either Ranger Blade or Ranger Dell

17  Isola?

18  A    Regarding --

19  Q    About the case.

20  A    Of course, yes.

21  Q    What did you guys discuss?

22  A    Preparation for trial, that we'd need to review the case,

23  that we would be, you know, refreshing our memories from over a

24  year ago on a case and that we should review it.

25  Q    Okay.  Did you speak to Mr. Chu about the case?

1    A     I did.  He suggested we review our footage.

2    Q     What about Mr. Spivak?

3    A     Not specifically.   I'm sure he could have, but I don't

4    remember specifically.

5    Q     Okay.  And Mr. Anderson?

6    A     I'm sure he was part of the conversation.

7    Q     Okay.  So on June 12th, you said you arrived later.  What was

8    the purpose of you being present on the scene?

9    A     As a supervisor, I commonly drop in on scenes to see if I can

10   be of use.

11   Q     Okay.  Were you alone or did you have a partner at the time?

12   A     I believe I was riding with Mr. Terry, Officer Terry.

13   Q     Okay.  Do you recall how many rangers were on scene in all?

14   A     Just give me a moment.

15   Q     Of course.

16   A     Initially we had Officers O'Brien and Officer Kim and King.

17   They were there before I was.  I did ask them to leave.  I had

18   concern there might be too many officers on scene.  They didn't

19   leave immediately, but they did eventually leave.  That left us

20   with Officer Hesse, Officer Dell Isola, Officer Terry, who was

21   with me and would not leave without me.  We had another trainee

22   there, so probably upwards of six -- six-plus at any given time --

23   plus medics at one time.

24   Q     Aside from the fact that it's common for you to drop in, does

25   a supervisor need to be on scene?

1   A    Not necessarily.

2   Q    So you arrived just during the medical incident?

3   A    Before the medics got there.

4   Q    Okay.

5   A    But I believe medics had been called for.

6   Q    Okay.  Do you recall that Ranger Hesse was -- had engaged

7   herself as an EMT?

8   A    As I recall, she recently completed her EMT training --

9   Q    Okay.

10  A    -- and that she was acting in some kind of medical capacity.

11  Q    Okay.  Do you recall determining that Mr. Gearheart was

12  "probably high" within 15 minutes of you arriving?

13  A    Not specifically.

14  Q    If I represent to you that that is what you said on your own

15  body camera, do you have any reason to doubt that?

16  A    Not specifically.  No.

17  Q    Have you had any prior first-hand interaction with Mr.

18  Gearheart?

19  A    No.

20  Q    Have you heard about any interactions with Mr. Gearheart?

21  A    I have.

22  Q    Okay.  When approximately would you have heard about those

23  incidents?

24  A    Around the time of his first contact here in the park.  We've

25  also watched him through previous body cam footage.

1  Q    Okay.  And who would have informed you of it?

2  A    Probably Ranger Hesse.

3  Q    Okay.

4  A    I supervised her.

5  Q    And you supervised -- I'm sorry?

6  A    I supervised Ranger Hesse and it was her case.

7  Q    Okay.  Okay.  Do you recall a conversation with Ranger Blade

8  on that evening -- on June 12th -- where Ranger Blade said to you

9  he didn't think that he was a danger to himself?

10 A    Not specifically.

11 Q    Okay.  I want to -- I'm going to play something for you.

12        MS. OTTERVANGER:  It's AV.  I'm going to --

13        THE WITNESS:  Sure.

14        THE COURT:  I can't see.

15     (Video clip being played.)

16 BY MS. OTTERVANGER:

17 Q    Does that appear to be your body camera?

18 A    It does.

19 Q    Who are you speaking to?

20 A    I believe it's Ranger Blade.

21 Q    Okay.  And so did you hear that person who you believe to be

22 Ranger Blade tell you he doesn't think that Mr. Gearheart is a

23 danger to himself?

24 A    Uh-huh.

25 Q    Can you -- do you understand why he was saying that?  What

1    does he mean by he's not a danger to himself?  What was the

2    consideration?

3    A    Whether he would have to go with medics immediately.

4    Q    Okay.  Do you know what the initial stop was for?

5    A    I believe it was out-of-bounds camping.

6    Q    Okay.  And was there any kind of a concern about him being

7    a danger to himself while out-of-bounds camping?

8    A    We couldn't have known, obviously.  We normally do out-of-

9    bound camping checks.

10   Q    Okay.  And so explain to me what happens at an out-of-bounds

11   camping check typically.

12   A    It's illegal to camp in a park without an established

13   campsite or towing, etc.  It's a huge problem for us.  So we

14   generally make contact with them in the vehicle.  We ID them in

15   case they become a habitual offender.  And we educate them on the

16   park rules, educated them on food storage, other violations at the

17   same time, and then either cite them --

18   Q    And how does it typically conclude?  Are they allowed to stay

19   where they are?

20   A    No, almost never.

21   Q    And you ask them to leave the park then?

22   A    Generally.

23   Q    Okay.

24   A    There are exceptions, but generally.

25   Q    And did you hear Ranger Blade say that he was thinking of

1  just having Mr. Gearheart sleep here tonight?

2  A    The conversations were muffled.  It would not surprise me.

3  Q    Okay.  And so that would mean that at the conclusion of the

4  out-of-bounds camping, instead of asking him to leave the park,

5  we're just going to ask him to sleep here?

6  A    Correct.

7  Q    Okay.  And did you hear yourself say that, "Either way, given

8  he's not under the influence, we should toss the car"?

9  A    Uh-huh.

10  Q    What was that based on?

11  A    I don't recall specifically.  I could have been notified of

12  other probable cause.

