UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES EDWARD GEARHART, JR,<br><br>Defendant. | Case No. 6:23-mj-00006-HBK-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS[1]<br><br>(Doc. No. 8)<br><br>ORDER SETTING STATUS CONFERENCE |

Pending before the Court is Defendant's Motion to Suppress filed August 25, 2023. (Doc. No. 8, "Motion"). In support, Defendant attaches Ranger Dell Isola's Report and his body-worn camera as exhibits. (Doc. Nos. 8-1, 8-2, Exhibits 1 and 2, respectively). Defendant seeks to suppress "all evidence and statements" obtained from a warrantless search of his vehicle and because his statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.*). On November 17, 2023, the Government filed an opposition to the Motion (Doc. No. 17), attaching as exhibits the Rangers' Reports, and the body-worn camera recordings for Rangers Dell Isola and Blade. (Doc. No. 18, Exhibits 1, 2 and 3 respectively). On December 22, 2023, Defendant filed a Reply. On May 7, 2024, the Court granted in part Defendant's request for an evidentiary hearing on the Motion. (Doc. No. 29). The Court held an evidentiary hearing on the

---

[1] This motion was referred by the district court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 421(b). (E.D. Cal. 2023).

Motion on July 10, 2024. At the evidentiary hearing, Gearheart submitted eleven video clips of the body worn camera recordings from the June 12, 2023 incident, as well as a clip from a January 4, 2023 incident in Yosemite National Park involving Plaintiff and his brother, which the Court included in its review of this Motion. In their oral argument at the evidentiary hearing, both Parties also cited additional case law not raised in their briefs, which the Court also reviewed.[2] For the reasons set forth below, the undersigned denies the Motion.

## FACTUAL BACKGROUND AND FINDINGS

Defendant Charles Edward Gearhart Jr. was charged in a three count criminal complaint of: (1) Camping outside designated sites or areas in violation of 36 C.F.R § 2.10(b)(10); (2) Carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation in violation of 36 C.F.R. § 2.4(c);[3] and (3) Possessing a controlled substance – psilocybin mushrooms (111.3 grams) in violation of 36 C.F.R. § 2.35(b), stemming from an incident that occurred on June 12, 2023 in the Michaels Ledges area of Yosemite National Park. (*See* Doc. No. 1). The following facts are gleaned from the probable cause statement in support of the complaint, body cameras worn by Rangers Dell Isola, Blade, Hesse and Rippetoe, and testimony at the evidentiary hearing.

On June 12th, 2023, at approximately 11:00 PM, United States Park Rangers Christopher Dell Isola and Jacob Blade were on patrol together in Yosemite National Park. (Doc. No. 40 at 10:8-18). Dell Isola had been a Park Ranger since January 2023. (*Id*. at 7:7-9). His first five months were at the academy and at the time of the incident in question, he had only been in the field for one month. (*Id*. at 7:10-15). Blade was acting as a field training officer for Dell Isola, who was in the second phase of an 11- to 13-week field training program. (*Id*. at 27:6-18). Dell Isola had participated in "two or three" vehicle searches relating to marijuana prior to the date of the incident. (*Id*. at 9:1). Around 11:00 PM, the Rangers observed a white Ford van backed into

---

[2] The Government also filed a Statement of Clarification as to Oral Argument on June 11, 2024. (Doc. No. 38).

[3] The Court previously denied Defendant's Motion to Dismiss the 36 C.F.R. § 2.4(c) charge under the Second Amendment. (*See* Doc. No. 28).

a parking spot at a turnout on Northside Drive west of Michaels Ledges. (Doc. No. 1 at 1; Doc. No. 40 at 10:6-18). The van had foil shades covering the driver's side, passenger's side and front windows. (Doc. No. 1). Based on the location, the time of night, and the foil shades on the car's windows, Dell Isola suspected the occupant(s) of the vehicle were engaged in out-of-bounds camping. (*Id*.).

Ranger Dell Isola knocked on the side of the van and announced himself as police. (Doc. No. 17 at 28). An occupant of the van, later identified as Defendant Charles Edward Gearheart Jr., told Ranger Dell Isola he was in the Park to attend a court hearing for an improperly stored firearm. (Doc. No. 1 at 2). Gearheart also explained to Dell Isola that he had a large dog inside that was not friendly. (Doc. No. 17 at 28).

After explaining that Gearhart could not camp in the pullout, Ranger Dell Isola asked for a driver's license. (Ex. 2 to Doc. No. 17 at 00:46-00:48). When Gearheart could not immediately produce the license, Ranger Dell Isola asked Gearhart for his name, date of birth, and the state of issuance of his driver's license. (*Id*. at 1:00-1:55). Ranger Dell Isola then turned to Ranger Blade and stated, "I'm going to run his name and DOB. It's kind of a weird setup with his dog so I was going to step over, can you just keep an eye out?" (*Id*. at 2:10-2:23). At this point, Gearhart offered to "throw [his] shoes on and come out and shut the door." (*Id.* at 2:23-2:25). Both rangers responded, "yeah, let's do that." (*Id*. at 2:26-2:27). Dell Isola observed a water pipe inside the van immediately before Gearheart exited the van. (Doc. No. 40 at 11:2-7, 24; 18:16-18). Ranger Blade confirmed with Dell Isola that he noticed "the paraphernalia?" (*Id*. at 2-7). Based on Dell Isola's training and experience, he identified the water pipe as one "commonly used to smoke marijuana." (*Id*. at 8-14).