13  Q    Okay.  And you said you eventually did smell the pipe that

14  Ranger either Dell Isola and/or Blade had found?

15  A    I did.

16  Q    You smelled it in short sequence after Ranger Blade and

17  Hesse; is that your recollection?

18  A    Correct -- or in some order.

19  Q    Okay.

20       MS. OTTERVANGER:  Actually, let's play AN, please.  And

21  just for the record, the previous clip was of course from Ranger

22  Blade.

23       (Video clip being played.)

24  BY MS. OTTERVANGER:

25  Q    Okay.  So I just want to walk through what we see on that

1    video.  Ranger Blade comes back over to where you were and Ranger

2    Hesse -- is that Ranger Hesse in the --

3    A    That's her footage.

4    Q    That's her footage.

5    A    I believe so.

6    Q    Okay.  So you're standing with Ranger Hesse.  Ranger Blade

7    comes back after Ranger Dell Isola has smelled the pipe?

8    A    Uh-huh.

9    Q    Did Ranger Blade smell the pipe while he was sitting there

10   with Ranger Dell Isola?

11   A    I don't believe so.

12   Q    Okay.  So he comes back to you.  You have a discussion.  And

13   then what happens?

14   A    I asked him to confirm.

15   Q    Okay.  And so -- in what order was subsequent smells?

16   A    I believe Ranger Dell Isola smelled it.

17   Q    Uh-huh.

18   A    He seemed to think it was tobacco.

19   Q    Uh-huh.

20   A    Ranger Blade came back to me, said something to the effect

21   of, "He thinks it was tobacco" or, you know, something about the

22   car being tobacco or something like that.  I asked him to confirm

23   because I had not worked closely with Ranger Dell Isola in the

24   past, not sure of his experience.  It would not have been

25   impossible to make a mistake.

1  Q    Okay.  And you smelled it after that -- so it was Dell Isola,

2  then Blade, then Hesse, then you?

3  A    I believe I was the last one.

4  Q    Did you catch at the beginning of that Ranger Hesse visibly

5  expressing her doubt that it was actually tobacco?

6  A    I think we all had our doubts that it was tobacco.

7  Q    Okay.

8  A    It would be very unusual for somebody to smoke tobacco out of

9  a bong -- not impossible, but very unusual.

10 Q    And you referenced earlier that you had asked some people to

11 leave.

12 A    Uh-huh.

13 Q    Do you recall saying that you were going to ask Ranger Hesse

14 to leave?

15 A    Not specifically.

16 Q    If I represent to you that you did say that, do you have any

17 reason to doubt that?

18 A    It would not surprise me.  It was a balance between trying to

19 search the car quickly at the time on scene versus overwhelming

20 scene with two other rangers.

21 Q    Uh-huh.  Do you recall whether Ranger Hesse did leave the

22 scene at any point?

23 A    I don't believe she did.

24 Q    Why would fewer people be better?

25 A    If we have people standing around doing nothing, there's

1    other work they could be doing.

2    Q    Uh-huh.

3    A    But if -- if we have use for them, if we're not going to, you

4    know, clutter up the car with too many people, it's a balance, you

5    know.  Only so many people can search a car effectively.  Being an

6    extra is not being of use watching a suspect or -- as far as being

7    useful, they can generally find something else to do.

8    Q    Was the pipe confiscated?

9    A    I don't recall.

10   Q    Was the contents of the pipe confiscated?

11   A    I don't recall.

12   Q    Did you do any -- what is the word I want? -- inventory of

13   what was confiscated?

14   A    Personally?  I don't recall.

15   Q    Okay.  If you had, would you have worn your body camera

16   during that inventory?

17   A    Generally.

18   Q    Okay.  Do you think it's important -- well, you guys have a

19   manual; right?  The rangers have a manual?

20   A    Uh-huh.

21   Q    What does that say about your body camera? -- when it should

22   be on, what should you do when you're turning it off?

23   A    Generally, when we're engaged in law enforcement contact, we

24   should have it on.

25   Q    Okay.

1   A    And when we turn it off, unless it's obvious the contact's

2   concluded, etc., we should verbalize why we're turning it off, for

3   example, to save battery, etc.

4   Q    Does it speak to whether it should be on during an inventory?

5   A    I don't recall specifically.

6   Q    Okay.

7          MR. CHU:  Objection.  Your Honor, we've given them a

8   little bit of leeway.  This has nothing to do with the -- to the

9   issues that the Court has.

10          MS. OTTERVANGER:  Mr. Chu represented to me at the

11   beginning of this proceeding he didn't think the Rules of Evidence

12   applied.

13          THE COURT:  They don't.

14          MR. CHU:  No.  I mean, I'm talking about the subject

15   matter.  Yeah.  We're going -- but it's in the scope of your

16   order, not the Rules of Evidence.  And we've given a lot of leeway

17   here today, to be honest.

18          THE COURT:  I get that, but I also get where she's

19   going, too.

20          MR. CHU:  Okay.

21          THE COURT:  So -- go ahead.

22          MS. OTTERVANGER:  I actually don't think I have any

23   further questions for you, Ranger Rippetoe.  Thank you for your

24   time today.  Appreciate it.

25          MR. CHU:  No further questions, Your Honor.

1          THE COURT:  All right.  I have a couple questions.  I

2     have a couple questions.  One is the -- when you have a

3     training -- a field training officer with a new hire, what

4     delegation of duty -- like what is the delegation of duty?  Do

5     they confirm everything or are they there just as an oversight?

6          THE WITNESS:  That's an excellent question.  I should

7     begin by saying I'm not a field training officer myself.

8          THE COURT:  Okay.

9          THE WITNESS:  I have not gone through the field officer

10    training.  But we do have several in the park, some of which I

11    supervise.  Our Field Training Program's broken up into at least

12    four phases and different duties and distribution of

13    responsibilities can vary, depending on which phase they are.  A

14    broader review would be at the very beginning, the trainees are

15    actually not actively doing law enforcement work.  They're kind of

16    shadowing and observing.