After stepping out of the van, Gearhart began adjusting something on his pants while partially turned away from Ranger Dell Isola; Gearhart then put his hands up and stated, "sorry." (Ex. 2 at 2:50-3:00). Ranger Dell Isola then asked Gearheart if he had any guns on him or in the vehicle. (*Id*. at 3:00-3:09). Gearheart answered no, stating, "I was just trying to tie my belt." (*Id*.). Gearheart then volunteered that Ranger Dell Isola could pat him down. (*Id*. at 3:12-3:14). Ranger Dell Isola responded, "All right, get you in a second," and then spent about thirty seconds

3

listening to radio traffic.  (*Id*. at 3:16-4:12).

Ranger Dell Isola then began to perform a pat down of Gearheart.  (*Id*. at 4:27-4:30). About a minute and a half into the pat-down, Gearheart became unsteady on his feet and Dell Isola prompting Dell Isola to ask if Gearheart had been using any drugs.  (*Id*. at 5:45-6:00). Gearheart denied using drugs but acknowledged drinking a beer about an hour earlier.  (*Id*. at 6:00-6:12).  As Gearheart continued to appear unsteady, the Rangers offered to call an ambulance.  (*Id*. at 6:21-6:22).  Gearheart declined and after about a minute indicated the Rangers could continue.  (*Id*. at 7:12).  Gearhart then appeared to lose consciousness once the Rangers resumed the search, prompting them to call Emergency Medical Services.  (*Id*. at 8:21; Doc. No. 17 at 28).

Rangers Stephany Hesse and Aaron Zavesky, who had arrived on scene as backup, attended to Gearheart's medical needs until EMS personnel arrived, including asking Gearheart questions related to his medical condition.  (*Id*. at 8:30-33:00).  Rangers Hesse and Zavesky explained to Gearheart that their questions were being used to render proper medical care, not for investigative purposes.  (*Id*. at 10:10-10:20).  During this time, Rangers Dell Isola and Blade discussed how best to conduct a search of Gearheart's vehicle given that Gearheart's dog was inside the van.  (*Id*. at 20:28-29:40).  Ranger Dell Isola also informed Ranger Blade of his suspicion that Gearheart was under the influence of drugs given his "weird" behavior.  (*Id*. at 20:30-20:40).  Ranger Blade informed Ranger Dell Isola of a previous interaction Gearheart had with park rangers, involving possession of marijuana.  (*Id*. at 22:00-23:00).  After Gearheart was medically cleared, Ranger Dell Isola completed the previously-interrupted pat-down.  (*Id*. at 33:05-34:20).

After the pat-down, Ranger Dell Isola advised Gearheart that the Rangers were going to search the van due to the presence of the "dab rig" (i.e. water pipe).  (*Id*. at 34:30-34:45). Gearheart responded that the pipe was used for smoking tobacco and volunteered that the rangers could "smell it."  (*Id*. at 34:45-35:15).  Ranger Dell Isola initially discussed with Gearheart taking the dog out of the vehicle so that rangers could conduct their search, but then decided against it after learning that the dog was uncollared.  (*Id*. at 34:20-38:00*).  Instead, Ranger Dell Isola asked

4

Gearheart to remove the pipe from the van and place it on the ground.  (*Id*. at 38:45-39:20).  After Gearheart did so, Ranger Dell Isola smelled the pipe and stated, "yeah it smells like tobacco, I think we're good."  (*Id*. at 39:30-39:40).  While Dell Isola discussed with Gearheart the out of bounds camping issue and where he would stay the night but before he issued any citation, (*id*. at 39:50-40:06), Ranger Blade and two other Rangers walked over to the pipe to confirm the smell.  (Ex. 3 at Doc. No. 17 at 42:14-42:40).  Ranger Blade stated that the smell was of "weed."  (Ex. 2 at 40:18-40:20).  Rangers Hesse and Rippetoe also smelled the pipe and confirmed that it smelled of marijuana.  (Doc. No. 40 at 71:11-16).

At the evidentiary hearing, Ranger Dell Isola acknowledged that he was "sensitive" to the smell of tobacco because he had smoked tobacco for 18 years and only discontinued smoking it the year prior.  (*Id*. at 9:19-25, 10:1-5, 14:2-9).  Dell Isola testified that he was "not confident that he smelled only tobacco, only that [he was] confident that he did smell tobacco."  (*Id*. at 13:24-25, 14:1).  When questioned as to why the other Rangers smelled marijuana, Dell Isola reasoned that "[i]t's possible that the pipe is being used for both."  (*Id*. at 14:2-4).

Due to the smell of marijuana, Rangers Dell Isola, Zavesky, and Michael Terry conducted a search of the van lasting about 40 minutes.  (Ex. 2 at 45:00-1:23:00).  Ultimately, the vehicle search led to the discovery of "a loaded 12-gauge Mossberg 590s shotgun," boxes of .38 special ammunition, multiple edged and blunt weapons, 0.3 grams of processed marijuana, 10 bags containing psylocibin mushrooms and a small jar containing psylocibin mushrooms in an unknown fluid, among other items.  (Doc. No. 17 at 29).  After the search, the rangers arrested Gearheart, (Ex. 2 at 1:33:12-1:34:40) and Rangers Zavesky and Dell Isola each read Mr. Gearheart his *Miranda* rights.  (*Id*. at 1:35:00-1:42:00).