17         THE COURT:  Uh-huh.

18         THE WITNESS:  And then they take on gradually more

19    responsibilities as their training progresses, up until the last

20    phase in which they're just being watched by a trainer.  Unless

21    something extraordinary happens, the trainer does not interfere.

22         THE COURT:  Okay.  And so Ranger Dell Isola said he was

23    in the second phase --

24         THE WITNESS:  Uh-huh.

25         THE COURT:  -- with Ranger Blade.  So in that phase, is

1  he -- is there more hands-on training?  Is --

2          THE WITNESS:  Again, my limited opinion -- not as a

3  field training officer -- it would be the beginning of his hands-

4  on law enforcement training.

5          THE COURT:  Uh-huh.

6          THE WITNESS:  So he's no longer just observing a more

7  experienced officer.  He's beginning to embark on his own

8  contacts, in close coordination with the training officer.

9          THE COURT:  Okay.  And in terms of confirming the smell,

10 whether it was tobacco or marijuana, had Ranger Dell Isola said it

11 was marijuana, would they also have confirmed the smell --

12         THE WITNESS:  Potentially.

13         THE COURT:  -- as a training officer?  In a supervisory

14 capacity, have you ever been on site where there has been

15 disagreements before as to whether or not it was -- something was

16 marijuana or not the smell of marijuana?

17         THE WITNESS:  I have been on scenes where someone did

18 smell something and someone did not, and I think it's -- it's

19 common depending on if someone has a cold or just a natural

20 sensitivity.  Some people smell better than others.  Some people

21 may be stuffed up.  Some people have allergies.  I have been on

22 scenes where one ranger says, "I smell marijuana," another says,

23 "I don't smell anything."

24         THE COURT:  Okay.  And how are those situations handled?

25         THE WITNESS:  There's generally a primary officer, so

1    there's -- the officer that initiated the stop or something like

2    that, the discretion's usually left to them.

3            THE COURT:  Got it.  All right.  Thank you.  All right.

4    I don't have anything else.  Anything more?

5            MS. OTTERVANGER:  No, Your Honor.  Thank you.

6            THE COURT:  Thank you.  Now is he excused?

7            MS. OTTERVANGER:  Yes.  You are excused.

8            THE COURT:  You're excused.  You can leave.

9                                    (The witness was excused.)

10           THE COURT:  Do we want to recall them?

11           MS. OTTERVANGER:  One moment, please.

12           THE COURT:  Sure.

13       (Pause.)

14           THE COURT:  Do you want to recall them?

15           MR. CHU:  No, Your Honor.

16           THE COURT:  Okay.

17       (Pause.)

18           MS. OTTERVANGER:  No, Your Honor.  Thank you.  They can

19    both be excused.

20           THE COURT:  They can both be excused.  Do you want to

21    tell them they're now excused.

22           THE CRD:  Everybody?

23           THE COURT:  Everybody.

24           MS. OTTERVANGER:  Yes.  Thank you so much.

25           THE COURT:  They're all done.

1          MS. OTTERVANGER:  Appreciate it.

2          THE COURT:  All right.  Do you want to -- I'm assuming

3   Ms. Ottervanger's going to say yes.  I'm sure she wants to do

4   argument.  I'm not sure if you do or not, but I'm happy to hear

5   argument at this stage, but --

6          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

7          MR. CHU:  We're happy to, Your Honor.  The one thing I

8   do want to address is that when I was not here yesterday, my

9   understanding was that the Court had a question about a Sixth

10  Circuit case.

11         THE COURT:  Uh-huh.

12         MR. CHU:  I'd be happy to either now or through

13  supplemental briefing explain why that's not applicable.

14         THE COURT:  Okay.  I'm happy to hear it.  I mean, I get

15  it's a dog.

16         MR. CHU:  It's --

17         THE COURT:  And it's time period and -- yeah, I can make

18  distinctions, but I guess is there any case law out there where

19  you get a do-over, you know what I mean?  Is there ever --

20         MR. CHU:  It --

21         THE COURT:  And I understand there's going to be

22  circumstances -- you're going to argue he was a trainee.

23         MR. CHU:  It's not.  I mean, Your Honor, there's no

24  prolongation in this case.  That's why we're emphasizing the whole

25  point about Mr. -- Ranger Dell Isola actually going back to the

1    camping issue.

2              THE COURT:  Uh-huh.

3              MR. CHU:  If we look at the Sixth Circuit case, Your

4    Honor -- referring to Your Honor, that's after there's no smell

5    with the first dog, it actually goes to 9 additional minutes of

6    waiting for another -- or 16 minutes of waiting for another dog to

7    show up.  There's nothing like that here.  (Indiscernible)

8    situation that the dogs would be actually here.  Two dogs came on

9    scene.

10             THE COURT:  Uh-huh.  Do you have a case where two dogs

11   are on scene -- one smells, one doesn't?

12             MR. CHU:  No, Your Honor, but this goes straight -- once

13   that -- once -- this goes back to addressing the first issue.

14   It's really just an *Illinois v. Cabellas* issue, Your Honor.  It

15   goes back to whether the officers are lawful -- is lawfully

16   present and is able to do the actions he did, which is smell the

17   pipe.

18             THE COURT:  Uh-huh.

19             MR. CHU:  There's no elongation.  It goes back -- it's

20   exactly *Illinois v. Cabellas*.  Now, in that case, because there's

21   been no elongation, even though there is now a reasonable

22   suspicion, they could do a dog search.