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  When a search is conducted without a warrant, the analysis begins "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically

established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). For example, because there is a lesser expectation in the privacy of one's vehicle than of one's person, a warrantless search of a vehicle may be conducted if there is probable cause to believe the vehicle contains contraband. *United States v. Ross*, 456 U.S. 798, 799 (1982).

Searches incident to lawful custodial arrests are also excepted from the Fourth Amendment's warrant requirement. *United States v. Robinson*, 414 U.S. 218, 235 (1973). The government bears the burden of establishing that a warrantless search was reasonable and did not violate the Fourth Amendment. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir. 1992), *cert. denied,* 510 U.S. 900 (1993) (citations omitted). Under the exclusionary rule, evidence obtained in violation of an individual's Fourth Amendment rights, including any "'fruit of the poisonous tree,'" is excluded from a criminal trial. *United States v. Cervantes*, 703 F.3d 1135, 1138-39 (9th Cir. 2012); *see also Alderman v. United States*, 394 U.S. 165, 171 (1969)

**DISCUSSION**

Gearheart moves to suppress all evidence seized during the search of his vehicle as well as the statements "obtained as a result of (1) the warrantless search of the vehicle . . . and (2) [in] violation of *Miranda v. Arizona*, 384 U.S. 436 (1966)." (Doc. No. 8 at 1). Gearheart does not dispute the validity of the initial law enforcement stop for out of bounds camping but contends that Rangers lacked probable cause to search the vehicle. As discussed below, the Court does not find any of Gearheart's arguments persuasive.

**A. Whether the Rangers' Investigation Exceeded the Scope of the Initial Stop**

Under the Fourth Amendment, a seizure for a traffic stop[4] is "a relatively brief encounter," "more analogous to a so-called *Terry* stop than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (alterations

---

[4] The Court accepts the Parties' view that a traffic stop occurred as opposed to a *Terry* stop. (Doc. No. 8 at 7); (Doc. No. 17 at 12 n. 8). Given that the two are analytically the same, the distinction is not material. *See United States v. Nault*, 41 F.4th 1073, 1080 (9th Cir. 2022) ("Whether described as a traffic stop or an investigative vehicle stop, the analysis here is the same. Traffic stops are analyzed under the same *Terry* principles that apply to investigative stops.") (internal quotation marks omitted).

omitted)). To be lawful, a traffic stop must be limited in its scope: an officer may "address the traffic violation that warranted the stop," make "ordinary inquiries incident to the traffic stop," and "attend to related safety concerns." *Id*. at 354–55 (quotations and alterations omitted). The stop may last "no longer than is necessary to effectuate" these purposes and complete the traffic "mission" safely. *Id*. at 354–55 (citations omitted); *see Rodriguez*, 575 U.S. at 355 (officers during traffic stops may check licenses, check for outstanding warrants against the driver, and inspect registration and insurance); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). A stop "may be extended to conduct an investigation into matters other than the original traffic violation" so long as "the officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019).

Here, Gearheart argues that "the entire search was invalid from the start because the rangers only obtained their probable cause due to unnecessary questioning after completing the mission of an underlying traffic stop." (Doc. No. 8 at 6). Gearheart contends that Ranger Dell Isola "had everything necessary to complete the mission of the traffic stop within the first two minutes of the recorded encounter" once he "obtained information to verify Mr. Gearheart's identity." (*Id*. at 7-8). However, it is uncontested that Ranger Dell Isola was in the process of verifying the information Gearheart provided when Gearheart volunteered that he would exit the vehicle.[5] (Doc. No. 8 at 4); (Doc. No. 17 at 7). As Gearheart exited the van, Ranger Dell Isola

---

[5] In his Reply, Gearheart cites *Landeros*, 913 F.3d at 867 and related cases for the proposition that an officer may not ask "extraneous questions that prolong a stop" absent reasonable suspicion. (Doc. No. 24 at 5). Gearheart contends that Dell Isola impermissibly prolonged the traffic stop when he asked Gearheart whether he had any weapons on his person or in the vehicle because such a question was "extraneous." However, as the Supreme Court noted in *Arizona v. Johnson*, "traffic stops are "especially fraught with danger to police officers . . . the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." 555 U.S. at 330-31. Attending to "safety concerns" involved in completing a traffic stop are within the scope of a routine stop. *Rodriguez*, 575 U.S. at 354-55. And as noted above, the Ninth Circuit specifically held in *Taylor*—for which the Supreme Court recently denied a petition for writ of certiorari—that asking whether a detainee has any weapons is one of the "ordinary inquiries" that officers may ask during a routine traffic stop. 60 F.4th at 1239.

observed a water pipe inside the van, and upon being questioned whether he had any guns or weapons on himself, Gearheart then volunteered to be frisked, which ultimately caused the investigation to be prolonged due to Gearheart becoming weak and fainting.