23             Here, he's smelling the pipe not because there's

24   manipulation being put on consent here, which Ranger -- I mean,

25   not Ranger -- Mr. Gearheart provided voluntarily.  And plus, at

1  the end of the day, even if it's a disagreement about the scope,

2  that's the reasonable scope of the consent, that's -- at worst,

3  that's a reasonable mistake of fact or law and there's no way --

4  there's no legal basis to argue that's an unreasonable search,

5  Your Honor.  It just --

6          And even if you look at a different perspective from the

7  way the Sixth Circuit looked at it in that perspective, which was,

8  "Hey, this dog was really accurate.  Therefore, there's no

9  reasonable basis to get another dog."  Here, we actually -- even

10  if the Court found a different pattern, we have the argument as

11  opposed to, "Hey, we have reason to doubt Ranger Dell Isola's

12  smell for whatever reason, given that he has less training, he's

13  just been out in the field for a month," etc., etc., etc., and to

14  both officers -- the two other officers both testified that, no,

15  it's a bong.  There's no -- no one uses tobacco.  There's multiple

16  reasons to actually go back and actually check.  Everything in the

17  Sixth Circuit that's -- opinions that cite to that decision, if

18  there is a basis to actually go back and do it, they say it's

19  okay.

20          But, again, there's not even elongation here.  There's

21  no Constitutional violation to begin with because he was

22  addressing a camping issue.  The smell took place when that issue

23  was being addressed.  There's no period of time -- there's no 90

24  minutes extra that's going on here.

25          And, again, you know -- but as far as -- the Defense

1  would have to argue that the smelling of the pipe itself is

2  wrongful at that point.  But, again, there was consent.  And as

3  far as disagreement about the scope of the consent, that goes to

4  reasonable mistake of fact or law.  And, again, --

5      THE COURT:  What about Ranger Blade's position that the

6  presence of the pipe was sufficient without the smell?

7      MR. CHU:  That was our position in our briefing as well.

8  Initially -- and I think Ranger Blade clarified why -- the reason

9  why.  Once you see the object, like the meth pipe in the case we

10  cited, there is probable cause based on the fact that this pipe

11  was used for X purpose -- the use of marijuana primarily.

12      Now -- now, the officers were clearly trying to help out

13  or alleviate the concern, maybe try to expedite things because of

14  the dog.  There was a dog inside.  If you watch the body cam, Your

15  Honor, there's multiple instances where Mr. Gearheart is telling

16  them how big the dog is, how dangerous the dog is, etc., etc.,

17  etc.  And to help maybe expedite things to make it safer, they

18  want to just smell it to see if it -- hey, if it smells like

19  tobacco, let's just (indiscernible) what that was.  Okay?

20      And, you know, Ranger Dell Isola "gave him the benefit

21  of the doubt."  He thought he smelled tobacco.  Other officers

22  disagreed.  But, again, there's no prolongation here.  And that's

23  not the way -- and, frankly, if you look at the briefing in both

24  their opening and the reply, they don't argue that issue as far as

25  the smell.  They don't explain what the prolongation actually was

1    once Ranger Dell Isola actually turned to the camping issue at the

2    end.

3           If you -- I believe specifically --

4           THE COURT:  I think their position is once he said

5    tobacco, you've asked your probable cause I think is what her --

6    the --

7           MR. CHU:  I would completely agree, Your Honor, in the

8    sense that there was no -- probable cause is gone.  It goes back

9    to *Cabellas -- Illinois v. Cabellas*, whether there's a lawful

10   discussion on -- about the camping issue.  There's -- it goes back

11   again to the -- to whether the officer, once he smells the pipe,

12   is in a lawful position to do that.  And here, he had consent.

13          THE COURT:  So you're saying that Gearheart's, "You can

14   smell the pipe," was you, you all?

15          MR. CHU:  And, Your Honor, there's -- I'll even, you

16   know -- the proposition that -- I'll just quote you a case.

17          THE COURT:  Was it in your brief already?

18          MR. CHU:  No.

19          THE COURT:  Okay.

20          MR. CHU:  I did extra research last night.  First, as

21   far as turning to the camping issue, there's an unpublished

22   opinion in the Sixth Circuit that cites to *Davis* that

23   specifically explains, you know -- let's see -- and I'll just read

24   a quote of this, *United States v. Rogers*, 861 --

25          THE COURT:  Wait, wait, wait.  *U.S. v. Rogers*?

1          MR. CHU:  Uh-huh, 861 Federal Appendix 8, pages 15

2    through 16.

3          THE COURT:  Wait, wait.  I can't write that fast.

4          MR. CHU:  Sorry about that.

5          THE COURT:  861 Fed. Appendix --

6          MR. CHU:  861 Federal Appendix 8, --

7          THE COURT:  Eight.

8          MR. CHU:  -- pincite 15, 16.

9          THE COURT:  Fifteen, 16?

10         MR. CHU:  Uh-huh, Sixth Circuit (2021).  "Here, the

11   police officer (indiscernible) to detain Rogers and Ford while

12   waiting for the off-duty police officer to arrive.  And a key

13   difference between the facts here and in *Davis* is that once the

14   off-duty officer failed to identify Rogers and Ford as the

15   robbers, the purpose had started transitioning to writing Rogers

16   a traffic citation," etc., etc., etc.

17         So now once that happens, --

18         THE COURT:  Uh-huh.

19         MR. CHU:  -- it goes back to, again, basic principles of

20   the Fourth Amendment.

21         Now, we can look at, again, whether, one, Ranger Blade's

22   conduct was lawful because he had consent or, two, you can also

23   get there just the reason it was asked, it was a reason to double-

24   check in a sense.

25         And, here, we also have a citation from a district court

1    -- let me get it -- for the proposition -- let's see -- it's from

2    *United States v. Avila,* 615 Federal Supp.3d 846, pincite 871, -72,

3    Northern District of Illinois (2022), affirmed by the Seventh

4    Circuit on July 9th, 2024.  "There's no (indiscernible) under the

5    Fourth Amendment, especially when the officer had their doubts

6    about the advocacy of the administrative search and they wanted to

7    double-check."