These events were not the result of any impermissible questioning or delay by the Rangers. Rather, they occurred while the Rangers were still completing their mission of verifying Gearheart's information and occurred in large part because of Gearheart's decision to exit the vehicle. Further, Gearheart voluntarily exited the van and admitted that his reason for being in the Park was to attend court for a previously improperly stored firearm. Not only were Dell Isola's inquiries about weapons reasonable and permissible under binding precedent, *Taylor*, 60 F. 4th at 1239, here they were prudent given Gearheart's disclosure of his previous weapons offense. The Court finds the traffic stop was not "prolonged beyond the time reasonably required to complete th[e] mission" of advising Gearheart as to the violation and verifying his information, and thus the subsequent investigation was not per se invalid under the Fourth Amendment. *See Rodriguez*, 575 U.S. at 349.

**B. Whether the Water Pipe Gave Rangers Probable Cause to Search the Vehicle**

Police may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132, 162 (1925); *see also United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) ("[Police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime . . . . 'Probable cause to search is evaluated in light of the totality of the circumstances.'") (citations omitted). The mere sound of a glass pipe that an officer suspects is drug-related paraphernalia can justify the search of a vehicle for contraband. *United States v. Alvarez*, 2023 WL 6567602, at *1 (9th Cir. Oct. 10, 2023). As to the scope of such a search, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. at 825.

The automobile exception "is motivated by the supposedly lower expectation of privacy individuals have in their vehicles as well as the mobility of vehicles, which allows evidence

contained within those vehicles to be easily concealed from the police." *United States v. Camou*, 773 F.3d 932, 941 (9th Cir. 2014) (citations omitted). Although under California state law "the smell of marijuana alone no longer provides a basis for probable cause, when combined with other factors, the smell of marijuana may still support probable cause that a vehicle contains evidence of marijuana activity that remains unlawful under California law." *See United States v. Vasquez*, 2021 WL 3011997, at *2 (9th Cir. July 15, 2021). Meanwhile, under federal law, marijuana possession remains a federal crime, and as discussed further below, the smell of marijuana on federal lands still provides probable cause to suspect a federal crime.

### 1. Did Dell Isola's Failure to Detect Marijuana Preclude Other Rangers Developing Probable Cause for a Search?

Central to Gearheart's argument is that "there was no probable cause to search [Defendant's] vehicle because the discovery of a tobacco water pipe that did not smell like marijuana does not supply probable cause to believe that marijuana or related contraband is in the vehicle." (Doc. No. 8 at 6). Gearheart argues that once Ranger Dell Isola failed to smell marijuana on the pipe, the investigation was effectively over, and the subsequent detection of marijuana on the pipe by three additional Rangers could not provide probable cause for a search. Essentially Gearheart contends that Dell Isola's opinion as to the smell on the glass pipe extinguishes all probable cause. Meanwhile, the Government argues that other rangers besides Ranger Dell Isola could develop probable cause for a search of Gearheart's vehicle and that the investigation was still underway when they did so. (Doc. No. 17 at 16). Both parties cited to various case law on this issue, and this question was discussed at length in the July 10, 2024 evidentiary hearing.

Defense cites *U.S. v. Davis*, 430 F.3d 345 (6th Cir. 2005), to argue that once Ranger Dell Isola failed to detect marijuana, the Rangers lost probable cause to search Defendant's vehicle and any further investigation was impermissible. Essentially, the defense suggests that a "one and done" principle applies to the instant situation—once Dell Isola smelled tobacco all probable cause was lost. In *Davis*, the defendant sought to suppress evidence obtained as the result of a second drug-sniffing dog alerting to the trunk of his car after a first drug-sniffing dog failed to

9

alert to the presence of narcotics in the trunk. *Id.* at 350. Defendant was detained for nearly an hour while the second dog was brought to the scene. *Id*. Police ultimately found no drugs in the vehicle, but documents discovered in the trunk ultimately led police to a storage unit with a large amount of cash, which was later used to convict defendant of drug and money-laundering offenses. *Id.* at 350-51. The trial court denied the defendant's motion to suppress, but the Sixth Circuit reversed, reasoning as follows:

> Once the drug-sniffing dog was brought to the scene and failed to alert positively to the presence of narcotics in the vehicle, the officers' suspicions that Davis was in possession of narcotics were dispelled. Drug-sniffing dogs are highly trained to detect the presence of narcotics, and the dog Rocky did not detect any narcotics in the car. Office Craigin, Rocky's handler, noted during the suppression hearing that Rocky was a qualified, trained, and certified dog. Rocky had been in service as a drug-sniffing dog for approximately three years prior to Davis's stop and underwent training on a continual basis. Officer Craigin testified that Rocky's success rate at accurately identifying the presence of narcotics was over ninety percent. Based upon this information, there were no grounds for the police to continue to believe that the vehicle contained narcotics after Rocky failed to alert.

*Id*. at 356.