8              Now, you know, the Fourth Amendment is, again, a

9    reasonableness standard.

10             THE COURT:  Right.

11             MR. CHU:  And that's the backdrop of it, Your Honor.

12   And here, even if we look at that aspect of it, you know, the

13   double-checking, the reason for all the discussion we've had, but

14   again there's no prolongation in this -- you know, so basically we

15   have two bases for argument here today.

16             THE COURT:  Okay.  Thank you, Mr. Chu.  Ms. Ottervanger.

17             CLOSING ARGUMENT ON BEHALF OF THE DEFENSE

18             MS. OTTERVANGER:  Thank you, Your Honor.  The stop was

19   an issue for out-of-bounds camping.  And I had -- I had all three

20   rangers explain to me what happened.  They see someone that they

21   think is camping.  They speak with them.  They have them identify

22   themselves and then they either write them a ticket or don't and

23   ask them to leave, or in some probably rare instances they ask

24   them to stay here.

25             Mr. Gearheart had already been told to stay here by

1   Ranger Dell Isola before Ranger Blade smelled the pipe.  The stop

2   is over at a minimum at that point.  If it is not over by the time

3   that Ranger Dell Isola says, "This is tobacco.  We're good," then

4   it is certainly over by the time he says, "We're going to have you

5   sleep here."  It is concluded.

6        The case law is clear that it is all you need to address

7   the mission.  There is nothing else to address the mission.  The

8   mission has been addressed.  Anything else is housekeeping; you

9   know, giving back an ID, whatever.  That's not addressing the

10  mission.  That's housekeeping.  There's case law that also is very

11  clear that holding onto an ID doesn't prolong the stop.  If it

12  did, any officer anywhere could just hold onto an ID for as long

13  as they wanted and say, "Oh, the stop wasn't over.  I didn't give

14  him the ID back."

15       Specifically, I'm looking at *United States v. Rodriguez*.

16  That is 575 U.S. 348.  I will admit, Your Honor, in my haste, I

17  didn't write down all the years.  As well as *Florida v. Royer*,

18  R-o-y-e-r, 460 U.S. 491.

19       And Mr. Chu harps a lot on how long the stop was

20  extended in the Sixth Circuit case, *Davis*.  That isn't relevant.

21  The case law is clear that even a brief extension, not even

22  momentarily -- it doesn't have to be a full minute, let alone a

23  full hour -- you may not extend it even momentarily.  Once

24  reasonable suspicion has been dispelled, even a brief extension

25  violates the Fourth Amendment.  That is *U.S. v. De La Cruz*, 203

1    F.3d 1193.

2            The reasonable suspicion has been dispelled by Ranger

3    Dell Isola confidently announcing, "This is tobacco.  We're good

4    to go," walking over, telling Mr. Gearheart, "This is tobacco.

5    We're good to go."  Ranger Blade didn't immediately confirm it.

6    He didn't confirm it until he had a conversation later.  Ranger

7    Dell Isola didn't stutter.  He didn't seem to have any doubts.  He

8    didn't say, "Hey, could you check me on this?"  He testified that

9    he has smoked both tobacco and marijuana.  He doesn't think he

10   needs any training to know what they smell like.  I don't -- I

11   don't know if anyone in this room needs training on what they both

12   smell like, but he does have training.  And Ranger Blade testified

13   -- Ranger Blade, who is a field officer trainer, a field trainee,

14   whatever they're called -- has testified that at that point,

15   Ranger Dell Isola is a fully-commissioned law enforcement officer.

16   It was his scene.  He is the primary -- a variation of a phrase

17   that he specifically used to say, This is Ranger Dell Isola's

18   scene.  He's the primary.  He's in charge.  I'm just -- I'm just

19   here.

20           Smelling marijuana isn't something that a new officer

21   needs holding hands with.  That's, How do I effect an arrest?  How

22   do I make initial contact?  Using your sense of smell is not

23   something that someone needs to be babysat for.  So him smelling

24   tobacco, announcing it both to Ranger Blade and Mr. Gearheart, is

25   dispelling the reasonable suspicion.

1          As to the consent issue, it's in the video.  I didn't

2     play it.  Perhaps I should have.  But you can see it.  You've got

3     the full video.  Mr. Gearheart is having a conversation with

4     Ranger Dell Isola.  He is saying, 'You' want to search my van?

5     Yes.  It's tobacco.  'You' can smell it.

6          Now, when somebody gives consent they have the right to

7     limit the scope of their own consent.  Mr. Gearheart was very

8     clear.  Of course, the doctrine of consent expressly did not apply

9     to searching his van.  I don't think that's in doubt.  I don't

10    think the Government would say it did.  And when we're looking at

11    what -- how to define the scope, it's a reasonable, objective

12    person standard.

13         I don't think that one could credibly argue that a

14    reasonable, objective person would think that my consent extends

15    to someone else who wants to double-check the guy who's letting me

16    go.  The guy who said, "This is tobacco" just as you said, "I'm

17    going to let you go," I don't think a reasonable person would say

18    that my consent extends to a bunch of other people who maybe they

19    won't let you go and we're going to search your van.  We could

20    have just said, "We don't have your consent to do it."  I don't

21    think that we have enough information to base that you meant

22    "y'all."  There were eight rangers on scene.  I don't think it's

23    reasonable to say that his consent extends to any and everybody

24    who was on scene, especially given the fact that he has had a

25    prior interaction with Ranger Blade and Ranger Hesse, and it

1  wasn't a particularly good interaction from I don't think either

2  side.