At the evidentiary hearing, the Court heard from three Rangers—Christopher Dell Isola, Jacob Blade, and Ian Rippetoe—whose testimony reflected important distinctions between their investigation of Gearheart and the investigation at issue in *Davis*. First and most importantly, Dell Isola explained that he was a trainee under Ranger Blade's supervision on June 12, 2023 when he smelled Gearheart's pipe and failed to detect the smell of marijuana. (Doc. No. 40 at 27:6-18). In fact, Ranger Dell Isola had only one month in the field as of the date of the incident in question. (*Id*. at 7:10-15). Unlike the drug-sniffing dog in *Davis*, Dell Isola's ability to detect drugs in the field was not well-established, even if he was familiar with the smell of marijuana. Indeed, he testified that he was more sensitive to the smell of tobacco given his long use and recent discontinuation of tobacco. Moreover, both Rangers Blade and Rippetoe testified that it was common to double-check the work of trainees like Dell Isola, and given their experience with water pipes like Gearheart's, those two rangers continued to suspect that there were drugs in Gearheart's van. Thus, unlike in *Davis*, here there were "grounds for the police to continue to

10

believe that the vehicle contained narcotics." (*Id*. at 35:12-13; 71:8-10). Further, unlike in *Davis* where the suspect was made to wait nearly an hour for a second drug dog to arrive, *Davis*, 430 F.3d at 350, the investigation here was not prolonged for other Rangers to arrive on the scene to smell the water pipe. Dell Isola was in the process of wrapping up the stop with Defendant Gearheart when, "about a minute"[6] after Dell Isola smelled the pipe, Rangers Hesse, Blade, and Rippetoe all smelled and confirmed the odor of marijuana. (Doc. No. 40 at 35:23-36:3). Thus, the rangers' actions in verifying Dell Isola's work were not unreasonable, both because they "served [an] investigatory purpose" and because they did not involve any additional delay to Defendant. *See Davis*, 430 F.3d at 356.

      At the evidentiary hearing, Defense counsel elicited testimony from Ranger Dell Isola indicating that Ranger Blade told him the pipe was his only basis for probable cause and that if he said it smelled like tobacco, he would lose probable cause. (Doc. No. 40 at 22:1-6). Defense also emphasized that Dell Isola, despite his training status, was considered the "lead officer" at the scene and in charge of the investigation. However, Defendant fails to cite any authority to suggest that only one officer at a scene can develop probable cause or that multiple officers cannot investigate the same evidence and come to different conclusions. Indeed, in *United States v. Avila*, the court found that after one officer conducted two pat downs of a motorist's belly area, it was not a violation of the Fourth Amendment for the second officer to conduct a third pat-down, which ultimately led to the discovery of a concealed weapon. 615 F.Supp.3d 846, 858-61 (N.D. Ill. 2022); *see also United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (noting that "once . . . officers [have] used all of the appropriate means available to them to allay their concerns of criminal activity" they must release a suspect.). Likewise, after Ranger Dell Isola failed to detect marijuana on Gearheart's pipe, Rangers Blade and Rippetoe were not required to ignore their own suspicions that the pipe was in fact used for marijuana and cease all further investigation. This is particularly true given that both Rangers Rippetoe and Blade were far more

---

[6] This estimate is confirmed by the body worn video, which reflects that the other rangers interrupted Ranger Dell Isola approximately 40 seconds after he stated, "I think we're good." (*See* Ex. 2 at 39:30-40:20).

experienced than Dell Isola and doing so was consistent with the common practice of double-checking the work of a trainee. Supervisory Ranger Rippetoe asked Blade to confirm the tobacco smell because he had not previously worked with Dell Isola and he and the other Rangers "all had their doubts that it was tobacco." (Doc. No. 40 at 78:20-25; 70:1-6). Further, Blade as the field training officer independently saw the water pipe before Gearheart exited the van. (Doc. No. 40 at 54:24-25). Blade had participated in "well over 100" marijuana search-related traffic stops. (*Id*. at 33:13-16). Blade recognized Gearheart from a prior interaction where drugs were located in the car in which Gearheart was travelling. (*Id*. at 54:11-18).[7] And despite being medically cleared, Blade considered that Gearheart had fainted for unknown reasons. (*Id*. at 54:19-23). Finally, Blade opined that in over his decade long training, he had "never seen a pipe of that sort being used to use tobacco." (*Id*. at 55:6-9).

Nor is there any legal significance to the fact that Dell Isola was considered the "lead officer" at the scene; while Ranger Blade encouraged Dell Isola to make decisions and take charge of the investigation, this did not change the fact that he was still a trainee and subject to supervision by Ranger Blade. Dell Isola understood that the purpose of the training was to give him "hands-on, on-the-ground experience while still having a more experienced ranger walk [him] through things and help [him] . . . make decisions." (Doc. No. 40 at 28:5-8). Based on the totality of the circumstances, Rangers Blade and Rippetoe smell of the water pipe to confirm whether it smelled of marijuana was reasonable.

////

////

---

[7] Admittedly, none of the drugs located in the car in which Gearheart was a passenger were found on his person or in his belongings, but the vehicle emitted a strong odor of burnt marijuana. *See* Case No. 6:23-po-00079-HBK-1 (Doc. No. 1 at 3). When questioned by Ranger Hesse, "Any marijuana in the vehicle?" Gearheart's brother responded, "We have a little bit of marijuana." (Ex. 2 to Doc. No. 21 at 2:20-2:40). When asked "when's the last time you smoked?" Gearheart's brother responded, "Uh, like this morning." And Gearheart added, "It's been at least like, six hours, at least, like twelve hours." (*Id*. at 2:48-3:00). When Gearheart was later asked by Ranger Hesse, "when's the last time you smoked [marijuana]?" Defendant responded, "Uh, like, last night." (*Id*. at 9:20-9:25). Later, Ranger Blade asked Ranger Hesse, "Do you think the driver's intoxicated?" She replied, "I can't smell anything on his breath. I asked the last time they smoked, they said this morning. The guy in the back, who actually has a driver's license, looks worse." (*Id*. at 36:18-36:40).