3        So with respect to the smelling and the consent -- hold

4  on.  I've got some cites for you.  It may take me a moment to find

5  them.  That's *Florida v. Jimeno*, 500 U.S. 248.

6        So given that the consent only extended to Ranger Dell

7  Isola and the reasonable suspicion has disipitated (sic) --

8  dispelled at this point, I would suggest that Ranger Blade's sniff

9  was a new -- a new unlawful seizure.  It is not the same as if

10  there had been marijuana emanating from it.  That -- this is the

11  distinction between *Florida v. Jardines* and the name is escaping

12  me, but the sort of passive like planes overhead that can see

13  things where they say, you know, officers don't have to avert

14  their view.  If they just happen to see it, they happen to see it.

15  But walking up to it, picking it up and smelling it is not a

16  passive observation.  It was a new seizure that they no longer had

17  reasonable suspicion for because that had been dispelled by Ranger

18  Dell Isola.

19        THE COURT:  You also mentioned about the conversation

20  issue.

21        MS. OTTERVANGER:  Yes.  It is my understanding -- so --

22  and I just mean this to be factual.  I don't -- I'm not trying to

23  frustrate (ph).  The videos in both of Mr. Gearheart's cases sort

24  of came, you know, in rolling waves.  They weren't provided all at

25  once.  Some of them were delivered in the first case.  Ranger

1  Hesse had turned off her camera, so I don't have everything.  And

2  Mr. Chu attached something to one of his responses to my motion

3  that has never been produced to me still, even after requesting

4  it.  Its still has never been officially produced to me.

5          THE COURT:  What is it?

6          MS. OTTERVANGER:   It's the inventory that Ranger

7  Cassling did of -- of the other paraphernalia.

8          THE COURT:  The other -- other --

9          MS. OTTERVANGER:  That's right.

10          THE COURT:  Okay.

11          MS. OTTERVANGER:  And in that, it references Ranger

12  Rippetoe being told to do everything else.  Ranger Rippetoe

13  doesn't think he did anything.  He does think he would wear his

14  camera.  I don't have that camera footage.  I don't have a report

15  from him.  I specifically re-asked Mr. Chu, you know, last week --

16          THE COURT:  That's in the January case we're talking

17  about?

18          MS. OTTERVANGER:  This is this one.

19          THE COURT:  This one.

20          MS. OTTERVANGER:  Uh-huh.  And so as far as everything

21  that I have, there's no marijuana confiscated, the pipe wasn't

22  confiscated, the contents of the pipe wasn't confiscated.  There's

23  no way to prove what it was.  So that was my inquiry into the

24  inventory and whether the pipe was taken or not.  So if it was,

25  nobody seems to have any track of it or know where it is, who took

1  it, and -- and Mr. Gearheart has told me that he has it still, so

2  that is sort of what I am basing that on of course.  I'm sorry.

3  Did I answer your question?  I was sort of rambling.

4          THE COURT:  Yes.

5          MS. OTTERVANGER:  Okay.

6          THE COURT:  And, Mr. Chu, were you going to say

7  something?

8          MR. CHU:  As far as our factual basis, I believe the

9  report mentions (indiscernible) marijuana.  Now, as far as the

10  pipe is concerned, it has -- it has no bearing.  There's no case

11  law suggesting that the basis of the probable cause has to come in

12  (indiscernible) of future charge or it has to be confiscated.

13  That's just irrelevant.

14          I mean, legally it is, Your Honor.  I'll leave that

15  factual point if Ms. Ottervanger wants to continue that.  I'd like

16  to reply afterwards.

17          THE COURT:  Okay.  I got it.

18          MS. OTTERVANGER:  I don't -- I don't think that any

19  marijuana was confiscated.  I do recall a reference to them

20  finding some.  It was one eighth of a tablespoon -- a teaspoon was

21  the amount.  They also of course found tobacco, hand-held

22  cigarettes, and other tobacco items.

23          I don't know what was confiscated.  I do agree that it's

24  irrelevant.  My point is not whether that little .3 grams was

25  confiscated.  My point is that we can't test what they smelled.

1  I'm not saying --

2          THE COURT:  I assume that's your argument.

3          MS. OTTERVANGER:  Yes, ma'am.  Your Honor, if -- I think

4  I've hit my points of course not very maybe eloquently or

5  thoroughly, but I think you've got enough of the gist of where I'm

6  going.  You know, Mr. Chu offered supplemental briefing.  If that

7  is your desire, I will engage with that, but --

8          THE COURT:  I don't think we need -- I don't think we

9  need any more briefing.

10          MS. OTTERVANGER:  Thank you.

11          THE COURT:  I'm briefed out.  I think I have plenty.  I

12  just wanted to get some perspective on --

13          MS. OTTERVANGER:  I'm sorry.

14          THE COURT:  Go ahead.

15          MS. OTTERVANGER:  I didn't touch very much on *Davis*.  I

16  only had the chance to sort of skim it last night.  I do think it

17  is instructive.  It is obviously not binding.  Your Honor

18  obviously knows these men are not dogs.

19          THE COURT:  Uh-huh.

20          MS. OTTERVANGER:  I do think -- I remember reading

21  something along the lines of the first dog -- I don't remember his

22  name --

23          THE COURT:  Uh-huh.

24          MS. OTTERVANGER:  -- was fully trained, no reason to

25  doubt -- of course, he had been doing it for three years.

1          THE COURT:  Right.  Right.

2          MS. OTTERVANGER:  Ranger Dell Isola has not, but he is

3    in fact fully trained.  Even if he is, you know, in additional

4    training, he has been fully trained.  He's a fully-commissioned

5    law enforcement officer and he -- his nose knows what marijuana

6    is.  I think I actually just quoted Justice Kagan.  But -- so I do

7    think it's instructive.  I do think the hour-long delay is

8    irrelevant.  It's a momentary delay that is unconstitutional and

9    that's what happened here.