2. <u>Did Rangers Blade and Rippetoe Need Defendant's Consent to Smell the Water Pipe?</u>

At oral argument, Defense counsel argued that the inspection of Defendant's pipe by three additional Rangers was improper for the additional reason that Defendant had not consented to their doing so. (Doc. No. 40 at 94:1-95:18). Counsel contended that the Rangers' actions constituted "a new seizure that they no longer had reasonable suspicion for because that had been dispelled by Ranger Dell Isola." (*Id*. at 95:16-18).

It is uncontested that Defendant offered for the Rangers to smell the pipe. (Ex. 2 to Doc. No. 17 at 34:45-35:15). Gearheart's argument is that his consent was limited only to Ranger Dell Isola and that when Rangers Blade, Rippetoe, and Hesse smelled the pipe it exceeded the scope of his consent.

Consent is a well-established exception to the Fourth Amendment's prohibition on warrantless searches. *Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003). Consent can be express or implied, but it must be "unequivocal and specific." *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011). The standard for measuring the scope of consent under the Fourth Amendment is that of "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). In a non-binding decision, our court of appeals indicated that this objectively reasonable standard includes an analysis of whether the suspect "reasonably understood [his] consent to extend to the search conducted." *United States v. Yerger*, 12 F.3d 1110, at *3 (9th Cir. 1993). The government must prove that consent was effectively given. *United States v. Shaibu*, 920 F.2d 1423, 1428 (9th Cir. 1990).

Defense has not cited, nor has the Court located, any case holding that the scope of a search may be limited in terms of *who* may conduct the search, as opposed to the physical scope of the search.[8] To the contrary, in *United States v. Perez*, the Ninth Circuit rejected a similar

---

[8] The Court does not find Defense's citations to *Florida v. Jimeno*, 500 U.S. 248 (1991) and *Florida v. Jardines*, 569 U.S. 1 (2013) to be persuasive. In *Jimeno,* the issue before the court was whether defendant's consent to search a vehicle extended to a bag within the vehicle—an issue only of the physical scope of a search. *See generally Jimeno*, 500 U.S. 248. Meanwhile in *Jardines*, the court considered

13

1  argument. 37 F.3d 510, 515-16 (9th Cir. 1994) overruled on other grounds by *United States v.*
2  *Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007).  In that case, defendant consented to a search of
3  his van, but claimed that having a drug-sniffing dog smell the exterior of the van exceeded the
4  scope of his consent. *Id*.  The court disagreed, reasoning that "the search was not more intrusive
5  than Perez had envisioned when giving his consent, but rather simply more effective." *Perez*, 37
6  F.3d at 515-16.  Here similarly, it is uncontested that the physical scope of the search was not
7  expanded by having three additional rangers inspect Defendant's water pipe.  Thus, the search
8  was not more intrusive than Gearheart had envisioned and did not thereby violate the Fourth
9  Amendment.

10  Moreover, Defendant's pipe was in plain view, both when it was inside his van, and after
11  he removed it for inspection by one or more rangers.  "If an article is already in plain view,
12  neither its observation nor its seizure would involve any invasion of privacy." *Horton v.*
13  *California*, 496 U.S. 128 (1990).  Defense implied that under the plain view doctrine, officers
14  could only engage in "passive observation" of the water pipe, but this is contrary to well-settled
15  law that law enforcement officers may also seize such items so long as their incriminating nature
16  is "readily apparent." *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971).  Despite Ranger
17  Dell Isola's examination of the pipe, Rangers Blade and Rippetoe testified that they continued to
18  suspect the water pipe was used for marijuana. (*See* Doc. No. 40 at 55:8-12) ("In my training and
19  experience over a decade, I've never seen a pipe of that sort used to use tobacco."); (Doc. No. 40
20  at 79:6-9) ("I think we all had our doubts that it was tobacco . . . It would be very unusual for
21  somebody to smoke tobacco out of a bong – not impossible, but very unusual.").  Because the
22  incriminating nature of the pipe was apparent to Officers Blade and Rippetoe, even assuming
23  Gearheart's consent did not extend to them, those officers could legally inspect and seize the pipe
24  under the plain view doctrine. *See Horton*, 496 U.S. at 134.
25  ////

---

27  whether a warrantless sniff of defendant's front porch by a drug-sniffing dog constituted a search under the Fourth Amendment. *See generally Jardines*, 569 U.S. 1.  Neither case holds that having multiple officers examine the same piece of evidence impermissibly expands the scope of a search or that
28  subsequent examinations after the first inspection constitutes a new seizure.

### 3. Did Rangers Have Probable Cause to Believe There Was Additional Contraband in the Vehicle?

Gearheart next contends that, even if the Rangers smelled marijuana on Gearheart's water pipe, "the probable cause regarding contraband would not extend further than the seized water pipe itself. No marijuana smell or other objective facts pointed to probable cause to find further contraband once the pipe was seized." (Doc. No. 8 at 6).