10          THE COURT:  So your position is basically once Dell

11   Isola said "tobacco," PC died?

12          MS. OTTERVANGER:  That's right.

13          THE COURT:  Unless there's some other basis to resurrect

14   PC --

15          MS. OTTERVANGER:  That's right.  And we --

16          THE COURT:  I'm just --

17          MS. OTTERVANGER:  And it's clear that --

18          THE COURT:  I'm confirming I'm understanding you on

19   this.

20          MS. OTTERVANGER:  Uh-huh.

21          THE COURT:  Unless there was some other basis to

22   resurrect PC on some other reason, whether they've got to be under

23   the influence, but it appears they have ruled that out, there was

24   no other smell of marijuana, your position is that's it.  He went

25   over.  He was finishing up the out-of-bounds and telling him he

1    can stay there -- We're going to let you stay here.  And that was

2    the end of the stop.  Whether they were going to write him a

3    citation or whatever, I don't know.  I can't remember if he was

4    cited for out-of-bounds camping.

5            MS. OTTERVANGER:  He was eventually, but I don't believe

6    they would have absent -- I think -- I guess I should have asked,

7    but --

8            THE COURT:  Right.

9            MS. OTTERVANGER:  -- it doesn't appear that they were

10   going to.

11           THE COURT:  Right.  So there's -- so that's your

12   position.  Your position is that Dell Isola's statement that it

13   was tobacco didn't -- didn't eliminate -- didn't stop -- is your

14   position it does?

15           MR. CHU:  No.  It is -- that the probable cause has

16   dissipated, Your Honor, but then he goes back to the out-of-bounds

17   camping.  There's zero prolongation.

18           THE COURT:  Why is it -- okay, but so he's -- back to

19   the out-of-bounds camping, how do you get back to smelling the

20   pipe?

21           MR. CHU:  This is just fundamental principles of the

22   Fourth Amendment.  Now, he goes back to the camping issue.

23           THE COURT:  Uh-huh.

24           MR. CHU:  While he's addressing the camping issue,

25   officers have consent to smell the pipe.  Now, --

1          THE COURT:  When you say "consent" -- I guess -- and I'm

2    trying to figure out the consent issue here with regards to

3    whether or not she's saying this is a -- do they even need consent

4    if they have the marijuana pipe to --

5          MR. CHU:  They do and that -- and that -- what Defense

6    counsel was getting at -- (indiscernible) jam things up, but what

7    she was really getting at is plain view issue.

8          THE COURT:  Uh-huh.

9          MR. CHU:  There's a plain smell doctrine, Your Honor.

10          THE COURT:  Uh-huh.

11          MR. CHU:  But, frankly, to be completely blunt, he did

12    touch the -- the pipe.  Now, that takes it out of plain smell

13    which is a corollary to the plain view doctrine.  So our position

14    is that it was, at worst, reasonable mistake of fact, which is

15    allowed for consent, even under the Supreme Court precedent.

16          THE COURT:  Uh-huh.

17          MR. CHU:  At worst, it's a reasonable mistake of fact or

18    law as to the scope of consent.  As Ranger Dell Isola mentioned,

19    he was turning around when he made that statement.  And if you

20    actually watch the body cam footage, which was the point I was

21    trying to get at, he's trying to convince all the rangers, "Oh,

22    it's tobacco.  It's tobacco."  He's telling multiple rangers about

23    "It's tobacco, tobacco, tobacco," whether or not Ranger Dell Isola

24    is even next to them or not.

25          THE COURT:  Let me ask you a hypothetical, Mr. Chu.

1   Let's say Blade says it's marijuana.  Rippetoe says it's not.

2   Hesse says it is.  What do you do?

3           MR. CHU:  I mean, it's up to, you know --

4           THE COURT:  It's up to who? -- the primary?

5           MR. CHU:  No.  I mean, it's up to the -- you know,

6   whoever, you know -- then it's an objective standard.  And taking

7   all those facts into account, was it -- was there potential

8   probable cause?  And it's a totality of the circumstances

9   situation.  It's a reasonableness standard.

10          Now, you know, again, there was zero prolongation.  It's

11  no secret to say that I'm suggesting that unlimited is okay.  I

12  never said that.  What I'm suggesting to you is that when he went

13  back to the out-of-camping (sic) issue and was still going on

14  about it, and the case -- the case law is clear, Your Honor --

15          THE COURT:  But he's investigating out-of-bounds

16  camping.

17          MR. CHU:  Uh-huh.

18          THE COURT:  Okay.  How do you go back from out-of-bounds

19  camping to then go back to, "I'm going to search the -- if I can

20  establish probable cause, I get to search the van"?

21          MR. CHU:  Uh-huh.

22          THE COURT:  Do you understand?  I'm trying to -- you

23  don't get to search a van for out-of-bounds camping.  You don't

24  get to say, "Hey, we think you're out-of-bounds camping."  You

25  come up and there's windows are tinted and the guy gives you ID

1   and they don't see a bong, that doesn't give them --

2           MR. CHU:  That's completely --

3           THE COURT:  -- the right to say, "I'm going to come and

4   search ..."

5           MR. CHU:  That's completely -- but, again, Your Honor,

6   they didn't go into the van.  They smelled it again.  They had a

7   lawful basis to (indiscernible) the smell.  This is exactly

8   *Illinois v. Cabellas*.  It's exactly that case, Your Honor.  You

9   have to go back to what's the --

10          THE COURT:  That's in your brief?

11          MR. CHU:  I did not brief this issue as far as --

12          THE COURT:  That *U.S. v.* --

13          MR. CHU:  Yeah.  I didn't brief that case.  The --

14  again, the only argument even --

15          THE COURT:  Do you have the cite for that one?

16          MR. CHU:  Sure, Your Honor.  And in that case, there was

17  a dog.  But the question is whether there's a lawful basis for the

18  officer.