This argument is contrary to applicable law. The notion that law enforcement officers should assume that contraband in plain view in a vehicle is the only illicit item to be found in the vehicle is also contrary to common sense. As noted above, the mere sound of a glass pipe that an officer suspects is drug-related paraphernalia can justify the search of a vehicle for contraband. *Alvarez*, 2023 WL 6567602 at *1. Indeed, where an officer observes drug paraphernalia and what he reasonably believes to be drugs in plain view in a vehicle, he has authority to search the entire vehicle and any containers within it under the automobile exception. *United States v. Gage*, 423 F. Supp. 3d 984, 989 (D. Idaho 2019), aff'd, 845 F. App'x 571 (9th Cir. 2021).

### 4. Does the Decriminalization of Marijuana Possession Render the Rangers' Actions Unconstitutional

Finally, Gearhart contends that the decriminalization of simple marijuana possession in California, various executive actions reflecting *de facto* decriminalization of simple possession of marijuana, and scarce enforcement of marijuana offenses by federal prosecutors effectively divested the rangers of probable cause, because the smell of burnt marijuana alone does not indicate that a crime has been or is about to be committed. (Doc. No. 8 at 11-12). As Gearheart concedes, the incident occurred on federal land and marijuana remains illegal under federal law. (*Id*. at 12); *see also* 21 U.S.C. § 801, et. seq. Gearheart fails to cite any authority to support his contention that the presence of marijuana or paraphernalia on federal lands no longer support probable cause. Nor is the Court aware of any such authority and, indeed, has previously rejected this argument. *See e.g., United States v. Tolmosoff*, No. 6:23-PO-00187-HBK-1, 2024 WL 2022554, at *6 (E.D. Cal. May 7, 2024), decision clarified on reconsideration, No. 6:23-PO-00187-HBK-1, 2024 WL 2114839 (E.D. Cal. May 10, 2024). Moreover, as the Government

1  notes, while federal prosecutors rarely prosecute marijuana offenses, this is an act of prosecutorial

2  discretion that does not divest law enforcement of authority to investigate potential federal

3  crimes.[9]  (Doc. No. 17 at 17).

4  Ultimately, in determining whether to prolong or expand an investigation, officers look to

5  the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).  In this

6  case that included Ranger Dell Isola's inspection of the water pipe, which did not detect the odor

7  of marijuana on the water pipe, and the smell and inspection of the pipe by three other more

8  experienced rangers, which did detect such an odor.  Based on the totality of the circumstances,

9  the Rangers were justified in suspecting that Gearheart's vehicle contained additional drugs or

10  contraband and thus their search did not violate the Fourth Amendment.

11  **C.  Whether *Miranda* Was Triggered During Plaintiff's Detention**

12  "The procedural protections afforded by *Miranda v. Arizona*, 384 U.S. 436 (1966), are

13  designed to secure an accused's privilege against self-incrimination and are triggered only in the

14  event of a custodial interrogation." *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir.

15  1985).  "A defendant is in custody when, based upon a review of all the pertinent facts, 'a

16  reasonable innocent person in such circumstances would conclude that after brief questioning he

17  or she would not be free to leave.'" *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981).

18  In making this determination, courts consider factors including "(1) the language used to

19  summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt,

20  (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the

21  degree of pressure applied to detain the individual." *United States v. Crisco*, 725 F.2d 1228, 1231

22  (9th Cir. 1984).  Meanwhile, "interrogation may be 'either express questioning or its functional

23  equivalent,' and . . . include[s] any statements or actions 'that the police should know are

24  reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Booth*,

25  669 F.2d 1231, 1237–38 (9th Cir.1981) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01

---

[9] Moreover, Gearheart assumes that drug paraphernalia could only provide evidence of simple marijuana possession (which remains a federal crime, although rarely prosecuted).  However, paraphernalia could also be indicative of a more serious drug-related offense, and law enforcement officers had probable cause at this stage to suspect such an offense.

16

(1980)).

Gearheart contends here that he was in custody "if not when he was initially frisked for weapons by Ranger Dell Isola, then at the latest at the 34:12-minute mark [of the body-worn camera recording], when he was initially ordered to get his dog out of the vehicle so that it could be searched and forced to stand under ranger supervision while the search ensued." (Doc. No. 8 at 14).[10] Gearheart points to various factors as supporting a finding of custody, including the presence of eight armed rangers during much of Gearheart's stop, the nearly 2-hour duration of the stop, and Gearheart being directed in his movements and supervised by rangers during the search of his vehicle. (*Id*.).

The Court agrees that the relatively lengthy duration of Gearheart's stop and the presence of multiple Rangers weighs in favor of a finding of custody. However, the Court also agrees with the Government that both the presence of additional officers and duration of the stop was due in significant part to Gearheart's need for medical attention and the complicating presence of a large dog that Gearheart described as not friendly. Thus, it is not apparent that the duration of the stop was excessive.

The Court finds that a review of the other four factors, on balance, weighs against a finding of custody.

Turning to the language used to "summon" Gearheart, where the Ninth Circuit has found an interrogation non-custodial, it has "emphasized that the defendant 'agreed to accompany' officers to the police station or to an interrogation room." *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) citing *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) and *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). Here, there was no obvious interrogation that occurred during the stop. Gearheart volunteered to exit the van rather than being summoned, volunteered to be searched for weapons, and the Rangers did not otherwise use coercion or intimidation to conduct their investigation. Thus, this factor weighs

---

[10] Defendant does not dispute that, as reflected in Ranger Dell Isola's Report, that Ranger Dell Isola read him his *Miranda* rights after placing him under arrest and in the back seat of his patrol vehicle, nor that all questioning ceased after Defendant stated that he would talk to Rangers "with the Yosemite Valley public defender present." (*See* Doc. No. 8-1 at 3).