19      (Pause.)

20          THE COURT:  I'm just trying to get how you get back to

21  establish probable cause for marijuana after someone's eliminated

22  it.

23          MR. CHU:  As long as there's a lawful contact going on,

24  officers are allowed to do whatever lawful things they're allowed

25  to do.

1          THE COURT:  Right.

2          MR. CHU:  Here --

3          THE COURT:  But you've eliminated that pipe; right?

4          MR. CHU:  Right.

5          THE COURT:  Clearly.  So what -- what now gives you a

6    second bite at that apple?  That's what I'm trying to --

7          MR. CHU:  It's -- again, you know, it's a reasonableness

8    standard, Your Honor, and one -- the one point of our argument is

9    the fact that, again --

10         THE COURT:  But there was eight officers there, so

11   what's reasonable?  How many get to smell it?

12         MR. CHU:  Well, I think --

13         THE COURT:  Till somebody says marijuana?

14         MR. CHU:  Well, in this case, you heard from both

15   officers articulate specific reasons why they thought it was not

16   plausible that the pipe was not -- smelled of tobacco.

17         Now, as far as going back to the issue -- again, if you

18   look at Illinois v. Cabellas --

19         THE COURT:  The cite.

20         MR. CHU:  Sure.  It's 543 U.S. 405.  Now, in that

21   case --

22         THE COURT:  543 U.S. --

23         MR. CHU:  -- 405.  Now, in that case, what had happened

24   was there was a traffic stop for speeding.  There was no

25   reasonable suspicion or anything else.  Officer shows up.  Because

1    a traffic stop is going on, he's allowed to use the dog to search.

2    It's the same scenario once we're back in the turning point of

3    going back to the out-of-camping (sic) issue.  It's just simply

4    whether the officer has a lawful basis to do what he did.

5              And here, he did.  That's one argument.

6              The other argument is of course there was a reasonable

7    basis to check given the testimony of the other officers saying,

8    hey, basically -- "Come on," like -- essentially, they're arguing

9    -- well, as far as the scenario was concerned, their perception

10   was, you know, it was less than accurate.  As far as that kind of

11   argument, the Sixth Circuit is replete with those kind of

12   arguments, even citing *Davis*.

13             But, again, it's simply a question of once he goes back

14   to the camping issue, was there prolongation?  No.  Did the

15   officers have a lawful basis to smell the pipe?  Yes, they did,

16   which was, you know, at worst, reasonable mistake of fact or law.

17             And one point I want to make clear, Your Honor, that

18   Defense counsel -- and this is -- they've kind of made this

19   argument in the briefing itself -- it's a suggestion that, Oh, you

20   say X words as far as a camping issue and then suddenly you get

21   Norby (ph) rights.  Like you give your ID and it's done.  I mean,

22   the case law is clear, Your Honor.  There's like 20 minutes, 30

23   minutes and then there's --

24             THE COURT:  Right.  You have a legitimate reason to

25   determine if there's weapons.  You know, I get all that, but --

1          MR. CHU:  That, and as far as the camping issue --

2          THE COURT:  That -- right, but that -- well, no, I think

3   what she's arguing is that the -- with regards to out-of-bound

4   camping, you know, what do they normally do once they determine --

5          MR. CHU:  No, I get that, Your Honor, but the case law

6   is pretty clear.  They said in U.S. v. (indiscernible) whether

7   they're  issuing a citation or etc., it's not some magic -- well,

8   they say magic, but I don't think that's exactly even factually

9   speaking.  That's not what the rangers spoke to as far as that

10  issue was concerned.  This is how we're going to process it.  We

11  are planning to have him do this. And they're talking about the

12  issue with Mr. Gearheart when they've been interrupted at the end

13  of the day, you know.

14         THE COURT:  Okay.  Anything further?

15         MS.  OTTERVANGER:     I  think  the  difference  between

16  Cabellas  and  here is that no one had dispelled that reasonable

17  suspicion otherwise when they called the dog.

18         MR. CHU:  Your Honor, it's just about whether an officer

19  has a lawful basis to do what he did.  That's the -- that's the

20  standard on the Court, Your Honor, as far as whatever actions they

21  take.    There's  no  Douglas  two  times  test  under  the  Fourth

22  Amendment.  There's nothing like that.  Even the district court we

23  cited says so.  It's a reasonableness standard at the end of the

24  day.

25         And there are times where -- there's cases from the

1   Tenth Circuit that talk about that sometimes there's a good reason

2   to double-check.  You're not going to make up a rule about that.

3   Depending on the circumstances, you can or you cannot.  I mean,

4   you know, again, there's no -- you're suggesting like is there a

5   case?  We cited at least a proposition that, you know, suggests

6   what we stated and, again, I don't think we can create a bright

7   line rule here that they couldn't smell it again.

8          THE COURT:  Okay.  Okay.  I think I understand your

9   arguments.  Thank you.

10          MR. CHU:  Thank you, Your Honor.

11          THE COURT:  We're in recess till 1:00 p.m.

12      (Proceedings adjourned at 12:26 p.m.)

13

14          I, Peggy Schuerger, certify that the foregoing is a

15   correct transcript from the official electronic sound recording

16   provided to me of the proceedings in the above-entitled matter.

17

18   _____*Peggy Schuerger*_____      July 18, 2024_____
     Signature of Approved Transcriber        Date

19

20   Peggy Schuerger_____
     **Ad Hoc Reporting**
21   Approved Transcription Provider
     for the U.S. District Court,
22   Eastern District of California

23

24

25