17

against a finding of custody.

The second factor considers "the extent to which the defendant was confronted with evidence of guilt." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). The Ninth Circuit has found a defendant to be in custody "when the interrogator adopts an aggressive, coercive, and deceptive tone." For example, in *United States v. Beraun–Panez*, 812 F.2d 578, 579 (9th Cir.1987), "[t]he officers demanded to know why [Beraun-Panez] was lying and said they knew the truth. They told him that witnesses had placed him at the scene, even though their two witnesses had in fact stated only that they had seen a tan truck, like [the one] that *Beraun–Panez* used, within several miles of [the site of the alleged crime]." *See also United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir.1985) ("The questioning progressed for over an hour and turned accusatory—Wauneka was told that he supplied information that only a perpetrator would know, that he matched the description of the rapist, and that he had better tell the truth."); *but see United States v. Craighead*, 539 F.3d 1073, 1078 (9th Cir. 2008) (finding custodial interrogation even though FBI agent questioned suspect without making any threats or promises to induce him to speak, where questioning occurred in suspect's home in presence of eight armed officers from three agencies wearing flak jackets and some had unholstered their weapons). Here, Gearheart does not argue that he was confronted with evidence of his guilt of any crime, much less that it was done in an aggressive, coercive, or deceptive tone. When the Rangers asked Gearheart about the water pipe, he asserted it was used for smoking tobacco, and Dell Isola initially accepted this representation rather than challenging Gearheart. *See Bassignani*, 575 F.3d at 884 (no custody "when the officers did not attempt to challenge [the defendant's] statements with other known facts suggesting his guilt, [but] merely asked [him] about the allegations" (citation and internal quotation marks omitted)). Thus, this factor also weighs against a finding of custody.

Turning to the physical surroundings during Gearheart's stop, the Ninth Circuit has held that "an interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody . . . [h]owever . . . isolating the defendant from the outside world" creates an inference of coercion. *Bassignani*, 575 F.3d at 885 (9th Cir. 2009) (citations and internal quotations omitted). Here, Gearheart's discussions with the rangers occurred in a pullout

along a main thoroughfare of a National Park, a short distance from his van. *See*, *e.g., United States v. Kapahu*, 729 F.App'x 600, 601 (9th Cir. 2018) (no custody where defendant was "questioned for only a few minutes in a public part of the airport."). While Gearheart points out that no non-law enforcement individuals are visible during the encounter, this largely reflects the late hour and does not indicate that the Rangers intentionally isolated Gearheart in a manner that would indicate coercion. The fact that eight officers were present at the scene for a significant part of the encounter does not by itself establish a custodial setting. *See, e.g., United States v. Bueno-Martinez*, 2009 WL 10678622, at *3 (E.D. Wash. Apr. 28, 2009), aff'd, 443 F. App'x 249 (9th Cir. 2011) ("Though several officers were on the scene, Defendant was not handcuffed, nor had he been arrested. The officers, while armed, did not have their guns drawn, nor were they physically intimidating towards the Defendant."). Here, the Rangers occasionally directed Gearheart where to sit or stand, but the interactions do not indicate coercion or intimidation. Overall, this factor is neutral or weighs against a finding of custody.

Finally, the lack of any physical pressure to detain Gearheart, such as handcuffs or placement in a police vehicle, and the fact that Gearheart was not told he was under arrest, also weighs against a finding of custody. *See, e.g. United States v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009) (weighing factor against custody where defendant was neither handcuffed nor told he was under arrest); *United States v. Castillo*, 312 F. App'x 891, 892 (9th Cir. 2009) (no custody where defendant "was not handcuffed, placed in [a] police car, or otherwise physically detained.").

Even assuming arguendo that Gearheart was in custody during some portion of the stop, he fails to establish that he was subject to interrogation during that time. His motion does not indicate what questions from the rangers a police officer "should know are reasonably likely to elicit an incriminating response from the suspect.'" *Booth*, 669 F.2d at 1237–38. It is well-settled that the defendant carries the burden of proof in a motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). It is not the role of the Court to garner from the evidence submitted an argument that the rangers engaged in such a line of questions. Gearheart argues that due to the Government's delay in providing the large volume of body worn camera footage, he was unable to review the footage and specifically identify what statements or

questions indicate interrogation. However, to the extent Gearheart needed additional time to file the Motion to Suppress or a Reply to the Government's Opposition, he could have filed an appropriate motion but elected not to do so. Moreover, given that the Court has found Gearheart was not in custody at any point prior to being *Mirandized*, his failure to establish interrogation is moot.

## CONCLUSION

Based upon a review of the record and evidence, the Court finds no basis to suppress the evidence obtained from the search of Gearheart's vehicle or to suppress Gearheart's statements to Rangers prior to being given *Miranda* warnings.

Accordingly, it is **ORDERED**:

1. Defendant Gearhearts' Motion to Suppress (Doc. No. 8) is **DENIED**.
2. The Court sets this case for a status conference for **September 10, 2024 at 10:00 A.M.**

Dated:   August 16, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

20